LeCLAIR RYAN, a Professional Corporation
Andrew J. Frisch, Esq.
830 Third Avenue
New York, New York 10022
Telephone: (212) 430-8031
Facsimile:  (212) 430-8061

Attorneys for Defendant
  Life Partners Holdings, Inc.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MAXIM GROUP LLC,

                         Plaintiff,                    07 CV 8099 (LAP)

            - against -
                                                       **NOTICE OF MOTION**

LIFE PARTNER HOLDINGS, INC.,

                         Defendant.
_____


        PLEASE TAKE NOTICE THAT, upon the Complaint in the above-

captioned action (Exhibit 1), a Declaration of R. Scott Peden, Esq. and a Memorandum of

Law electronically filed today, defendant Life Partners Holdings, Inc. will move this

Court, before the Honorable Loretta A. Preska, at the United States Courthouse, 500

Pearl Street, New York, New York, at a date and time to be set by the Court, for an Order

pursuant to Federal Rule of Civil Procedure 56(a) granting summary

judgment to defendant, and for such other and further relief as this Court may deem just

and proper.

Dated:  December 5, 2007
        New York, New York

                                       Respectfully submitted,

                                       **LeClairRyan**,
                                       A Professional Corporation
                                       Attorneys for Defendant
                                          Life Partners Holdings, Inc.

                         By: /s/ Andrew J. Frisch
                                     Andrew J. Frisch (AF-9393)
                                     830 Third Avenue
                                     New York, New York 10022
                                     (212) 430-8031

                                   Robert P. Howard, Jr.
                                   1101 Connecticut Avenue, N.W.
                                   Washington, D.C. 20036
                                   (202) 659-6707
                                     Of Counsel

To:  Matthew F. Schwartz, Esq.
     Schwartz & Ponterio, PLLC
     Attorneys for Plaintiff Maxim Group LLC
     134 West 29th Street
     New York, New York 10001

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MAXIM GROUP LLC,

                              Plaintiff,

      -against-

LIFE PARTNER HOLDINGS, INC.,

                              Defendant.
------------------------------------------------------------x

JUDGE PRESKA

**07 CIV 8099**

Dkt. No.

COMPLAINT

RECEIVED
SEP 14 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Maxim Group LLC, by its attorneys, Schwartz & Ponterio, PLLC, as and for its

Complaint against defendant Life Partner Holdings, Inc., alleges, upon personal knowledge and

upon information and belief, as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in

that plaintiff is a citizen of New York and defendant is a citizen of Texas and the amount in

controversy exceeds $75,000.

2.      Venue in this judicial district is appropriate pursuant to 28 U.S.C. §§ 1391(a)(1)

and 1391(a)(2).

### The Parties

3.      Plaintiff Maxim Group LLC ("Maxim") is a limited liability company formed

under the laws of the State of New York.  Maxim is a citizen of the State of New York.

4.      Upon information and belief, defendant Life Partner Holdings, Inc. ("LPHI") is a

corporation organized and existing under the laws of the State of Texas.  Upon information and

belief, LPHI was incorporated in the state of Texas on September 10, 1991 and is a citizen of the

State of Texas.

## The Contract

5.      Maxim is an investment banking, securities and investment management firm that is registered as a broker-dealer with the U.S. Securities and Exchange Commission and is a member of, *inter alia*, the Financial Industry Regulatory Authority.  Amongst other undertakings, Maxim regularly provides both public and private companies with certain or all of the following specialized areas of expertise: corporate finance, mergers and acquisitions and corporate advisory services.

6.      On or about October 24, 2004, Maxim and LPHI entered a written contract (the "Contract") under which Maxim agreed to provide general financial advisory and investment banking services to LPHI.  A copy of the Contract is annexed as Exhibit A.

7.      Among other things, the Contract outlined: (1) the services to be performed by Maxim; (2) the term of the agreement; (3) the compensation due Maxim for its performance; (4) the reimbursement of Maxim's expenses; and (5) the provisions for termination.

8.      Specifically, under Section 1 of the Contract, Maxim agreed to provide the following services to LPHI: (a) Maxim agreed to familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of LPHI; (b) Maxim agreed to advise LPHI on matters relating to its capitalization; (c) Maxim agreed to evaluate alternative financing structures and arrangements for LPHI; (d) Maxim agreed to assist LPHI in developing appropriate acquisition criteria and identifying target industries; (e) Maxim agreed to assist LPHI in evaluating, and make recommendations concerning, the relationships among its various lines of business and potential areas for business growth; and (f) Maxim agreed to provide such other financial advisory and investment banking services upon which the parties mutually agreed.

2

9.      In return for these services, under Section 3 of the Contract, LPHI agreed to compensate Maxim as follows: (a) payment of a non-refundable fee of $25,000 payable upon execution of the Contract; (b) granting Maxim a warrant ("Warrant") to purchase 100,000 shares of LPHI common stock exercisable at any time during the five-year period commencing on the date of the Contract at an exercise price of $7.00 per share. The foregoing compensation terms were tied only to Maxim's performance of the services outlined in Section 1 of the Contract and were not contingent on the achievement of any particular result.

## Maxim Honors its Contractual Obligations

10.      Throughout the term of the Contract, Maxim worked faithfully and diligently in accordance with the terms of its agreement and fully performed all of its obligations under the Contract.

11.      Notwithstanding the foregoing and Maxim's efforts, LPHI was unable to avail itself of the opportunities introduced by Maxim.

12.      Following the initial six-month term of the Contract, LPHI stopped communicating with Maxim and requested no further services.

## LPHI Breaches the Contract

13.      LPHI made the initial payment of $25,000 but failed to deliver the Warrant as required in the Contract.

14.      Maxim has duly demanded that LPHI deliver the Warrant as required under the Contract.

15.      Despite due demand, LPHI has refused to deliver the Warrant pursuant to the provisions of the Contract and has indicated that it will not honor its obligations.

3

### First Cause of Action
(Breach of Contract)

16.    Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 15 above as though fully set forth herein.

17.    For its part, plaintiff has faithfully and fully performed all of its duties and obligations in accordance with the terms of the Contract and all conditions precedent have been performed or have occurred.  Plaintiff has performed all conditions, covenants and promises to be performed on its part in accordance with the terms and conditions of the Contract, except to the extent said performance has been excused or rendered impossible by defendant

18.    LPHI has breached the Contract by failing and refusing to deliver the Warrant, despite its clear obligation to do so under the Contract.

19.    As a result of LPHI's failure to deliver the Warrant as described above, plaintiff has been damaged and demands judgment against defendant in an amount to be determined at or before trial, but in no event less than Five Million Dollars ($5,000,000.00), with pre-judgment interest at the legal rate from October 24, 2004.

### Second Cause of Action
(Specific Performance)

20.    Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1 through 19 above as though fully set forth herein.

21.    At all times relevant to this action, plaintiff performed all services required under the Contract.

22.    There is an actual controversy existing between plaintiff and the defendant, who has benefited from the services performed by plaintiff, and who is refusing to compensate plaintiff.

23.    Plaintiff has been damaged by defendant's wrongful failure to honor the terms of the Contract, and has no adequate remedy at law.

24.    In light of the foregoing, plaintiff seeks specific performance by defendant of its duties under the Contract.

25.    As a proximate result of defendants' breach, plaintiff has suffered damages in an amount according to proof at time of trial.  However, plaintiff has no adequate legal remedy in that their damages cannot be properly ascertained such that any damage award will be inadequate to compensate plaintiff for the harm it has suffered.

26.    Accordingly, plaintiff requests that defendant be ordered to, *inter alia*, specifically perform its duties and obligations under the Contract.

27.    Specifically, plaintiff requests that the Court enter an order declaring the Contract to be in full force and effect, and compelling specific performance by defendant Life Partner Holdings, Inc. to issue and deliver to plaintiff Maxim Group LLC the Warrant to purchase 100,000 shares of LPHI common stock exercisable at any time prior to October 24, 2009 at an exercise price of $7.00 per share.

WHEREFORE, plaintiff Maxim Group LLC demands judgment against defendant Life Partner Holdings, Inc. as follows:

A)     on the First Cause of Action, awarding plaintiff Maxim Group LLC damages in an amount to be determined at trial but in no event less than Five Million Dollars ($5,000,000.00), with pre-judgment interest at the legal rate from October 24, 2004; and

B)     on the Second Cause of Action, an order by this Court declaring the Contract to be in full force and effect, and compelling specific performance by defendant Life Partner Holdings, Inc. to deliver to plaintiff Maxim Group LLC the Warrant to purchase 100,000 shares of LPHI common stock exercisable at any time prior to October 24, 2009 at an exercise price of $7.00 per share; and

C)     awarding such other further and different relief as the Court deems just and proper.

Dated: New York, New York
        September 14, 2007

                              SCHWARTZ & PONTERIO, PLLC
                              *Attorneys for Plaintiff*

By:     *[signature]*
                              _____
                              Matthew F. Schwartz (MS 9843)
                              134 West 29th Street – Suite 1006
                              New York, New York 10001
                              Telephone: (212) 714-1200

# EXHIBIT A



*Private and Confidential*

October 25, 2004

Mr. Brian Pardo
Chairman & CEO
Life Partners Holdings, Inc.
204 Woodhew
Waco, TX 76712

Dear Mr. Pardo:

     We are pleased that Life Partners Holdings, Inc., a Texas corporation ("**LPHI**" or the "**Company**") has decided to retain Maxim Group LLC ("**Maxim**") to provide general financial advisory and investment banking services to the Company as set forth herein. This letter agreement ("**Agreement**") will confirm Maxim's acceptance of such retention and set forth the terms of our engagement.

     1.    <u>Retention</u>.  The Company hereby retains Maxim, during the term of this agreement, as its exclusive financial advisor and investment banker (said exclusivity shall be subject to the exceptions set forth in this paragraph) to provide general financial advisory and investment banking services, and Maxim accepts such retention on the terms and conditions set forth in this Agreement. In such capacity, Maxim shall: (i) familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of the Company; (ii) advise the Company on matters relating to its capitalization; (iii) evaluate alternative financing structures and arrangements; (iv) assist the Company in developing appropriate acquisition criteria and identifying target industries; (v) assist the Company in evaluating and make recommendations concerning the relationships among the Company's various lines of business and potential areas for business growth; and (vi) provide such other financial advisory and investment banking services upon which the parties may mutually agree. Notwithstanding anything to the contrary in this agreement, the parties hereto agree that this agreement shall not apply to any pre-existing relationship or agreement for utilization of the Company's services (either directly or indirectly), debt, letter of credit, warehouse line of credit or any other form of debt structure involving CapSource, Shinsei Bank, Sumiutomo Bank, any affiliate thereof or any other lender or lender affiliate introduced to the Company under any formal or informal agreement entered into prior to the execution of this agreement.

     2.    <u>Information</u>.   In connection with Maxim's activities hereunder, the Company will cooperate with Maxim and furnish Maxim upon request with all information regarding the business, operations, properties, financial condition, management and prospects of the Company (all such information so furnished being the "**Information**") which Maxim deems appropriate and will provide Maxim with access to the Company's officers, directors, employees, independent accountants and legal counsel. The Company represents and warrants to Maxim that all Information made available to Maxim hereunder will be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are or will be made. The Company further represents and warrants that any projections and other forward-looking information provided by it to Maxim will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable.   The Company recognizes and confirms that Maxim: (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated



by this Agreement without having independently verified the same; (ii) does not assume responsibility for the accuracy or completeness of the Information and such other information; and (iii) will not make an appraisal of any assets of the Company. Any advice rendered by Maxim pursuant to this Agreement may not be disclosed publicly without Maxim's prior written consent. Maxim hereby acknowledges that certain of the Information received by Maxim may be confidential and/or proprietary, including Information with respect to the Company's technologies, products, business plans, marketing, and other Information which must be maintained by Maxim as confidential. Maxim agrees that it will not disclose such confidential and/or proprietary Information to any other companies in the industry in which the Company is involved.

    3.   <u>Compensation</u>. As consideration for Maxim's services pursuant to this Agreement, Maxim shall be entitled to receive, and the Company agrees to pay Maxim, the following compensation:

    (a)   (i) a non-refundable cash fee of $25,000 payable upon execution of this Agreement ("**Initial Advisory Fee**"), and (ii)The Company shall grant to Maxim a warrant ("**Warrant**") to purchase 100,000 shares of the Company's common stock. The Warrant shall be exercisable at any time during the five-year period commencing on the date hereof at an exercise price of $7.00 per share. The Warrant shall provide for immediate registration at the optionee's expense as well as other provisions, including, without limitation, those pertaining to cashless exercise, anti-dilution protection and piggyback registration rights, contained in the Warrant certificates delivered to the Company together with this Agreement. The fees appearing in <u>Exhibit B</u> (hereto, the "**Fee Schedule**") shall be earned by and paid to Maxim by the Company in connection with financings or transactions undertaken by the Company, the terms of which will be will be mutually agreed upon under separate advisory, placement agency and/or underwriting agreements.

    (b)   The Company and Maxim acknowledge and agree that, in the course of performing services hereunder, Maxim may introduce the Company to third parties who utilize the services of the Company to purchase life settlements for the third party's own account (a "**Financing**") or in entering into a transaction with the Company other than for the usual and customary services provided by the Company to its clients, including, without limitation, a merger, acquisition or sale of stock or assets (in which the Company may be the acquiring or the acquired entity), joint venture, strategic alliance or other similar transaction (any such transaction, a "**Transaction**").

    The Company agrees that if within eighteen (18) months from the effective date of the termination of this Agreement either the Company or any party to whom the Company was introduced by Maxim or who was contacted by Maxim in connection with its services for the Company hereunder proposes a Financing or any Transaction involving the Company and Maxim is not engaged as the Company's exclusive financial advisor, agent and/or investment banker in connection with such Financing or Transaction pursuant to Section 6 hereof, then, if any such Financing or Transaction is consummated, the Company shall pay to Maxim fees in accordance with the Fee Schedule.

    Such fees shall be payable to Maxim in cash at the closing or closings of the



Financing or Transaction to which it relates.

The amount of consideration paid in a Transaction shall include, for purposes of calculating such fee, all forms of consideration paid or received, directly or indirectly, by the Company and/or its stockholders in such Transaction, including, without limitation, cash, securities, notes or other evidences of indebtedness, assumption of liabilities (whether by operation of law or otherwise), or any combination thereof. If all or portion of the consideration paid in the Transaction is other than cash or securities, then the value of such non-cash consideration shall be the fair market value thereof on the date the Transaction is consummated as mutually agreed upon in good faith by the Company and Maxim. If such non-cash consideration consists of common stock, options, warrants or rights for which a public trading market existed prior to the consummation for the Transaction, then the value of such securities shall be determined based upon the closing or last sales price thereof on the date of the consummation of the Transaction. If such non-cash consideration consists of newly-issued, publicly-traded common stock, options, warrants or rights for which no public trading market existed prior to the consummation of the Transaction, then the value thereof shall be the average of the closing prices for the 20 trading days subsequent to the fifth trading day after the consummation of the Transaction. In such event, the fee payable to Maxim pursuant to this Section 3 shall be paid on the 30th trading day subsequent to consummation of the Transaction. If no public market exists for the common stock, options, warrants or other rights issued in the Transaction, then the value thereof shall be as mutually agreed upon in good faith by the Company and Maxim. If the non-cash consideration paid in the Transaction consists of preferred stock or debt securities (regardless of whether a public trading market existed for such preferred stock or debt securities prior to consummation of the Transaction or exists thereafter), the value thereof shall be the maximum liquidation value (without regard to accrued dividends) of the preferred stock or the principal amount of the debt securities, as the case may be.

Any amounts payable by a purchaser to the Company, any stockholder of the Company or an affiliate of either the Company or any stockholder of the Company in connection with a non-competition, employment, consulting, licensing, supply or other agreement (or payable by the Company if the Company is the acquiring entity) shall be deemed to be part of the consideration paid in the Transaction. If all or a portion of the consideration payable in connection with the Transaction includes contingent future payments, then the Company shall pay to Maxim an additional cash fee, determined in accordance with this Section 3, as, when and if such contingency payments are received. However, in the event of an installment purchase at a fixed price and fixed time schedule, the Company agrees to pay Maxim, upon consummation of such Transaction, an additional cash fee, determined in accordance with this Section 3 based upon the present value of such installment payments using a discount rate of 10%. If with respect to any non-cash consideration the Company and Maxim are unable to agree on the fair market value thereof, then such value shall be determined by submission of the question to a reputable appraisal firm with experience valuing property of the nature of the subject consideration acceptable to the Company and Maxim (the fees and

# MAXIM GROUP

expenses of whom shall be borne equally by the Company and Maxim).

4. **Expenses**. In addition to payment to Maxim of the compensation set forth in Section 3 hereof, the Company shall promptly upon request from time to time reimburse Maxim for all reasonable expenses (including, without limitation, fees and disbursements of counsel and all travel and other out-of-pocket expenses) incurred by Maxim in connection with its engagement hereunder. Maxim will provide the Company an invoice and copies of receipts pursuant to its expenses and such expenses shall not exceed $5,000 without prior authorization of the Company; provided that the foregoing limitation and consent shall not apply to legal fees.

5. **Indemnification**. The Company agrees to indemnify Maxim in accordance with the indemnification and other provisions attached to this Agreement as <u>Exhibit A</u> (the "**Indemnification Provisions**"), which provisions are incorporated herein by reference and shall survive the termination or expiration of this Agreement.

6. **Future Rights**. As additional consideration for its services hereunder and as an inducement to cause Maxim to enter into this Agreement, if at any time during the term of this Agreement or within eighteen (18) months from the effective date of the termination of this Agreement, the Company proposes to effect a public offering of its securities or a Financing or Transaction or to engage an investment banking firm to provide any other services to the Company (other than during the term of this Agreement the services to be provided by Maxim hereunder), the Company shall offer to retain Maxim as manager of such offering, or as its exclusive advisor, agent and/or investment banker in connection with such Financing, Transaction or other matter, upon such terms as the parties may mutually agree, such terms to be set forth in a separate engagement letter or other agreement between the parties. Such offer shall be made in writing in order to be effective. The Company shall not offer to retain any other investment banking firm in connection with any such offering, Financing, Transaction or other matter on terms more favorable than those discussed with Maxim without offering to retain Maxim on such more favorable terms. Maxim shall notify the Company within 30 days of its receipt of the written offer contemplated above as to whether or not it agrees to accept such retention. If Maxim should decline such retention, the Company shall have no further obligations to Maxim, except as specifically provided for herein.

7. **Other Activities**. The Company acknowledges that Maxim has been, and may in the future be, engaged to provide services as an underwriter, placement agent, finder, advisor and investment banker to other companies in the industry in which the Company is involved. Subject to the confidentiality provisions of Maxim contained in Section 2 hereof, the Company acknowledges and agrees that nothing contained in this Agreement shall limit or restrict the right of Maxim or of any member, manager, officer, employee, agent or representative of Maxim, to be a member, manager, partner, officer, director, employee, agent or representative of, investor in, or to engage in, any other business, whether or not of a similar nature to the Company's business, nor to limit or restrict the right of Maxim to render services of any kind to any other corporation, firm, individual or association. Maxim may, but shall not be required to, present opportunities to the Company.

8. **Termination; Survival of Provisions**. The term of this agreement shall be six (6) months after which time this agreement shall continue on a month to month basis during which either Maxim or LPHI may terminate this Agreement at any time upon 30 days' prior written notice to the other party. In the event of such termination, the Company shall pay and deliver to Maxim: (i) all compensation earned through the date of such termination ("**Termination Date**") pursuant to any provision of Section 3 hereof, and (ii) all compensation which may be earned by Maxim after the



Termination Date pursuant to Section 3 hereof, and shall reimburse Maxim for all expenses incurred by Maxim in connection with its services hereunder pursuant to Section 4 hereof. All such fees and reimbursements due to Maxim pursuant to the immediately preceding sentence shall be paid to Maxim on or before the Termination Date (in the event such fees and reimbursements are earned or owed as of the Termination Date) or upon the closing of a Financing or Transaction or any applicable portion thereof (in the event such fees are due pursuant to the terms of Section 3 hereof). Notwithstanding anything expressed or implied herein to the contrary: (i) any Agency Agreement entered into between Maxim and the Company may only be terminated in accordance with the terms thereof, notwithstanding an actual or purported termination of this Agreement, and (ii) the terms and provisions of Sections 3, 4, 5 (including, but not limited to, the Indemnification Provisions attached to this Agreement and incorporated herein by reference), 6, 7, 8, 9, 10 and 15 shall survive the termination of this Agreement.

9.    Notices. All notices provided hereunder shall be given in writing and either delivered personally or by overnight courier service or sent by certified mail, return receipt requested, or by facsimile transmission, if to Maxim, to Maxim Group LLC, 99 Sunnyside Boulevard Extension, Woodbury, New York 11797, Attention: Edward L. Rose, Esq., General Counsel, Fax No. (516) 364-1310, and if to the Company, to the address, set forth on the first page of this Agreement, Attention: Brian Pardo. Any notice delivered personally or by fax shall be deemed given upon receipt (with confirmation of receipt required in the case of fax transmissions); any notice given by overnight courier shall be deemed given on the next business day after delivery to the overnight courier; and any notice given by certified mail shall be deemed given upon the second business day after certification thereof.

10.    Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein, without regard to conflicts of law principles. Without submitting to the general jurisdiction of any state other than the state in which each party is domiciled, both parties agree and submit to the jurisdiction of any United States District Court in which the plaintiff is domiciled for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, which is brought by or against the Company, and agrees that service of process in connection with any such suit, action or proceeding may be made upon the Company in accordance with Section 9 hereof. The parties hereby expressly waive all rights to trial by jury in any suit, action or proceeding arising under this Agreement.

11.    Amendments. This Agreement may not be modified or amended except in a writing duly executed by the parties hereto.

12.    Headings. The section headings in this Agreement have been inserted as a matter of reference and are not part of this Agreement.

13.    Successors and Assigns. The benefits of this Agreement shall inure to the parties hereto, their respective successors and assigns and to the indemnified parties hereunder and their respective successors and assigns, and the obligations and liabilities assumed in this Agreement shall be binding upon the parties hereto and their respective successors and assigns. Notwithstanding anything contained herein to the contrary, neither Maxim nor the Company shall assign any of its obligations hereunder without the prior written consent of the other party.

14.    No Third Party Beneficiaries. This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person or entity not a party hereto, except those entitled to the benefits of the Indemnification Provisions. Without limiting the foregoing, the Company acknowledges



and agrees that Maxim is not being engaged as, and shall not be deemed to be, an agent or fiduciary of the Company's stockholders or creditors or any other person by virtue of this Agreement or the retention of Maxim hereunder, all of which are hereby expressly waived.

15.    Waiver. Any waiver or any breach of any of the terms or conditions of this Agreement shall not operate as a waiver of any other breach of such terms or conditions or of any other term or condition, nor shall any failure to insist upon strict performance or to enforce any provision hereof on any one occasion operate as a waiver of such provision or of any other provision hereof or a waiver of the right to insist upon strict performance or to enforce such provision or any other provision on any subsequent occasion. Any waiver must be in writing.

16.    Counterparts. This Agreement may be executed in any number of counterparts and by facsimile transmission, each of which shall be deemed to be an original instrument, but all of which taken together shall constitute one and the same agreement. Facsimile signatures shall be deemed to be original signatures for all purposes.

[Signature Page Follows]

**MAXIM** GROUP

If the foregoing correctly sets forth our agreement, please sign the enclosed copy of this Agreement in the space provided below and return it to us.

Very truly yours,

By: _____
Managing Director

MAXIM GROUPIXC

By: _____
Clifford A. Teller
Managing Director

**Agreed to and accepted this** ____ **day of October, 2004**

LIFE PARTNERS HOLDINGS, INC.

By: _____
Brian Pardo
Chairman & CEO



### Exhibit A

### INDEMNIFICATION PROVISIONS

Capitalized terms used in this Exhibit shall have the meanings ascribed to such terms in the Agreement to which this Exhibit is attached.

Life Partners Holdings, Inc. agrees to indemnify and hold harmless Maxim and each of the other Indemnified Parties (as hereinafter defined) from and against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, and any and all actions, suits, proceedings and investigations in respect thereof and any and all legal and other costs, expenses and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise (including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing, pursing or defending any such action, suit, proceeding or investigation (whether or not in connection with litigation in which any Indemnified Party is a party)) (collectively, "Losses"), directly or indirectly, caused by, related to, based upon, arising out of, or in connection with, Maxim's acting for the Company, including, without limitation, any act or omission by Maxim in connection with its acceptance of or the performance or non-performance of its obligations under the Agreement between the Company and Maxim to which these indemnification provisions are attached and form a part (the "Agreement"), any breach by the Company of any representation, warranty, covenant or agreement contained in the Agreement (or in any instrument, document or agreement relating thereto, including any Agency Agreement), or the enforcement by Maxim of its rights under the Agreement or these indemnification provisions, except to the extent that any such Losses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of the Indemnified Party seeking indemnification hereunder. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of Maxim by the Company or for any other reason, except to the extent that any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.

These Indemnification Provisions shall extend to the following persons (collectively, the "**Indemnified Parties**"): Maxim, its present and former affiliated entities, managers, members, officers, employees, legal counsel, agents and controlling persons (within the meaning of the federal securities laws), and the officers, directors, partners, stockholders, members, managers, employees, legal counsel, agents and controlling persons of any of them. These indemnification provisions shall be in addition to any liability which the Company may otherwise have to any Indemnified Party.

If any action, suit, proceeding or investigation is commenced, as to which an Indemnified Party proposes to demand indemnification, it shall notify the Company with reasonable promptness; provided, however, that any failure by an Indemnified Party to notify the Company shall not relieve the Company from its obligations hereunder. An Indemnified Party shall have the right to retain counsel of its own choice to represent it, and the fees, expenses and disbursements of such counsel shall be borne by the Company. Any such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company. The Company shall be liable for any settlement of any claim against any Indemnified Party made with the Company's written consent. The Company shall not, without the prior written consent of Maxim, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement,

# MAX**III**M
##### GROUP

compromise or consent (i) includes, as an unconditional term thereof, the giving by the claimant to all of the Indemnified Parties of an unconditional release from all liability in respect of such claim, and (ii) does not contain any factual or legal admission by or with respect to an Indemnified Party or an adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company shall contribute to the Losses to which any Indemnified Party may be subject (i) in accordance with the relative benefits received by the Company and its stockholders, subsidiaries and affiliates, on the one hand, and the Indemnified Party, on the other hand, and (ii) if (and only if) the allocation provided in clause (i) of this sentence is not permitted by applicable law, in such proportion as to reflect not only the relative benefits, but also the relative fault of the Company, on the one hand, and the Indemnified Party, on the other hand, in connection with the statements, acts or omissions which resulted in such Losses as well as any relevant equitable considerations. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for fraudulent misrepresentation. The relative benefits received (or anticipated to be received) by the Company and it stockholders, subsidiaries and affiliates shall be deemed to be equal to the aggregate consideration payable or receivable by such parties in connection with the transaction or transactions to which the Agreement relates relative to the amount of fees actually received by Maxim in connection with such transaction or transactions. Notwithstanding the foregoing, in no event shall the amount contributed by all Indemnified Parties exceed the amount of fees previously received by Maxim pursuant to the Agreement.

Neither termination nor completion of the Agreement shall affect these Indemnification Provisions which shall remain operative and in full force and effect. The Indemnification Provisions shall be binding upon the Company and its successors and assigns and shall inure to the benefit of the Indemnified Parties and their respective successors, assigns, heirs and personal representatives.



### Exhibit B

### FEE SCHEDULE

Capitalized terms used in this Exhibit shall have the meanings ascribed to such terms in the Agreement to which this Exhibit is attached.

**Financing Fees:**    1. For any Financing, the Company shall:
     (i)    pay Maxim a cash fee of 3.5% of the amount of capital raised, invested or committed; **and**
     (ii)   pay Maxim a cash fee for unallocated expenses of .5% of the amount of capital raised, invested or committed.

**Transaction Fees:**
The Transaction Fees shall be payable to Maxim in cash at the closing or closings of the Transaction to which it relates. An amount equal to the greater of:

     (i)    $350,000, **or**

     (ii)   4% of the aggregate consideration paid or received by the Company and/or its stockholders in such Transaction, as the case may be.

**Attorney Fees:**
The Company will pay up to $25,000 in legal fees related to the Financing or the Transaction to Maxim's counsel at the Closing.

**Agent Warrants:**
The Company shall grant Maxim Agent Warrants in the form of, at Maxim's option, (a) Securities issued pursuant to a Financing or (b) Common Stock of the Company, as follows:

     (i)    For any Financing or Transaction, warrants to purchase 7% of the amount of capital raised, invested or committed; **provided** that The Company has sufficient treasury stock to issue that amount of such warrants at the time such compensation under this paragraph is due. Nothing herein shall require the Company to increase its number of authorized shares in order to comply with this provision and, in the event the Company does not have sufficient treasury shares to issue the amount of warrants called for in this provision at the time such compensation is due, the Company shall be required to issue only the amount of warrants for which it has treasury shares to cover such warrants.

The Agent Warrants shall have: (a) an exercise price equal to 110% of the 30-day VWAP of Common Stock preceding the closing of the Financing or Transaction, (b) a 5-year term, (c) cashless exercise provisions, (d) standard anti-dilution protections, (e) no limitation as to the right of registration at the expense of Maxim and (f) unlimited "piggy-back" registration rights.

## CERTIFICATE OF SERVICE

I, ANDREW J. FRISCH, certify the following to be true under the penalties of perjury: on December 5, 2007, I served the within NOTICE OF MOTION on the party listed below by depositing one true copy of said paper to the addresses listed below, enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

> Matthew Schwartz,, Esq.
> 134 West 29th Street – Suite 1006
> New York, New York 10001

Dated: New York, New York
      December 5, 2007

> /s/  Andrew J. Frisch
> Andrew J. Frisch

6