UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAXIM GROUP LLC,                              :
                                              :
                        Plaintiff,            :        Dkt. No. 07 CV 8099 (LAP)
                                              :
        -against-                             :        **DECLARATION OF**
                                              :        **ANDREW SCOTT**
LIFE PARTNER HOLDINGS, INC.,                  :
                                              :
                        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, Andrew Scott, declare as follows:

1.      I am employed as a Managing Director of Investment Banking at Maxim Group,

LLC ("Maxim"), the plaintiff in this lawsuit. I was the person at Maxim responsible for

negotiating the October 28, 2004 contract (the "Contract") with defendant Life Partner Holdings,

Inc. ("LPHI") that is at issue in this lawsuit. A copy of the Contract is annexed as Exhibit 1. I

was also responsible for supervising the services provided by Maxim to LPHI in 2004-2005. As

such, I have personal knowledge of the circumstances that give rise to this lawsuit. I respectfully

submit this Declaration in opposition to LPHI's motion for summary judgment.

### Background

2.      I attended the University of Maryland and Pace University, where I graduated

with a BBA in Accounting, with a minor in Mathematics. I began my career at Bear Stearns,

where I worked in the accounting and corporate finance departments, specifically the Corporate

Finance division. I hold Series 7 and 63 licenses and I have worked in the securities industry for

over 12 years. I currently specialize in structured finance at Maxim.

3.      Maxim is a limited liability company formed under New York law and does

business as an investment banking, securities and investment management firm, registered as a

broker-dealer with the S.E.C. Among other undertakings, Maxim regularly provides both public

and private companies with investment banking services in the following specialized areas: corporate finance, mergers and acquisitions, and corporate advisory services.

4.     Maxim employs approximately 200 people in New York, including over 100 registered brokers. Maxim's trading network incorporates a large range of clients including insurance companies, banks, hedge funds, broker-dealers and floor specialists. Maxim's institutional coverage spans the United States, Austria, Belgium, Brazil, France, Germany, Holland, Hong Kong, India, Italy, Japan, Luxembourg, Portugal, Spain, Switzerland, and the United Kingdom.

## Introduction to LPHI

5.     Beginning in November, 2002, I was employed as a Senior Research Analyst at Maxim. In this position, my responsibilities included writing reports on publicly traded companies giving descriptions of the businesses and my analysis of the companies' investment potential, usually from a fundamental analysis standpoint. To do so, I got information by studying public records of the company and by participating in public conference calls with company management.

6.     My first contact with LPHI came in approximately February, 2002, before I began work at Maxim, when I was contacted by LPHI's investor relations representative Steve Kesselman and LPHI's President of Institutional Division, Michael Beste. Mr. Kesselman and Mr. Beste contacted me in an effort to generate investment interest in LPHI.

7.     At that time, my research indicated that LPHI was considered a "micro cap"[1] company whose performance had been lethargic since the company went public in 2001. LPHI

---

[1] The term "micro cap" applies to companies with low, or "micro", capitalizations, meaning the total value of the company's stock. "Micro cap" companies typically have limited assets and market capitalizations between $50 million and $300 million.

showed investment potential because, at the time, it was the only publicly traded company in the

"life settlement" business. As discussed below, the life settlement business was in its infancy

and LPHI had the potential to take advantage of its position as one of the pioneers in the filed.

### Negotiation of the Contract

8.    I continued to follow LPHI when I began working as a research analyst at Maxim

in November, 2002. In 2004, I was promoted from the position of research analyst to a

Managing Director in investment banking. In this position, I had greater ability to bring in

investment banking clients to the firm. I contacted LPHI to pursue a further relationship.

9.    After some initial conversations with LPHI executives, we began to negotiate the

terms of the contractual relationship between Maxim and LPHI. The negotiations took place in

September-October, 2004 during which time I had numerous telephone and e-mail

communications with various LPHI executives, including Brian Pardo (Chief Executive Officer),

Scott Peden (General Counsel), and Mr. Beste.

10.    Mr. Pardo and I discussed the basic structure of the agreement and we reached an

understanding on the general terms of the agreement in or around October, 2004. I then

communicated with LPHI General Counsel Scott Peden regarding the actual terms of the

contract. We exchanged drafts of a contract and Mr. Peden prepared revisions to the draft

contract as evidenced by his e-mails to me dated October 26, 2004 and October 27, 2004, copies

which are annexed as Exhibits 2 and 3.

11.    I understand that throughout its motion, LPHI characterizes the contract at issue in

this case as "Maxim's Contract" in an effort to diminish its role in the drafting of the contract.

LPHI, through its CEO and General Counsel, participated fully in the negotiation and drafting of

the Contract. The October 27, 2004 e-mail illustrates LPHI's participation in the process of

drafting the contract as it includes highlighted portions which were offered by LPHI in its

revision of the contract.  These portions include Section 3(a) which provides that LPHI shall

deliver a warrant to Maxim.  The highlighted portion of the draft contract in Exhibit 3 – p. 2 -

including the language of the Section 3(a) warrant provision at the center of this dispute - was

drafted by LPHI.

### The Contract

12.    Once we agreed on the final terms of the agreement, on or about October 24,

2004, Maxim and LPHI executed the Contract under which Maxim agreed to provide general

financial advisory and investment banking services to LPHI.

13.    Among other things, the Contract sets forth: (1) the services to be performed by

Maxim; (2) the term of the agreement; (3) the compensation due Maxim for its performance; (4)

the reimbursement of Maxim's expenses; and (5) the provisions for termination.

14.    Specifically, under Section 1 of the Contract, Maxim agreed to provide the

following services to LPHI: (a) Maxim agreed to familiarize itself, to the extent appropriate and

feasible, with the business, operations, properties, financial condition, management and prospects

of LPHI; (b) Maxim agreed to advise LPHI on matters relating to its capitalization; (c) Maxim

agreed to evaluate alternative financing structures and arrangements for LPHI; (d) Maxim agreed

to assist LPHI in developing appropriate acquisition criteria and identifying target industries; (e)

Maxim agreed to assist LPHI in evaluating, and make recommendations concerning, the

relationships among its various lines of business and potential areas for business growth; and (f)

Maxim agreed to provide such other financial advisory and investment banking services upon

which the parties mutually agreed.

15.    In return for these services, under Section 3 of the Contract, LPHI agreed to

compensate Maxim as follows: (a) payment of a non-refundable fee of $25,000 payable upon

execution of the Contract; (b) granting Maxim a warrant ("Warrant") to purchase 100,000 shares

of LPHI common stock exercisable at any time during the five-year period commencing on the

date of the Contract at an exercise price of $7.00 per share.

16.    The Warrant was to include certain other provisions contained in warrant

certificate "delivered to [LPHI] with the [Contract]". Contract, § 3 (a) (ii).  The foregoing

compensation terms were tied only to Maxim's performance of the services outlined in Section 1

of the Contract and were not contingent on the achievement of any particular result.

**The Warrant**

17.    I understand that LPHI claims that, under the Contract, Maxim had an "obligation

to deliver [ to LPHI ] proposed certificates describing the terms and conditions of the warrant."

LPHI Memo of Law, p. 4.  This is not true and contradicts my conversations with LPHI

executives at the time as well as the express terms of the Contract.  On this issue, the Contract

states, in relevant part, as follows:

> 3. Compensation.    As consideration for Maxim's services pursuant to this
> Agreement, Maxim shall be entitled to receive, and the Company agrees to pay
> Maxim, the following compensation:
>
> > (a)(i) a non-refundable cash fee of $25,000 payable upon execution of this
> > Agreement ("Initial Advisory Fee"), and (ii) The Company shall grant to
> > Maxim a warrant ("Warrant") to purchase 100,000 shares of the
> > Company's common stock.  The Warrant shall be exercisable at any time
> > during the five year period commencing on the date hereof at an exercise
> > price of $7.00 per share.    The Warrant shall provide for immediate
> > registration at the optionee's expense as well as other provisions,
> > including, without limitation, those pertaining to cashless exercise, anti-
> > dilution protection and piggyback registration rights, **contained in the
> > Warrant certificates delivered to the Company together with this
> > Agreement.** The fees appearing in Exhibit B hereto, the "Fee Schedule")
> > shall be earned by and paid to Maxim by the Company, in connection with
> > financings or transactions undertaken by the Company, the terms of which
> > will be will be [sic] mutually agreed upon under separate advisory,
> > placement agency and/or underwriting agreements.

Contract, § 3 (emphasis added).

18.     First, the Contract states that LPHI "shall grant" the Warrant. As noted above, this language was drafted by LPHI's general counsel. See Exhibit 3, p. 2. This is consistent with industry practices under which companies draft their own securities instruments, as discussed in the Declaration of Clifford A. Teller submitted herewith. Maxim's practice in this regard, throughout the time that I have been employed there, is consistent with these standards.

19.     Thus, contrary to LPHI's argument, the Contract sets forth the essential "terms and conditions of the warrant" explicitly: (a) "The Company shall grant to Maxim a warrant ("Warrant") to purchase 100,000 shares of the Company's common stock"; (b) "The Warrant shall be exercisable at any time during the five year period commencing on the date hereof"; (c) "…at an exercise price of $7.00 per share."; and (d) "The Warrant shall provide for immediate registration at the optionee's expense." Contract, § 3(a).

20.     The "certificates delivered to the Company together with this Agreement" refer to warrant certificates that had been provided or were otherwise available to LPHI during the negotiation process. In this case, the certificates included the language for *pro forma* provisions relating to cashless exercise, anti-dilution, and "piggy-back" rights. These types of provisions are common in the securities industry and they are described in detail in the Teller Declaration.

21.     I am familiar with Maxim's policies and procedures for the period of October, 2004. At that time, whenever Maxim entered a transaction involving issuance of warrants to Maxim, it was our practice to either provide our clients with warrant certificates that had been executed in other transactions by other clients of Maxim, or to use warrant certificates that the client itself had previously executed, in order to provide the general substance of certain provisions to be included in our warrant from the client. If Maxim was to provide the warrant form, this was generally a ministerial task performed by our administrative staff. I have no specific recollection myself of providing the warrant certificates to LPHI but I am certain that

6

they were available to LPHI well before it signed the Contract, either by delivery from Maxim support staff or from LPHI's own prior warrants.

22.     The important points here are that, under the Contract: (a) Maxim had no express obligation to deliver the warrant certificates; and (b) by signing the Contract, LPHI acknowledged that the warrant certificates had been "delivered to [it] together with the [Contract]." This is consistent with my conversations with LPHI executives. As discussed below, following the execution of the Contract, I requested on several occasions that LPHI grant the Warrant as required by the Contract. I was repeatedly told that they were working on it. At no time did LPHI claim that it did not have the warrant certificates or that it was necessary for Maxim to provide a form of warrant certificate in order for LPHI to grant the Warrant.

## Maxim Honors its Contractual Obligations

23.     Following the execution of the Contract, I was the person at Maxim responsible for managing the relationship with LPHI and for ensuring Maxim's performance of its obligations under the Contract. I understand that LPHI has claimed in this lawsuit that " the relationship intended by the contract failed to materialize," and that LPHI "disputes that Maxim performed the services it agreed to provide under the terms of the Contract." These claims by LPHI are false.

24.     Throughout the term of the Contract, Maxim worked faithfully and diligently in accordance with the terms of its agreement and fully performed all of its obligations under the Contract. The following is a summary of the services provided by Maxim relating to the Contract. This does not include all the work done by Maxim but it will provide the Court with an understanding of the kinds of services Maxim provided during the relevant period.

### *Due Diligence Work*

25.     Under the Contract, Maxim agreed to "familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of LPHI." Contract, § 1. During the negotiation of the Contract, and throughout the period Maxim actively provided service to LPHI, Maxim fulfilled this due diligence obligation.

26.     Part of this due diligence work was for Maxim (and I) to learn about the life settlement industry and LPHI's business. LPHI is engaged in the "life settlement" industry, a secondary market for life insurance policies. At the time Maxim and LPHI entered the Contract, the life settlement market was less than 10 years old. It was essential for Maxim to learn the business, and to keep abreast of market developments in the field, in order to provide the investment banking services required by the Contract. Maxim employees and I performed this due diligence work continuously following the execution of the Contract. A "life settlement" is the sale of a life insurance policy in return for a purchase price that typically exceeds the surrender value of the policy. Such policies typically involve insureds who are 75 years or older, have more than two years life expectancy, and are wealthy. These policies are often owned by trusts or companies, though in some instances the owners are the elderly insured individuals themselves. Owners may want to sell their policies for a variety of reasons, including avoiding high premium payments or getting out of what are in essence poorly performing investments. The buyers are investors who, after buying the policy, continue to pay premiums until the insured dies.

27.     In the 1980s, investors began purchasing life insurance policies from terminally ill individuals, often afflicted with the HIV virus and in need of immediate cash, in transactions known as viaticals. However, as HIV medical treatments improved and individuals lived longer, transactions involving these types of policies became less common. Furthermore, various states

moved to regulate the industry to curtail fraudulent practices typically involving middlemen who defrauded the purchasers of policies. Many states, including New York, enacted laws that require strict licensing and disclosure in all cases where the insured has "a catastrophic or life threatening illness or condition." N.Y. Insurance Law Article 78.

28.    The life settlement industry developed in the late 1990s as an outgrowth of viaticals, involving older individuals who were not on the brink of death. Under an industry standard that is codified in some states (though not New York), sales in which the insured has two or more years of life expectancy are considered "life settlements" and transactions involving those with shorter life expectancies are considered "viaticals". The life settlement industry has grown dramatically in the past ten years. By 2005, for example, investors purchased life insurance policies with death benefits estimated at $13 billion. One research analyst has predicted that the business will grow more than ten-fold to $160 billion over the next several years. (Bernstein Research Call, March 4, 2005).

29.    LPHI claims to be the oldest and one of the largest life settlement companies in the United States. In 1997, LPHI entered the senior life settlement market and, according to its website, has since then originated, underwritten, and processed for closing over $600 million in face amount of senior life settlements. In January 2000, LPHI became a publicly traded company and, as such, began publishing its audited financial information on a quarterly and annual basis.

30.    I spent many hours familiarizing myself with the life settlement industry and LPHI's business model. This included reviewing various materials, including industry publications, LPHI records and marketing materials, LPHI financial disclosures, and other documents. In addition, as discussed more fully below, in January, 2005, I visited LPHI's headquarters in Waco, Texas and spent time there to meet with company management and to

learn more about LPHI's business. I was assisted in this due diligence work by other Maxim personnel, and together, we spent many hours performing this due diligence work on a continuous basis from the time the Contract was signed and during the ensuing months in order to service LPHI.

31.    My initial due diligence work is partly reflected in the work I did between October-November, 2004, preparing a Commitment Committee Memo (the "Commitment Committee Memo") for LPHI. A copy of the Commitment Committee Memo is annexed as Exhibit 4. At Maxim, the purpose of the Commitment Committee Memo is to provide Maxim's executives with a synopsis of a company's business model and its prospects for growth. Maxim prepares Commitment Committee Memos for its potential investment banking clients in order to make decisions on whether to accept such clients and to enable Maxim's executives to become familiar with the clients' business model in order to better service the client.

### *Power Point Presentation*

32.    Beginning in November, 2004, I also assisted LPHI in the preparation of a power point presentation (the "Power Point Presentation") for potential investors. I annex as Exhibit 5 copies of my e-mail exchanges with LPHI executives relating to the Power Point Presentation. In Maxim's investment banking work, we make frequent use of power point presentations in order to explain investment opportunities to investors on behalf of clients such as LPHI.

33.    In this case, I assisted in the preparation of the Power Point Presentation together with other Maxim personnel. Together we spent many hours reviewing and revising preparing and revising the Power Point Presentation and consulting with LPHI. The Power Point Presentation was an effective means to share information about LPHI and I used it to make presentations to potential investors, analysts, and with Maxim personnel.

### *November 2004 Meetings in New York*

34.    As part of Maxim's work for LPHI under the Contract, I arranged a meeting that took place on November 8, 2004 at our New York office.  LPHI President of Institutional Division Michael Beste traveled to New York and met with me and with Maxim executives, including Maxim CEO Michael Rabinowitz, Armand R. Pastine, Managing Director of Maxim's Institutional Fixed Income Group, and Christopher Fiore, Maxim's head of capital markets.

35.    The purpose of the meeting was to introduce Mr. Beste to Maxim executives and discuss potential strategies for stimulating investor interest in LPHI.  The meeting lasted the better part of a day and during the meeting we discussed LPHI's business model, its potential for growth, and potential strategies for developing investor interest.  Our initial plan of action was to introduce LPHI to Maxim's institutional investor clients in the hopes that we would generate investment in the company.

36.    During Mr. Beste's trip to New York, I also introduced Mr. Beste and LPHI to representatives of several funds, including Wasatch Advisors ("Wasatch"), Driehaus Capital Management ("Driehaus"), and Schottenfeld Advisors ("Schottenfeld") and a few others. I also introduced them to a research analyst at Ladenburg Thalmann ("Ladenburg"), in an effort to get more research coverage of the stock.  These introductions were made at meetings and on conference calls with fund representatives.  I was assisted in this regard by Christopher J. Fiore, the Managing Director of Maxim's Capital Markets.

37.    The purpose of these introductions and meetings was to stimulate investment and market research interest in LPHI with the hope of inducing them to invest in the company.  From the time the Contract was signed and continuing thereafter, I remained in constant contact with representatives of these funds, and with other funds, to keep them advised of LPHI's business and provide them with any information they required in order to make a decision on whether to

invest in LPHI. I was assisted in this effort by 6 or 7 Maxim sales representatives, each of whom had close relationships with these funds.

38.    As a result of Maxim's efforts, Wasatch, Driehaus, and Schottenfeld all invested in LPHI. For example, on or about December 14, 2004, Wasatch purchased 90,000 shares of LPHI stock. Schottenfeld purchased 14,000 shares in November 2004. Driehaus also made a significant investment in this same time period.

39.    As a result of Maxim's work, in early 2005, Wasatch's Portfolio Manager for the Wasatch Micro Cap Value Fund, Brian Bythrow, flew to LPHI corporate headquarters in Waco, Texas to meet with LPHI management. I remained in contact with Mr. Bythrow and I had discussions with LPHI executives about the meetings with Mr. Bythrow. I was advised by LPHI executives that these meetings went very well and that Wasatch purchased over 70,000 additional shares of LPHI stock thereafter.

40.    Maxim's efforts on behalf of LPHI produced positive results immediately. As a direct result of Maxim's efforts, LPHI gained institutional investment and enjoyed a rapid and substantial increase in its stock price. For example, I annex as Exhibit 6 a copy of the LPHI share price chart for the period between October, 2004 and January, 2005 (the "LPHI Chart"). LPHI is traded on NASDAQ and the LPHI Chart is a true copy of the chart using data generated by the Yahoo! Finance website showing the daily share price of LPHI as traded on NASDAQ during this period.

41.    As the LPHI Chart illustrates, at the time Maxim was retained by LPHI on October 28, 2004, its stock was trading at around $5.59 per share. Less than three months later, on January 13, 2005, the stock closed at $8.17 per share, a 46% increase in share price. As discussed below, however, it was in mid-January that LPHI announced disappointing earnings and the stock fell as a result.

### *January, 2005 Meetings in Waco, Texas*

42.    LPHI is based in Waco, Texas. In early January, 2005, I traveled to Waco to meet with company executives and to learn more about LPHI's business operations and to further explore the plans we had discussed in New York. I flew to Dallas, Texas and Mr. Beste met me at the airport and drove me to Waco, Texas, approximately one hour's drive to the north. During our drive we discussed the LPHI's business and the areas where Maxim could potentially assist the company.

43.    The following morning, I went to LPHI's corporate headquarters to spend the day meeting with company executives, including Mr. Pardo, Mr. Peden, and Mr. Beste. I was given a tour of the facility and I met many LPHI employees. LPHI executives showed me how they operated their business, including developing leads and quality control. Following my day at LPHI, Mr. Beste drove me back to the airport in Dallas and I returned to New York.

44.    Following my trip to Waco, I was very optimistic about LPHI's business model and obtaining further investment in the company. LPHI's executives were very optimistic in their assessments of the company's performance and in the future success of the company. Shortly after the Waco trip, however, LPHI issued a very disappointing earnings report and the company's stock price fell significantly.

### *January, 2005 Earnings Report*

45.    In mid-January, 2005, LPHI announced disappointing earnings. I do not recall the exact date of this earnings report but, based on the LPHI Chart, I believe it was on or about January 14, 2005. The LPHI shows that the volume of LPHI stock traded increased significantly that day and that the stock price fell from a high of $8.65 to $5.78. This fall in share price was the result of the disappointing earnings report issued by LPHI.

46.     Maxim's institutional clients were very disappointed by this unexpected bad news. As a result of this earnings report, the stock price fell back to October, 2004 levels and Maxim was unable to generate further investor interest on the part of its institutional clients.

### *Strategic Settlement Fund*

47.     In 2005, Mr. Pardo traveled to New York to meet with Maxim's executives to discuss our future work for the company. He met with myself, Mr. Rabinowitz, and others. During this meeting, Mr. Pardo proposed setting up a "Strategic Settlement Fund" whereby investors would deposit money into a fund to be used by LPHI to buy and sell life insurance policies. LPHI proposed that the investors would share any profits from these transactions and LPHI would earn a management fee. LPHI did not have a lead investor for the proposed fund and, more importantly, was unwilling to put up its own capital to initiate the fund. Maxim executives and I had numerous conversations with Mr. Pardo and the other LPHI executives in which we advised them that it would be difficult to obtain investment in the fund under these circumstances. Nevertheless, we attempted to obtain investors for the proposed fund but Maxim's clients were not responsive given LPHI's earnings performance and LPHI's unwillingness to invest its own money in the fund.

48.     As an alternative, Maxim proposed to LPHI that it could raise capital for its operations by issuing additional stock through a public offering. Maxim executives and I had numerous conversations with Mr. Pardo and the other LPHI executives about a potential public offering. Mr. Pardo rejected this proposal because he felt the LPHI stock price was too low and because he did not want to dilute his ownership in the company.

49.     Following this meeting, LPHI's stock price continued to languish and Maxim's institutional clients were not interested in any further investment. Maxim remained available to LPHI to provide investment banking services and, although it never cancelled the Contract, LPHI

never contacted us again. Following the initial six-month term of the Contract, LPHI stopped communicating with Maxim and requested no further services.

### LPHI Breaches the Contract

50.     LPHI made the initial payment of $25,000 but failed to deliver the Warrant as required in the Contract. A copy of the check issued by LPHI is annexed as Exhibit 7. Maxim has duly demanded that LPHI deliver the Warrant as required under the Contract. Despite due demand, LPHI has refused to deliver the Warrant pursuant to the provisions of the Contract and has indicated that it will not honor its obligations.

51.     I had numerous conversations with Mr. Pardo and others at LPHI in the months following the execution of the Contract in October, 2004 asking them to deliver the Warrant. They repeatedly assured me that it would be delivered. They did not do so. It should also be noted that LPHI never terminated the Contract.

52.     In October, 2005, I left Maxim and was employed elsewhere for approximately 6 months. During this period, apparently no one from Maxim followed up with LPHI in order to obtain the executed Warrant. I returned to Maxim in May, 2006 and thereafter Maxim sought to obtain the Warrant from LPHI. To date, however, LPHI has refused to deliver the Warrant.

### Conclusion

53.     Maxim honored all of its obligations under the Contract. As discussed above, we performed extensive due diligence work to familiarize ourselves with LPHI's business, operations, properties, financial condition, management and prospects. Maxim executives and I advised LPHI on matters relating to its capitalization and we evaluated alternative financing structures and arrangements for LPHI. Maxim assisted LPHI in developing appropriate acquisition criteria and identifying target industries. Maxim assisted LPHI in evaluating, and make recommendations concerning, the relationships among its various lines of business and

15

potential areas for business growth.  Maxim provided such other financial advisory and investment banking services upon which the parties mutually agreed.

54.    LPHI accepted these services without reservation or complaint and never terminated the Contract.  LPHI should be required to honor its obligations and deliver a Warrant in compliance with the Contract.  For the reasons discussed above, LPHI's motion for summary judgment should be denied.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  28 U.S.C. §1746.

Dated this ___24th___ day of January, 2008.

ANDREW SCOTT