UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
MAXIM GROUP LLC,

                        Plaintiff,                    Dkt. No. 07 CV 8099 (LAP)

    -against-                             **DECLARATION OF**
                                                  **CLIFFORD A. TELLER**

LIFE PARTNER HOLDINGS, INC.,

                        Defendant.
---------------------------------x

       I, Clifford A. Teller, declare as follows:

       1.     I am employed as a Director of Investment Banking at Maxim Group LLC ("Maxim"), the plaintiff in this lawsuit.

       2.     I respectfully submit this Declaration in opposition to the motion for summary judgment filed by defendant Life Partner Holdings, Inc., ("LPHI"). Specifically, I submit this Declaration to assist the Court in understanding the terms of the contract (the "Contract") between LPHI and Maxim, a copy of which is submitted herewith as Exhibit 1.

### Background

       3.     I hold a Series 7 license, as well as a series 24 license and I have worked in the securities industry for over 18 years, primarily in investment banking and private equity servicing emerging growth, middle market and large cap companies in a variety of industries, including technology, healthcare, and media. As a Series 24 licensee at Maxim, part of my responsibilities include supervising Maxim's investment banking employees who are registered with the NASD to ensure regulatory compliance.

       4.     I received my MBA in Finance from Fordham University, and I hold a BA in Accounting and Business Administration from the State University of New York at Albany. I began my career in securities in 1990 at Chase Securities Corporation, previously Chemical

Bank, where I completed its management training program and worked in the corporate finance group servicing emerging growth and middle market companies.

5. Prior to joining Maxim Group, I founded Momentum Media Capital, a private equity fund focused on financing Hispanic media companies. Previously, between 1998-2002, I was a Partner and Senior Vice President at BlueStone Capital Partners, LP, managing the corporate finance group, focusing on emerging growth companies. In addition, between 1995 and 1998, I managed a leveraged portfolio in excess of $2 billion in the leverage buyout group at Mitsubishi Banking Corporation.

6. I have extensive experience working with companies seeking public and private capital. During the course of my career, I have participated, either directly as a broker or in a supervisory capacity, in thousands of securities transactions, including purchases and sales of stock, options, and warrants. As such, I am familiar with warrants and the typical provisions contained in warrants that are the subject of transactions in US securities markets.

## **Warrants**

7. As used in the industry, a "warrant" is a type of security issued by a corporation that gives the holder of the warrant the right to purchase shares of a stock for a specified price within a specified period of time.

8. Warrants are much like call options, and will often confer the same rights as an equity option and can be traded in secondary markets. Although the holder of the warrant is often referred to as the "optionee", warrants are different from options in several respects, including that warrants are issued by private parties, typically the corporation on which a warrant is based, rather than a public options exchange.

9. The essential terms of a warrant are: (a) the identity of the optionee; (b) a description of the stock governed by the warrant; (c) the number of shares to which the warrant

applies; (d) the price at which the warrant may be exercised, or the "strike price"; and (e) the time period in which the warrant may be exercised.

10. Whenever Maxim is to receive stock from a company, whether in the form of share certificates, or by options or warrants, the company delivering the stock is responsible for drafting and executing the instrument by which it is to be delivered. The reasons for this are that the issuance of securities such as warrants is highly regulated by federal and local securities laws, as well as by the company's governing documents such as shareholder agreements, by-laws, etc. In addition, any warrants issued by the company will be subject to review by the company's transfer agent which will be familiar with the form used by the company. In short, the company will be most familiar with the laws and rules applicable to the issuance of a warrant and will be in the best position to draft a warrant that will comply with applicable law, its governing agreements, and with its transfer agent's procedures.

11. I signed the Contract between LPHI and Maxim, a copy of which is submitted as Exhibit 1. In this case, the essential terms of the Warrant to be granted by LPHI are specifically described in the Contract: (a) the Contract identifies Maxim as the optionee; (b)-(c) the warrant was to encompass 100,000 shares of LPHI common stock; (d) the warrant was to be exercisable at a price of $7.00 per share; and (e) the warrant was to be exercisable for five years beginning October 28, 2004.

12. In addition to these essential terms, warrants frequently include additional *pro forma* provisions. In this case, LPHI agreed to grant a Warrant to Maxim that would include the three following *pro forma* provisions: (a) registration rights (both "demand" and "piggy back"); (b) cashless exercise; and (c) anti-dilution protection. These types of provisions are standard in the securities industry and were all solely intended to provide additional protection to Maxim. All of these terms would be readily understood in the industry and by LPHI. I will now provide

the Court with an explanation of these terms as used in the securities industry and as they apply in this case.

### *Registration Rights*

13.     Registration rights are contractual rights that entitle investors to force a company to register the investors' shares of company stock with the Securities and Exchange Commission (the "SEC") and state securities commissions. This registration, in turn, enables the investors to sell their shares to the public. Registration rights give investors liquidity by enabling them to free their shares from the transfer restrictions imposed on unregistered securities by federal and state securities laws. Venture capitalists invariably require them as a condition of funding. If shares are not registered

14.     Registration rights come in two varieties: "demand" rights, which enable investors to require a company to register their shares for sale in public offering any time an investor demands; and "piggyback" rights, which allow investors to include (or "piggyback") their shares in a public offering the company is already conducting.

15.     In this case, LPHI agreed that Maxim's Warrant would include both kinds of registration rights. The Contract requires that the Warrant "provide for immediate registration at the optionee's expense." This "demand right" means that the Warrant must include a provision allowing Maxim, upon exercising the Warrant, to require LPHI to register the shares granted by the Warrant in order to allow Maxim to sell the shares on the public markets. In this case, the Contract also provided that Maxim would be required to pay any costs incurred by LPHI in connection with the registration.

16.     The Contract also calls for the Warrant to include "piggyback rights". Unlike demand rights, piggyback rights do not entitle investors to require a company to conduct a public offering but, rather, allow them to include shares in a registration that is initiated by the

company, which allow investors to include (or "piggyback") their shares in a public offering the company is already conducting.

### *Cashless Exercise*

17. "Cashless exercise" provisions are commonly used in the securities industry and frequently appear in securities such as warrants and options. A "cashless exercise" provision in a warrant allows the holder of the warrant to exercise the warrant and receive stock without paying any money to the company that issued the warrant.

18. To illustrate a cashless exercise, assume a trading price of $10.00 per share and a warrant to acquire 10,000 shares at an exercise price of $1.00 per share. Presumably, the warrant is worth $90,000 (10,000 x $10 = $100,000, less the exercise price of $10,000). In a cashless exercise, rather than pay for 10,000 shares, the holder would simply surrender the warrant in exchange for 9,000 shares ($90,000 intrinsic value of warrant divided by the $10 stock price).

19. As set forth in the Declaration of Edward L. Rose, he attempted to obtain Maxim's Warrant in September, 2007, but LPHI refused to deliver it. Given that LPHI was then trading at $52 per share, Maxim's Warrant was then worth $4.5 million. In a cashless exercise, Maxim should have received 86,538 shares of LPHI stock ($4.5 million intrinsic value of warrant divided by the $52 stock price).

### *Anti-Dilution Protection*

20. The Contract also calls for the LPHI Warrant to include anti-dilution protection for Maxim. Anti-dilution provisions are commonplace in securities transactions and are generally understood to give the shareholder the right to maintain their fractional ownership of a company by buying a proportional number of shares of any future issue of common stock. Anti-dilution rights enable an investor to obtain additional equity in a company without additional cost when a later investor purchases equity at a lower cost per share. Many investors insist on some

sort of anti-dilution protection to protect themselves against the dilutive effects of future sales of stock at lower prices.

### *LPHI Filings*

21.     All of the foregoing are *pro forma* provisions that would be readily understood by anyone involved the securities industry or corporate governance. LPHI has been publicly traded since 2001 and as such, is subject to regulatory filing requirements. LPHI's public filing demonstrates that LPHI has utilized similar *pro forma* provisions prior to signing the Contract.

22.     For example, in January, 2001, LPHI filed a Quarterly Report, or a "10-Q report" (the "LPHI 10-Q Report"), pursuant to Securities Exchange Act of 1934 §§ 13-15. A copy of the LPHI 10-Q Report is submitted as Exhibit 8.[1] A 10-Q report is a comprehensive report of a company's performance that must be submitted quarterly by all public companies to the Securities and Exchange Commission ("SEC"). In the 10-Q report, public companies are required to disclose relevant information regarding their financial position.

23.     In the LPHI 10-Q Report, LPHI included a copy of an investment banking agreement (the "Sutro-First Global Agreement") it signed with Sutro & Co., Incorporated ("Sutro") and First Global Securities, Inc. ("First Global"). Exhibit 8, pp. 20-25. The Sutro-First Global Agreement includes a warrant provision very similar to the one in the Contract at issue in this case:

> 3.     Compensation. Sutro and Global's compensation for their services performed pursuant to this Agreement will be determined as follows:

\*\*\*

---

[1] Exhibit 8 was obtained from the EDGAR website. EDGAR, the Electronic Data-Gathering, Analysis, and Retrieval system, performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the SEC. As of May, 1996, all public domestic companies were required to make their filings on EDGAR, except for filings made in paper because of a hardship exemption. Most of these documents are now filed electronically and are available via EDGAR.

    c)    A warrant to purchase seventy-five thousand (75,000) shares of the issued and outstanding common stock of the Company at a strike price of $8.00 per share for five years adjusted *pro forma* for the issuance of shares of common stock and/or warrants issued in connection with the proposed Private Placement (including without limitation the common stock underlying the warrants issued to Sutro). The percentage of equity to be purchased shall be subject to **customary anti-dilution provisions**, together with pre-emptive rights and tag along rights. The warrants will be granted upon the closing of the Financing and shall conform in terms, including, but not limited to, the term of the warrants and the strike price of the warrants to be issued in the Private Placement [if no warrants are to be issued in the private placement, specify terms of warrants pursuant hereto]. The warrants shall contain a **cashless exercise provision**. The holders of the warrants shall be entitled to **unlimited "piggyback" registration rights** during the first five years following the Private Placement. The Company shall bear all costs and expenses in connection with such registrations.

Sutro-First Global Agreement, § 3(c) (emphasis added).

24.     The Sutro-First Global Agreement includes all three of the *pro forma* provisions found in the Contract between Maxim and LPHI: (a) registration rights; (b) cashless exercise; and (c) anti-dilution protection.[2] The Sutro-First Global Agreement also illustrates the *pro forma* nature of these provisions. There was no form of warrant annexed to the Sutro-First Global Agreement and the provisions relating to registration rights, cashless exercise, and anti-dilution protection are not described in detail in the agreement itself. In fact, the agreement describes these provisions as "customary" or "*pro forma*".

25.     We have had no discovery in this lawsuit so we do not yet have access to any other agreements entered by LPHI or to any warrants actually issued by LPHI. The Sutro-First Global Agreement, however, demonstrates clearly that LPHI well understood the meaning of registration rights, cashless exercise, and anti-dilution protection at least as early as January,

---

[2] The only difference between the Sutro-First Global Agreement and the Contract in this case is that the Sutro-First Global Agreement did not include demand registration rights.

7

2002, well before it entered the Contract with Maxim. The Court should reject its refusal to issue the Warrant based on the bogus claim that Maxim did not provide the form language for these *pro forma* provisions.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. 28 U.S.C. §1746.

Dated this 24th day of January, 2008.

_____
CLIFFORD A. TELLER