# EXHIBIT 8

# LIFE PARTNERS HOLDINGS INC

## FORM 10QSB/A
(Amended Quarterly Report of Financial Condition)

Filed 01/22/02 for the Period Ending 11/30/01

| | |
|---|---|
| Address | 204 WOODHEW |
| | WACO, TX 76710 |
| Telephone | 8003685569 |
| CIK | 0000049534 |
| Symbol | LPHI |
| SIC Code | 6199 - Finance Services |
| Fiscal Year | 02/28 |

http://access.edgar-online.com

© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

### AMENDMENT NO. 1 TO FORM 10-QSB

[X] Quarterly Report Pursuant to Section 13 or 15 (d) of the
Securities Exchange Act of 1934
For the quarterly period ended: November 30, 2001
or
[ ] Transition Report Pursuant to Section 13 or 15 (d) of the Securities
Exchange Act of

*Commission File Number: 0-7900*

# LIFE PARTNERS HOLDINGS, INC.

(Name of small business issuer in its charter)

Massachusetts 74-2962475

------------------------    ------------------------

(State of incorporation)  (I.R.S. employer ID no.)

204 Woodhew, Waco, Texas 76712
(Address of Principal Executive Offices)(Zip Code)

Issuer's telephone number, including area code: 254-751-7797

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days. Yes [X] No [ ]

Shares of Common Stock, $.01 par value, outstanding as of January 11, 2002:
9,626,721

Transitional Small Business Disclosure Format: Yes [ ] No [X]

1

INDEX

| Description | Page |
|---|---|

PART I.  FINANCIAL  INFORMATION

    Item  1.  Financial  Statements

        Consolidated Condensed Balance  Sheet  -
        November  30,  2001 ............... 3-4

        Consolidated  Condensed  Statements  of  Income  -
        For  the  Three and  Nine  Months  Ended
        November  30,  2001  and  2000 ............... 5

        Consolidated  Condensed  Statements  of
        Stockholders  Equity  -  For  the  Nine  Months
        Ended  November  30,  2001  and  2000 ............... 6

        Consolidated  Condensed  Statements  of
        Cash  Flows - For the Nine Months  Ended
        November  30,  2001  and  2000 ............... 7

        Notes  to  Consolidated  Condensed
        Financial  Statements ............... 8-11

    Item  2.  Management's  Discussion  and  Analysis of
        Financial Condition and Results  of  Operations ............... 12-16

PART II.  OTHER  INFORMATION

    Item  1.  Legal  Proceedings ............... 16-17

    Item  5.  Other  Information ............... 17

    Item  6.  Exhibits  and  Reports  on  Form  8-K ............... 17

EXHIBITS ............... 19-24

This quarterly report on Form 10-QSB should be read in conjunction with Life Partners Holdings, Inc.'s Annual Report on Form 10-KSB for the year ended February 28, 2001.

2

Item 1. Financial Statements – November 30, 2001 and 2000

## LIFE PARTNERS HOLDINGS, INC.
### CONSOLIDATED CONDENSED BALANCE SHEET
NOVEMBER 30, 2001
(UNAUDITED)

Page 1 of 2

## ASSETS

| | | |
|---|---|---:|
| CURRENT ASSETS: | | |
| Cash | $ | 4,601,317 |
| Accounts receivable - trade | | 2,603 |
| Due from employees | | 20,173 |
| Current portion - long-term notes receivable | | 3,419 |
| Prepaid income taxes | | 20,460 |
| Prepaid expenses | | 163,023 |
| Total current assets | | 4,810,995 |
| PROPERTY AND EQUIPMENT: | | |
| Land and building | | 803,328 |
| Machinery and equipment | | 71,498 |
| Transportation equipment | | 173,775 |
| | | 1,048,601 |
| Accumulated depreciation | | (201,594) |
| | | 847,007 |
| OTHER ASSETS: | | |
| Notes receivable, net of current portion, shown above, and allowance for bad debt of $40,798 | | 3,403 |
| Premium advances, net of reserve for uncollectible advances of $313,871 | | - |
| Deferred income taxes | | 27,244 |
| Other | | 27,091 |
| | | 57,738 |
| Total Assets | $ | 5,715,740 |

See accompanying notes.

3

PIFE PARTNERS HOLDINGS INC

CONSOLIDATED CONDENSED BALANCE SHEET

NOVEMBER 30, 2001

(UNAUDITED)

Page 2 of 2

## LIABILITIES AND STOCKHOLDERS' EQUITY

```
CURRENT  LIABILITIES:
    Accounts  payable                                    $      40,841
    Current  portion  of  long-term  debt                       25,538
    Accrued  liabilities                                       751,212
                                                          ---------------

        Total  current liabilities                            817,591
                                                          ---------------

DEFERRED  REVENUE                                             143,500
                                                          ---------------

LONG-TERM  DEBT,  net  of  current  portion  shown  above    587,757
                                                          ---------------

CONTINGENCIES                                                      -
                                                          ---------------

STOCKHOLDERS'  EQUITY:
    Common stock,  $0.01 par value,  10,000,000  shares
        authorized;  10,000,000  shares  issued  and
        outstanding                                           100,000
    Additional  paid-in  capital                           11,247,804
    Accumulated  deficit                                   (6,416,885)
    Less: Notes  receivable  issued  for  common  stock     (455,041)
    Less: Treasury  stock  -  373,279  shares               (308,986)
                                                          ---------------

        Total  Stockholders' Equity                         4,166,892
                                                          ---------------

        Total Liabilities and Stockholders' Equity      $  5,715,740
                                                          ===============
```

See accompanying notes.

4

## CONSOLIDATED CONDENSED STATEMENTS OF INCOME
### FOR THE THREE AND NINE MONTHS ENDED NOVEMBER 30, 2001 AND 2000
#### (UNAUDITED)

| | FOR THE THREE MONTHS ENDED NOVEMBER 30, | | FOR THE NINE MONTHS ENDED NOVEMBER 30, | |
|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 |
| REVENUES | $1,231,197 | $ 289,809 | $2,931,732 | $3,247,187 |
| BROKERAGE AND REFERRAL EXPENSES | 578,097 | 94,022 | 1,466,779 | 1,527,031 |
| REVENUES, NET OF BROKERAGE EXPENSES | 653,100 | 195,787 | 1,464,953 | 1,720,156 |
| OPERATING AND ADMINISTRATIVE EXPENSES: | | | | |
| General and administrative | 556,008 | 602,060 | 1,822,585 | 1,872,267 |
| Depreciation | 13,316 | 12,750 | 38,767 | 31,176 |
| | 569,324 | 614,810 | 1,861,352 | 1,903,443 |
| INCOME (LOSS) FROM OPERATIONS | 83,776 | (419,023) | (396,399) | (183,287) |
| OTHER INCOME (EXPENSES): | | | | |
| Interest and other income | 82,207 | 211,468 | 164,644 | 283,086 |
| Underwriting losses | (93,619) | - | (352,119) | - |
| Interest expense | (14,487) | (20,276) | (44,202) | (33,584) |
| | (25,899) | 191,192 | (231,677) | 249,502 |
| INCOME (LOSS) BEFORE INCOME TAXES | 57,877 | (227,831) | (628,076) | 66,215 |
| INCOME TAXES: | | | | |
| Current tax expense (benefit) | - | (104,127) | - | - |
| | - | (104,127) | - | - |
| INCOME (LOSS) BEFORE CUMULATIVE EFFECT FOR CHANGE IN ACCOUNTING PRINICIPLE | 57,877 | (123,704) | (628,076) | 66,215 |
| CUMULATIVE EFFECT OF CHANGE ON YEARS PRIOR TO 2001 | (143,500) | - | (143,500) | - |
| NET INCOME (LOSS) | $ (85,623) | $ (123,704) | $ (771,576) | $ 66,215 |
| BASIC EARNINGS (LOSS) PER SHARE: | | | | |
| Income before cumulative effect of accounting changes | $ - | $ (0.01) | $ (0.06) | $ 0.01 |
| Cumulative effect of accounting change | (0.01) | - | (0.02) | - |
| Net income (loss) | $ (0.01) | $ (0.01) | $ (0.08) | $ 0.01 |
| AVERAGE COMMON AND COMMON EQUIVALENT SHARES OUTSTANDING | 9,626,721 | 8,401,003 | 9,278,744 | 8,397,225 |

See accompanying notes.

## CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY
### FOR THE NINE MONTHS ENDED NOVEMBER 30, 2001 AND 2000
#### (UNAUDITED)

| | Common Stock | | | | | Treasury Stock | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Shares | $0.010 par Value | Additional Paid-In Capital | Accumulated Deficit | Note Receivable | Number of Shares | Amount | Total Shareholders' Equity |
| Balance, February 29, 2000 | 10,000,000 | $100,000 | $ 4,705,817 | $(4,803,754) | $ - | 1,842,228 | $ - | $ 2,063 |
| Contribution of shares to Company by former employees | - | - | - | - | - | 45,000 | - | - |
| Treasury stock issued for notes payable | - | - | 170,000 | - | - | (11,148) | - | 170,000 |
| Treasury stock sold by the Company | - | - | 509,189 | - | - | (33,250) | - | 509,189 |
| Treasury stock purchased by the Company | - | - | - | - | - | 18,541 | (298,130) | (298,130) |
| Contribution of shares to Company by shareholders | - | - | - | - | - | 84,500 | - | - |
| Net loss for the nine months ended November 30, 2000 | - | - | - | 66,215 | - | - | - | 66,215 |
| Balance, November 30, 2000 | 10,000,000 | $100,000 | $ 5,385,006 | $(4,737,539) | $ - | 1,945,871 | $(298,130) | $ 449,337 |
| Balance, February 28, 2001 | 10,000,000 | $100,000 | $ 6,359,371 | $(5,645,309) | $(300,041) | 1,410,151 | $(308,986) | $ 205,035 |
| Treasury stock sold for cash | - | - | 4,740,233 | - | - | (1,017,778) | - | 4,740,233 |
| Treasury stock rescinded | - | - | (6,800) | - | - | 906 | - | (6,800) |
| Treasury stock sold for note receivable | - | - | 155,000 | - | (155,000) | (20,000) | - | - |
| Net income for the nine months ended November 30, 2001 | - | - | - | (771,576) | - | - | - | (771,576) |
| Balance, November 30, 2001 | 10,000,000 | $100,000 | $11,247,804 | $(6,416,885) | $(455,041) | 373,279 | $(308,986) | $4,166,892 |

6

LIFE PARTNERS HOLDINGS, INC.
CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS
FOR THE NINE MONTHS ENDED NOVEMBER 30, 2001 AND 2000
(UNAUDITED)

|  | 2001 | 2000 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income (loss) | $ (771,576) | $   66,215 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities - | | |
| Depreciation | 38,767 | 31,176 |
| (Increase) decrease in accounts receivable | 1,011 | (189,647) |
| (Increase) in prepaid expenses | (154,113) | (2,113) |
| (Increase) decrease in advances on premiums | 63,198 | (36,149) |
| (Increase) decrease in other assets | 157 | (16,752) |
| Increase (decrease) in accounts payable | (2,859) | 31,677 |
| Increase in deferred revenues | 143,500 | - |
| Decrease in income taxes payable | - | (78,087) |
| Increase (decrease) in accrued liabilities | 272,221 | (43,583) |
| Net cash provided by (used in) operating activities | (409,694) | (237,263) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchases of property and equipment | (21,176) | (813,884) |
| Net cash used in investing activities | (21,176) | (813,884) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from notes payable | 4,702 | 900,051 |
| Payments on notes payable | (18,225) | - |
| Proceeds from issuance of treasury stock | 4,733,433 | 509,189 |
| Purchase of treasury stock | - | (298,130) |
| Net cash provided by (used in) financing activities | 4,719,910 | 1,111,110 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 4,289,040 | 59,963 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 312,277 | 115,775 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $4,601,317 | $   175,738 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | |
| Interest paid | $   44,202 | $   33,584 |
| Income taxes paid | $        - | $   78,087 |

During May of 2001, the Company issued 17,778 shares of its treasury stock in settlement of a claim against the Company. This transactions was valued at $80,000 for financial reporting purposes.

See accompanying notes.

7

## NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
NOVEMBER 30, 2001
(UNAUDITED)

These consolidated condensed financial statements have been prepared by Life Partners Holdings, Inc. (the "Company") without audit, pursuant to the rules and regulations of the Securities and Exchange Commission, and reflect all adjustments which are, in the opinion of management, necessary for a fair statement of the results for the interim periods, on a basis consistent with the annual audited financial statements. All such adjustment is of a normal recurring nature. Certain information, accounting policies, and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the financial statements and information presented not misleading. These financial statements should be read in conjunction with the financial statements and the summary of significant accounting policies and notes thereto included in the Company's most recent annual report on Form 10-KSB.

The Company's fiscal year ends on the last day of February. In fiscal 2002, the Company's interim quarters ended May 31, 2001, August 31, 2001 and November 30, 2001.

(1) DESCRIPTION OF BUSINESS

Life Partners Holdings, Inc. (the "Company") formerly IGE, Inc. was organized under the laws of the Commonwealth of Massachusetts in 1971, but had been dormant and without operations since 1985. On January 18, 2000, the shareholders of Life Partners Holdings, Inc. and Life Partners, Inc. (LPI) entered into a share exchange agreement whereby LPI became a wholly owned operating subsidiary of the Company. On January 20, 2000, the Company acquired all of the outstanding stock of Extended Life Services, Inc. for $500.

The Company's subsidiaries are as follows:

LPI is a viatical settlement company established in 1991 and incorporated in State of Texas for the purpose of assisting persons in facilitating the purchase of the life insurance policies of terminally ill persons at a discount to their face value.

Extended Life Services, Inc. was established in 1998 and incorporated in the State of Texas for the purpose of assisting persons in facilitating the purchase of the life insurance policies of elderly individuals at a discount to their face value.

(2) CHANGE IN ACCOUNTING PRINCIPLE

During the nine months ended November 30, 2001, the Company changed its method of reporting revenues to take into consideration certain nominal services performed by the Company subsequent to closing of the viatical settlement. These services although not called for in the policy funding agreements entail monitoring the insured's progress and notifying the holder of the policy when the insured dies. The Company has elected to change its policy funding agreement to specify that this service will be performed and to charge an up front fee for this service of $100 per policy. The fee will be deferred and amortized over the life expectancy of the insured. Prior to this change, all revenues were recognized on the closing date for the acquisitions of the policies by investors. With respect to earlier purchases (in which the fee was not charged), the Company has reserved a portion of its previously recognized income through a charge against income. The reserved portion is equivalent to the unamortized amount that would have existed had the Company always deferred and amortized a $100 fee. The cumulative effect of this change in accounting method (assuming the Company had charged this fee from inception) resulted in a one-time charge of $143,500, which is reflected in the financial statements at November 30, 2001. Proforma numbers reflecting the effect of this change as if the Company had reported earnings in this manner were not included as the effects would have been immaterial to earnings during the three and nine-month periods ended November 30, 2001 and 2000.

8

As of November 30, 2001, the Company had the following long-term debt:

| | |
|---|---:|
| Building loan | $608,593 |
| Equipment loans | 4,702 |
| | 613,295 |
| Less current portion | 25,538 |
| Long-term debt | $587,757 |

## (4) COMMON STOCK OPTIONS AND CHANGES IN CAPITALIZATION

### Reverse Merger

On January 18, 2000, the Company acquired LPI in a share exchange whereby LPI became a wholly owned subsidiary of the Company. This transaction was treated as a pooling of interest for financial reporting purposes. The Company issued LPI stockholders 9,500,000 shares of common stock. The Company approved the transfer of its assets to LPI and the existing Board of Directors and Officers resigned. On January 21, 2000, the Company's principal shareholders contributed 3,000,000 shares of the Company's common stock back to the Company to be used in accordance with the terms of the its Omnibus Equity Compensation Plan. Any shares not optioned by January 31, 2002 were to revert to this shareholder. As of February 28, 2001, this shareholder waived its reversionary rights to these shares.

### Omnibus Equity Compensation Plan

The Company adopted an Omnibus Equity Compensation plan. This plan allows the Company to issue options and other rights covering up to 3,000,000 shares of its treasury stock to its employees and agents at prices and terms to be determined by the Company on the date of issuance.

As of November 30, 2001, the Company had issued options covering 1,395,356 shares under this plan. As of such date, all options had been exercised and no options or other rights awarded under the plan were outstanding.

## (5) OTHER STOCK TRANSACTIONS

On December 26, 2000, the Company issued 41,385 shares of its restricted treasury stock to a corporation in exchange for a one-year note receivable in the amount of $300,041. This note bears interest at the rate of 9.5% per annum and is personally guaranteed by certain individuals. For financial reporting purposes, this note has been reflected as a reduction in the Company's Shareholders' Equity section similar to a stock subscription receivable. During December 2001, this note receivable was renewed for one year with the unpaid interest rolled into the principal balance of the new note.

As of November 30, 2001, the Company had 244,523 warrants outstanding at exercise prices ranging from $7.25 to $9.375 per warrant for one share each of the Company's treasury stock. These warrants will expire in three years commencing in 2003.

On May 24, 2001, the Company entered into a series of private placement transactions resulting in the sale of 1,000,000 shares of the Company's treasury stock at $5.00 per share. The Company's net proceeds totaled $4,650,000.

During May, 2001, the Company issued 17,778 shares of its treasury stock in settlement of a claim against the Company. This transaction was valued at $80,000 for financial reporting purposes.

On August 23, 200?, the Company issued 30,000 shares of its restricted treasury stock to an individual in exchange for a three-year note receivable in the amount of $155,000. This note bears interest at the rate of 6.5% per annum. For financial reporting purposes, this note has been reflected as a reduction in the Company's Shareholders' Equity section similar to a stock subscription receivable.

## (6) EARNINGS (LOSS) PER SHARE

Basic earnings per share amounts are computed based on the weighted average number of shares outstanding on that date during the applicable periods.

Diluted earnings per share was not computed as of November 30, 2001 and 2000 because there was no material differences between basic and diluted earnings per share.

## (7) CONTINGENCIES

LPI was named as defendant in a suit claiming it violated the Texas Securities Act by not complying with the registration requirements of the Act in connection with viatical settlement contracts it has arranged. On July 31, 2001, the McLennan County District Court for the 19th Judicial District ruled that the Company's viatical settlement transactions were not securities under Texas law and that the Company is not required to register them as securities prior to sale. In making its' ruling, the Court awarded summary judgment against the Plaintiff in this action dismissing the case entirely. Plaintiff has appealed this decision.

LPI had been named as defendant in a suit wherein the plaintiff alleged that her investment advisor misrepresented certain facts to her in purchasing certain viatical settlements. The plaintiff alleged that the investment advisor was an agent of the Company. The plaintiff claimed she invested over $160,000 to purchase viatical settlements at issue in this case and paid approximately $14,000 in taxes that she contended were LPI's responsibility. She also included a claim for punitive damages and recovery of attorneys' fees. During December 2001, this case was settled for a nominal amount.

On May 31, 2001, LPI was named as defendant in a suit brought by the State of Texas. Plaintiff alleges that LPI failed to disclose to purchasers of viatical settlements prior to 1997 that the purchasers could incur additional carrying costs in the form of premium payments if viators lived beyond their projected life expectancies. Plaintiff claims that the nondisclosure violates the Texas Deceptive Trade Practices Act (the "DTPA") and seeks an injunction against future violations, civil penalties, and the restitution to the affected individuals. The Company has met with the plaintiff to discuss resolution of this matter, but the results of that meeting were not conclusive. Management believes that it did not violate the DTPA and that the applicable statute of limitations would preclude most of the possible claims. The Company's primary legal counsel in this case has informed the Company that they do not anticipate the settlement costs in this case to exceed $400,000.

The Company has accrued $450,000 in a loss reserve relating to the above-described cases. It believes this reserve will be adequate to cover all costs of defending itself and settling these cases.

The Company has been named as a defendant in a suit brought by two former employees who alleged that they were entitled to certain stock options representing a total of 30,000 shares of the Company's common stock. These stock options were allegedly issued to them by the Company's principal shareholder and were to have had an exercise price of $.01 per share. Plaintiffs allege that the Company was not willing to exercise these options resulting in losses of approximately $357,000 in actual damages. Plaintiffs are also asking for exemplary damages. Management denies any liability in this suit and plans to pursue its defense vigorously. No liability has been accrued on the Company's books as of November 30, 2001 in connection with this suit.

During the three and nine months ended November 30, 2001, the Company accrued $96,619 and $362,118, respectively, in underwriting losses.

On September 20, 2001, the Company received notice from the Internal Revenue Service of a proposed tax adjustment to Life Partners, Inc.'s taxable income for the years ended September 30, 1993, 1994 and 1995. The proposed tax deficiencies totaled $1,755,624 plus proposed penalties totaling $351,125. The Company would also be liable for interest due on any portion of this assessment if it is upheld.

The Company's legal counsel in this matter has not had sufficient time to make an estimation of the Company's liability, if any, in connection with this proposed assessment. Management believes that it has substantial support for its position and that the ultimate liability, if any, will be substantially less than the proposed assessment. Because the Company has not been able to quantify its liability, if any, with regard to this proposed assessment, no loss accrual has been recorded as of November 30, 2001.

In the opinion of management, no other legal matters will have a material impact on the Company's financial statements.

(8) AGREEMENT WITH SUTRO & CO.

On September 6, 2001, the Company signed an engagement letter with Sutro & Co. Incorporated ("Sutro"). Sutro is to assist in the preparation of a public or private offering of up to $500 million of asset-backed securities involving senior life settlements.

Terms of this agreement call for the Company to pay Sutro and advisory fee equal to 3% of the principal amount of asset backed securities created in the private or public offering. In addition, Sutro is to receive a 25% interest in the residual and/or equity certificates issued in connection with the securities issued pursuant to this agreement.

The agreement also calls for the Company to make a $100,000 non-refundable retainer deposit to Sutro. This deposit is to be applied against any fees future advisory fees earned by Sutro. The Company has also agreed to give Sutro a $25,000 deposit, which is to be utilized for fees, expenses, and costs Sutro might incur in connection with this engagement. As of November 30, 2001, the $125,000 advanced to Sutro is reflected in prepaid expenses on the Company's balance sheet.

11

Statements in this quarterly report on Form 10-QSB concerning our business prospects or future financial performance; anticipated revenues, expenses, profitability or other financial items, growth in the viatical or life settlement markets or our projected sales in such markets; developments in industry regulations and the application of such regulations, and our strategies, plans and objectives, together with other statements that are not historical facts, are forward-looking statements" as that term is defined under the federal securities laws. All of these forward-looking statements are based on information available to us on the date hereof, and we assume no obligation to update any such forward-looking statements. Forward-looking statements involved a number of risks, uncertainties and other factors, which could cause actual results to differ materially from those stated in such statements. We do not undertake any obligation to release publicly any revisions to such forward-looking statements to reflect events or uncertainties after the date hereof or reflect the occurrence of unanticipated events.

The following discussion is intended to assist in understanding of our financial position as of November 30, 2001, and its results of operations for the three and nine month periods ended November 30, 2001 and 2000. The financial statements and notes included in this report contain additional information and should be referred to in conjunction with this discussion. It is presumed that the readers have read or have access to Life Partners Holdings, Inc.'s annual report on Form 10-KSB for the year ended February 28, 2001.

### The Company

General. Life Partners Holdings, Inc. ("We", the "Company" or "Life Partners") is the parent company of Life Partners, Inc. ("LPI") and Extended Life Services, Inc. ("ELSI"). LPI is the oldest and one of the largest viatical settlement companies in the United States. To supplement LPI's viatical business, we acquired ELSI in January 2000 to engage in senior life settlement transactions, a strongly emerging market similar to our viatical settlement business.

Our Viatical Settlement Business. LPI was incorporated in 1991 and has conducted business under the registered service mark "Life Partners" since 1992. To date, our revenues have been principally derived from fees for facilitating the purchase of viatical settlement contracts. A viatical settlement is the sale of a life insurance policy covering a person who is terminally ill. By selling the policy, the insured (a viator) receives an immediate cash payment to use as he or she wishes. The purchaser takes an ownership interest in the policy at a discount to its face value and receives the death benefit under the policy when the viator dies.

The following table shows the number of settlement contracts we have transacted, the aggregate face values and purchase prices of those contracts, and the revenues we derived, for the three and nine months periods ended November 30, 2001 and 2000:

|  | Period Ended November 30, 2000 | | Period Ended November 30, 2001 | |
|  | Three Months | Nine Months | Three Months | Nine Months |
| --- | --- | --- | --- | --- |
| Number of settlements | 13 | 115 | 36 | 107 |
| Face value of policies (in `000's) | $ 776 | $ 8,681 | $ 2,041 | $ 7,843 |
| Average revenue per settlement | $22,293 | $28,236 | $34,200 | $27,399 |
| Net revenues derived (in `000's) (1) | $ 196 | $ 1,720 | $ 653 | $ 1,465 |

(1) The revenues derived are exclusive of referring broker commissions.

12

Our New Senior Life Settlement Business To supplement our viatical settlement operations, we entered the market for "senior life settlements" in 1997 under contract with ELSI. We later acquired ELSI as a wholly owned subsidiary to focus on this market, which Conning & Co., an independent industry analyst, estimates to be in excess of $100 billion in face amount. On behalf of ELSI, we originated, reviewed and underwrote almost $600 million in face value of senior life settlements in 1997. In underwriting these policies, we quantified premium and life expectancy risks, but did not purchase any of the policies for our own account or assume any risk associated therewith. Although we anticipate purchasing senior life settlements for our securitization with Sutro & Co. Incorporated (see below), we have not purchased any senior life settlements since 1997.

A senior life settlement differs from a viatical settlement in that the insured in a life settlement is not terminally ill, is 65 years of age or older, and has a life expectancy of between two and twelve years. Senior life settlements appeal to persons who purchased life insurance for income protection or estate planning, but no longer need the insurance due to growth in their investment portfolios or other changes in circumstances. The settlements also appeal to persons who want to make immediate gifts to their beneficiaries. In these instances, the insured may feel the insurance is no longer needed.

On September 6, 2001, the Company signed an engagement letter with Sutro & Co. Incorporated to act as its exclusive financial advisor and placement agent for either the public or private placement of up to $500 million of asset backed securities involving life insurance policies and senior life settlements. See Note 8 to the Notes to the Consolidated Condensed Financial Statements and "Liquidity and Capital Resources" below.

## Comparison Of The Three Months Ended November 30, 2001 And 2000

We reported net loss of $(85,623) for the three months ended November 30, 2001, as compared to net loss of $(123,704) for the three months ended November 30, 2000. This $38,081 improvement is attributable primarily to the following factors: (1) a 233% increase in revenues net of brokerage expense offset in part by (2) a 61% decrease in other income, (3) the accrual of underwriting losses of $93,619 in 2001, (4) a charge of $143,500 in 2001 associated with a change in accounting principles and, (5) a decrease in income tax benefits of $104,127 from 2000.

Revenues - Revenues increased by $941,388 or 325% from $289,809 in 2000 to $1,231,197 for the same period in 2001. This increase was due primarily to a 177% increase in the number of policies settled from 13 in 2000 to 36 in 2001 combined with a 53% increase in the average revenues per settlement from $22,293 in 2000 to $34,200 for the comparable period in 2001. Management believes the increase in the number of settlements is due to increasing demand for viatical settlements by investors, which we believe results from increased interest in viatical settlements as a means of diversification of our clients investment portfolios. The increase in the average revenue per settlement is due to a decrease in the number of viatical settlement companies resulting in Company's ability to negotiate lower purchase prices from insured's.

Brokerage and Referral Expenses - Brokerage and referral expenses increased by 515% or $484,075 from $94,022 in 2000 to $578,097 in 2001. This increase is due primarily to (1) a 177% increase in the number of cases settled combined with (2) a 122% increase in the average brokerage fees per settlement from $7,232 in 2000 to $16,058 in 2001 . The increase in the average brokerage and referral fee per settlement is due to (1) higher average settlements in 2001 than in 2000 and (2) the market trend towards paying higher referral fees.

General and Administrative Expenses - General and administrative expenses decreased by 8% or $46,052 from $602,060 in 2000 to $556,0008 in 2001. This decrease was due primarily to (1) a $29,505 decrease in rent as a result of the purchase of our own office building and, (2) decreases in salaries and related expenses as a result of reductions in the number of personnel, offset in part by a $25,069 increase in legal and professional fees resulting from our defense of various litigation.

Depreciation Expense - Depreciation expense increased from $12,750 in 2000 to $13,316 for the comparable three-month period in 2001.

13

Interest and Other Income - Interest and other income decreased by $129,261 from $211,468 in 2000 to $82,207 in 2001. This decrease was due primarily to the collection in 2000 of reimbursements for premium advances totaling $182,358, which had previously been charged to expense. During the comparable period in 2001, we did not receive any significant premium reimbursements.

Underwriting Losses - We incurred underwriting losses of $93,619 for the three month period ended November 30, 2001. We have implemented stricter underwriting guidelines in an effort to minimize or eliminate underwriting losses in the future.

Interest Expense - Interest expense decreased from $20,276 in 2000 to $14,487 for the same three-month period in 2001. This decrease was due primarily to the inclusion of four months building interest in the quarter ended November 30, 2000.

Cumulative Effect of Change in Method of Income Recognition - During 2001 the company recognized a charge of $143,500 associated with a change in the Company's method of recognizing income to take into consideration certain nominal services, which are performed subsequent to the settlement date.

Income Taxes - No income tax expense was reported in 2001 as the Company had a loss. An income tax benefit of $104,127 was reported in 2000. This benefit resulted from the offsetting of the current quarter's loss against the income tax liability accrued for the first two quarters earnings.

Tax Assessment - On September 20, 2001, we received notice from the Internal Revenue Service of a proposed tax adjustment to LPI's taxable income for the years ended September 30, 1993, 1994 and 1995. The proposed tax deficiencies totaled $1,775,624 plus proposed penalties totaling $351,125. Interest and penalties could be added to any portion of this assessment that is upheld. Our legal counsel and we are assessing LPI's liability, if any, in connections with this proposed assessment. We believe that LPI has substantial support for its position and that the ultimate liability, if any, will be substantially less that the proposed assessment. We have not be able to determine the amount, if any, of liability that should be accrued on our books in connection with this proposed tax adjustment, therefore no accrual has been recorded as of November 30, 2001.

## Comparison Of The Nine Months Ended November 30, 2001 And 2000

We reported net loss of $(771,576) for the nine months ended November 30, 2001, as compared to net income of $66,215 for the nine months ended November 30, 2000. This decrease in net income is attributable primarily to the following factors: (1) recognition of $352,119 in underwriting losses,
(2) a 10% decrease in revenues, (3) a 42% decrease in interest and other income, and (4) a charge of $143,500 related to the Company's method of reporting income.

Revenues - Revenues decreased by $315,455 or 10% from $3,247,187 in 2000 to $2,931,732 for the same nine month period in 2001. This decrease was due primarily to a 3% decrease in the average revenue per settlement from $28,236 in 2000 to $27,399 for the comparable nine month period in 2001 combined with a 7% decrease in the number of settlements from 115 in 2000 to 107 for the comparable period in 2001. The decrease in the number of settlements is attributable to market conditions, which did not start improving until the third quarter of 2001.

Brokerage and Referral Expenses - Brokerage and referral expenses decreased 4% or $60,252 from $1,527,031 for the nine months ended November 30, 2000 to $1,466,779 for the nine months ended November 30, 2001. This decrease is due in part to a 7% decrease in the number of settlements offset in part by a 3% increase in the average brokerage and referral fee per settlement from $13,278 in 2000 to $13,708 in 2001. This increase is due to the market trend towards paying higher referral fees.

General and Administrative Expenses - General and administrative expenses decreased by 3% or $49,682 from $1,872,267 for the nine months ended November 30, 2000 to $1,822,585 for the nine months ended November 30, 2001. This decrease is due in part to the following: (1) a $88,515 decrease in rent as a result of the Company's acquiring its own facility,
(2) decreases in salaries and telephone expense as a result of decreases in the number of employees, offset in part by, (3) a $122,754 increase in legal and professional fees due primarily to legal fees incurred in its defense of various litigation.

Depreciation Expense - Depreciation expense increased from $31,176 in 2000 to $38,767 for the comparable nine-month period in 2001. This increase is due primarily to our purchase of an office building in June of 2000.

14

Interest and Other Income - Interest and other income decreased by 42%, or $118,442 from $283,086 for the nine months ended November 30, 2000 to $164,644 for the nine months ended November 30, 2001. This decrease was due primarily to the collections in 2000 of reimbursement for an unusually large premium advance, which had previously been charged to expense.

Underwriting Losses - We incurred $352,119 in underwriting losses during the nine months ended November 30, 2001. We have implemented stricter underwriting guidelines in an effort to minimize or eliminate underwriting losses in the future.

Interest Expense - Interest expense increased from $33,584 for the nine months ended November 30, 2000 to $44,202 for the same nine-month period in 2001. This increase is due primarily to the addition of debt associated with the acquisition of the Company's office building.

Cumulative Effect of Change in Method of Income Recognition - During 2001, the Company recognized a charge of $143,500 associated with a change in the Company's method of recognizing income to take into consideration certain nominal services, which are performed subsequent to the settlement date.

Tax Assessment - On September 20, 2001, we received notice from the Internal Revenue Service of a proposed tax adjustment to LPI's taxable income for the years ended September 30, 1993, 1994 and 1995. The proposed tax deficiencies totaled $1,775,624 plus proposed penalties totaling $351,125. interest and penalties could be added to any portion of this assessment that is upheld. Our legal counsel and we are assessing LPI's liability, if any, in connections with this proposed assessment. We believe that LPI has substantial support for its position and that the ultimate liability, if any, will be substantially less that the proposed assessment. We have not be able to determine the amount, if any, of liability that should be accrued on our books in connection with this proposed tax adjustment, therefore, no accrual has been recorded as of November 30, 2001

## Liquidity and Capital Resources

### Operating Activities

Net cash flows used in operating activities for the nine months ended November 30, 2001 were $(409,693) compared with net cash flows used in operating activities of $(237,263) for the nine months ended November 30, 2000. This decrease in cash flows from operating activities was attributed primarily to the net loss of $(771,576) during the nine months ended November 30, 2001 as compared to the net income of $66,215 for the comparable period in 2000 combined with a $151,113 increase in prepaid expenses in 2001 offset in part by increases in accrued liabilities and deferred income totaling $415,721.

Our strategy is to increase cash flows generated from operations by increasing revenues while controlling brokerage and general and administrative expenses. To this end, we have substantially increased revenues from our viatical settlements, which resulted in net income for the three months ended November 30, 2001, before the one-time charge resulting from the change of accounting principles. We anticipate further increases in revenues from our participation in the senior life settlement market though the Sutro & Co. placement. We also intend to commence investing directly in viatical and senior life settlement policies on our own behalf.

### Sale of Equity

During May 2001, we sold one million shares of our restricted treasury stock for net proceeds of $4,650,000. We used these proceeds for additional working capital.

### Capital Resources and Liquidity

At November 30, 2001, we had working capital of $3,993,404, which we believe is sufficient for our foreseeable needs. We believe future viatical settlement operations will generate sufficient profits and cash flows to meet our anticipated working capital needs for this business segment.

15

We have signed an engagement letter with Sutro & Co. Incorporated which intends to place a public or private offering up to $500 million of asset-backed securities involving senior life settlements. The senior life settlements will serve as the assets backing notes to be sold to investors. Securing $500 million of notes will require approximately $1.0 billion in policy face amounts. We anticipate that we will originate the senior life settlements, receive placement fees for its origination, and will retain a contingent revenue interest in the settlements to the extent that life insurance proceeds exceed the amounts necessary to retire the notes. We are currently negotiating the structure of the securitization and have begun identifying senior life settlements. We expect that Sutro & Co. will place approximately $250 million of bonds within the first quarter of the next fiscal year ending 2003, and the balance during the next three quarters of fiscal 2003. After the bonds are placed, we will acquire senior life settlements with the note proceeds over a period of up to 18 months. If all $500 million of the securities are sold as planned, we expect to realize up to $55.0 million in placement fees (approximately 5.5% of policy face amounts) during the first three quarters of its fiscal year ended February 28, 2003.

During the nine months ended November 30, 2001, we accrued $352,119 associated with certain underwriting losses of which $80,000 was paid by the issuance of Company stock and another $53,119 was paid in cash. On September 20, 2001, we received notice from the Internal Revenue Service of a proposed tax adjustment to Life Partner Inc.'s taxable income. We are unable to determine at the time the amount, if any, that LPI might owe and had not accrued any liability on our financial statements related to this proposed tax deficiency. See Part II, Item 1, Legal Proceedings.

## PART II - OTHER INFORMATION

### Item 1. Legal Proceedings

LPI was named as defendant in a suit claiming it violated the Texas Securities Act by not complying with the registration requirements of the Act in connection with viatical settlement contracts it has arranged. On July 31, 2001, the McLennan County District Court for the 19th Judicial District ruled that LPI's viatical settlement transactions were not securities under Texas law and that LPI is not required to register them as securities prior to sale. In making its' ruling, the Court awarded summary judgment against the Plaintiff in this action dismissing the case entirely. Plaintiff has appealed this decision.

LPI had been named as defendant in a suit wherein the plaintiff alleged that her investment advisor misrepresented certain facts to her in purchasing certain viatical settlements. The plaintiff alleged that the investment advisor was an agent of LPI. The plaintiff claimed she invested over $160,000 to purchase viatical settlements at issue in this case and paid approximately $14,000 in taxes that she contended were LPI's responsibility. She also included a claim for punitive damages and recovery of attorneys' fees. During December 2001, this case was settled for a nominal amount.

On May 31, 2001, LPI was named as defendant in a suit brought by the State of Texas. Plaintiff alleges that LPI failed to disclose to purchasers of viatical settlements prior to 1997 that the purchasers could incur additional carrying costs in the form of premium payments if viators lived beyond their projected life expectancies. Plaintiff claims that the nondisclosure violates the Texas Deceptive Trade Practices Act (the "DTPA") and seeks an injunction against future violations, civil penalties, and the restitution to the affected individuals. LPI has met with the plaintiff to discuss resolution of this matter, but the results of that meeting were not conclusive. Management believes that it did not violate the DTPA and that the applicable statute of limitations would preclude most of the possible claims. LPI's primary legal counsel in this case has informed LPI that they do not anticipate the settlement costs in this case to exceed $400,000.

On September 20, 2001, we received notice from the Internal Revenue Service of a proposed tax adjustment to LPI's taxable income for the years ended September 30, 1993, 1994 and 1995. The proposed tax deficiencies totaled $1,793,624 plus proposed penalties totaling $351,125. LPI would also be liable for interest due on any portion of this assessment that is upheld. LPI's legal counsel in this matter has not had sufficient time to make an estimation of LPI's liability, if any, in connection with this proposed assessment. We believe that LPI has substantial support for its position and that the ultimate liability, if any, will be substantially less than the proposed assessment. Because LPI has not been able to quantify its liability, if any, with regard to this proposed assessment, no loss accrual has been recorded as of November 30, 2001.

In the opinion of management, no other legal matters will have a material impact on our financial statements.

## Item 5. Other Information

On December 13, 2001, we announced that the Board of Directors had authorized the Company to purchase as much as 250,000 shares of our common stock on the open market. We may purchase such stock at the discretion of management at any time subject to all applicable SEC rules and regulations. As of the date of this report, we have not purchased any shares.

## Item 6. Exhibits and Reports on Form 8-K

(a) Exhibits

### Letter of Intent with Sutro & Co., Incorporated

(b) Reports on Form 8-K

The Company filed the following Form 8-K during the quarter ended November 30, 2001:

A form 8-K dated September 6, 2001, reporting the entering into an agreement with Sutro & Co. Incorporated to act as its exclusive financial advisor and placement agent for either the public or private placement of up to $500 million of asset backed securities involving life insurance policies and Senior Life Settlements.

17

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

January 11, 2002                    Life Partners Holdings, Inc.


                                    Brian  D.  Pardo
                                    President  and  Chief  Executive  Officer

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|------|-------|------|
| Brian  D.  Pardo | President, Principal Executive Officer, and Director | January 11, 2002 |
| Jacquelyn Davis | Chief Financial Officer, Treasurer, and Director | January 11, 2002 |
| R.  Scott  Peden | Corporate Clerk (Secretary), Director | January 11, 2002 |

18

CONFIDENTIAL

September 4, 2001

Mr. Brian D. Pardo
President
Life Partners Holdings, Inc.
6615 Sanger Avenue, Suite 30
Waco, Texas 76710

Dear Mr. Pardo:

In accordance with our recent discussions, this letter (the "Agreement") sets forth the terms under which Life Partners Holdings, Inc. (the "Company") will retain Sutro & Co., Incorporated ("Sutro") and First Global Securities, Inc. ("Global") to act as its exclusive financial advisor and placement agent for either the public or private placement of up to $500,000,000 of asset-backed securities in one or more transactions (the "Securities") primarily involving life insurance policies and settlements. Such placement of the Securities shall be referred to as the "Placement" and our engagement pursuant to this letter agreement (the "Agreement") shall be referred as the "Engagement".

1. Scope of the Engagement. Sutro and Global will assist you in affecting the Placement the on the terms and conditions of this Agreement. In this regard, we propose to undertake the following activities, to the extent each is appropriate, on your behalf:

a) Advising the Company as to the form and structure of the Placement;
b) Assisting the Company and its counsel in the preparation of a Placement Memorandum (the "Memorandum") concerning the Company and the Securities. Responsibility for the contents of such Memorandum shall be solely that of the Company, and to protect the Company, the Memorandum shall not be made available to, or used in discussions with, prospective investors by Sutro until both the Memorandum and its use for those purposes have been approved by the Company;
c) Identifying and introducing to, and consulting as to strategy for initiating discussions with potential investors;
d) Using its best efforts to privately place the Securities with Investors;
e) Negotiating the sale of the Securities to Investors;
f) Assisting in the preparation of definitive documentation for the Placement.

1.1 Company Information. In connection with Sutro and Global's engagement, the Company represents that all of the data, material, and information concerning the Company (the "Information") furnished to Sutro and Global by it and its advisors and agents shall be accurate and complete in all respects at the time furnished; and further agrees that if any of such Information becomes inaccurate, misleading or incomplete during the term of Sutro and Global's engagement hereunder, the Company shall promptly so advise Sutro in writing and correct any such inaccuracy or omission. The Company acknowledges that it is the exclusive source of such Information. The Company recognizes and confirms that Sutro and Global in advising the Company and undertaking the Engagement assignment, will be using and relying on the Information without independent verification or investigation and without performing any appraisal of the assets or businesses of the Company. The Company authorized Sutro and Global to use and deliver the Information, and any other data obtained by Sutro from reliable published sources, to potential Investors. Sutro and Global agree to keep any non-public information confidential so long as it remains non-public, unless disclosure is required by law or requested by any governmental or regulatory agency or body, and Sutro and Global will not make any use thereof, except for Sutro and Global's services for the Company as described in this Agreement.

19

1.2 Placement Memorandum. Sutro and Global will assist the Company and its counsel in the preparation of a Placement Memorandum and will provide Sutro and Global with the number of copies of each Memorandum, as Sutro shall request. The Company shall provide Sutro and Global, prior to the dissemination of the Memorandum, with a written representation that the Memorandum and the Information are complete and correct in all material aspects and do not contain any untrue statement of a material face or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made, other than information furnished to the Company by Sutro and Global.

2. Exclusivity. It is understood that the Company is engaging Sutro on an exclusive basis to act as financial advisor and placement agent in connection with the Placement for a period commencing on September 4, 2001 and ending on March 1, 2002, provided, however, that such Period shall be automatically renewed for successive thirty-day periods unless either party gives notice to the other within 30 days of the expiration of the Period of its desire to terminate this Engagement. In addition, Sutro and Global may, at its sole option terminate this Engagement without liability if, in the opinion of Sutro, a change has occurred in the Company's financial condition, results of operations, properties, business or prospects, or the composition of the Company's management or Board of Directors, which, in Sutro and Global's sole determination, has adversely affected the marketability of the Securities.

It is expressly understood that the provisions in this Agreement relating to the payment of fees and expenses will survive any such termination of the Engagement or completion of Sutro and Global's services pursuant to this Agreement. The Company shall be obligated to pay Sutro and Global the Advisory Fee (as that term is defined in paragraph 3 below) if during the Period or within the twelve month period following the termination of this Engagement the Company receives acceptable commitments from any Investor (a) identified to the Company by Sutro or Global or (b) with which Sutro or Global had a discussion regarding the Placement, in any instance, during the term of the Engagement and whether or not such discussions were initiated by Sutro or Global. It is also understood that the Company will notify potential purchase of the Securities. It is understood that Sutro and Global's involvement in the Placement is strictly on a best efforts basis and the consummation of the Placement will be subject to, among other things, prevailing market conditions.

3. Compensation. Sutro and Global's compensation for their services performed pursuant to this Agreement will be determined as follows:

a) An advisory fee (the "Advisory Fee") equal three percent (3.0%) of the principal amount of the asset-backed securities created in the Placement Memorandum. The Advisory Fee will be payable in cash upon the closing of the Private Placement.

b) A non-refundable retainer of $100,000.00 payable immediately upon execution of this Agreement. This retainer shall be credit against any fees payable to Sutro pursuant to paragraph 3(a).

c) A warrant to purchase seventy-five thousand (75,000) shares of the issued and outstanding common stock of the Company at a strike price of $8.00 per share for five years adjusted pro forma for the issuance of shares of common stock and/or warrants issued in connection with the proposed Private Placement (including without limitation the common stock underlying the warrants issued to Sutro). The percentage of equity to be purchased shall be subject to customary anti-dilution provisions, together with pre-emptive rights and tag along rights. The warrants will be granted upon the closing of the Financing and shall conform in terms, including, but not limited to, the term of the warrants and the strike price of the warrants to be issued in the Private Placement [if no warrants are to be issued in the private placement, specify terms of warrants pursuant hereto]. The warrants shall contain a cashless exercise provision. The holders of the warrants shall be entitled to unlimited "piggyback" registration rights during the first five years following the Private Placement. The Company shall bear all costs and expenses in connection with such registrations.

20

d) A twenty-five percent (25.0%) ownership interest in the residual and/or equity certificates in connection with the securities issues in pursuant to the Engagement.

4. Fees and Expenses. In addition to the foregoing fees, and irrespective of whether the transaction contemplated by this Agreement is consummated, the Company agrees, upon Sutro and Global's request to promptly reimburse them for all out-of-pocket expenses arising out of this Engagement, including but not limited to, such costs as printing, travel, accommodations, meals, telephone, facsimile, courier service, copying, direct computer expenses and the reasonable fees and disbursements of Sutro's legal counsel. The Company agrees to provide Sutro and Global upon execution of this Agreement with a $25,000.00 deposit to be utilized for all fees, expenses, and costs. All such fees, expenses and costs will be billed not more frequently than monthly and are payable by the Company promptly upon receipt of Sutro and Global's request. Upon termination or expiration of the Agreement, any unreimbursed fees and expenses will be immediately due and payable.

5. Indemnification. In connection with the Engagement of Sutro and Global hereunder, the Company has entered into a separate letter agreement, dated as of the date hereof (the "Indemnification Agreement"), providing for the indemnification of Sutro and certain related parties by the Company.

6. Private Offering. If this Engagement results in a Private Offering (as opposed to an SEC registered offering) Sutro and Global agrees that: (a) it will offer the securities in a manner which will not impair the availability of the private offering exemption from federal securities registration provided by Section 4(2) of the Securities Act of 1933, and Regulation D promulgated thereunder, and in accordance with all applicable securities laws of the jurisdictions in which offers or sales of the Securities are made. The Company shall conduct the Private Placement and shall cooperate with Sutro to ensure that the Private Placement is conducted, in compliance with the private offering exemption from federal securities law registration provided by Section 4(2) of the Securities Act of 1933, and Regulation D promulgated thereunder, and the securities laws of the jurisdictions in which offers and sales of the Securities are made by Sutro in accordance with this Agreement

7. Successors. This Agreement and all rights and obligations hereunder shall be binding upon and inure to the benefit of each party's successors, but may not be assigned without the written consent of the other party, which consent shall not be unreasonably withheld.

8. Contractual Relationship. The Company expressly acknowledges that Sutro and Global have been retained as a financial advisor and placement agent to the Company only, and not as a financial advisor and placement agent to, or agent of, any other person, and that the Engagement is not intended to confer rights upon any persons not a party hereto (including shareholders, employees or creditors of the Company) as against Sutro or Global, their affiliates or their respective directors, officers, agents and employees.

It is understood that Company is a sophisticated business entity that has retained Sutro for the limited purposes set forth in the Agreement, and the Company and Sutro and Global acknowledge and agree that their respective rights and obligations are contractual in nature. Company and Sutro each disclaim any intention to impose fiduciary obligations on the other by virtue of the Engagement contemplated by this agreement.

9. Entire Agreement/Governing Law. This Agreement and the Indemnification Agreement constitute the entire agreement between us relating to this Engagement and supersede and take precedence over all prior agreements or understandings whether oral or written, between Sutro and Global and the Company with respect to this Engagement and may only be modified by written agreement which is singed by both parties. This Agreement and the Indemnification Agreement shall be governed by and construed in accordance with the laws of the State of California.

21

PAGE 4 OF 6

10. Arbitration. Any dispute arising from the interpretation, validity or performance of this Agreement and the Indemnification Agreement or any of their terms and provisions shall be submitted to binding arbitration in accordance with the provisions of the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. or the Arbitration Rules of the New York Stock Exchange, and judgment upon the award rendered by the arbitrators (or a majority of the arbitrators) may be entered in any court having Jurisdiction thereof. In the event there is any dispute involving Sutro and the Company that is not arbitrated, each of the parties hereby waives its right to a trial by jury. Such arbitration proceedings, or court proceeding if a dispute is not arbitrated, shall take place in California. In any such proceeding, the prevailing party shall be entitled to recover from the other its costs and expenses incurred therewith, including reasonable attorneys' fees.

11. Severability. If any term, provision, covenant or restriction contained in this agreement or in the Indemnity Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Please confirm that the foregoing correctly sets forth our agreement by signing and return to us the enclosed duplicate copy of the Agreement and the Indemnity Agreement. We look forward to working with you and to the successful conclusion of this Engagement.

Very truly yours,

SUTRO & CO. INCORPORATED

By:/s/Neal  A.  Sebbard
------------------------------
Neal  A  Sebbard
Managing  Director

Accepted and Agreed to
as of the date written above:

LIFE PARTNERS HOLDINGS, INC.

By:/s/Brian  Pardo
-------------------------
CEO
-------------------------
Title

FIRST GLOBAL SECURITIES, INC.

By:/s/Noble  B.  Trenham
-----------------------------------------
CEO
-----------------------------------------
Title

22

PAGE 5 OF 6

ANNEX A

**Indemnification and Contribution Provisions**

In connection with the engagement of Sutro & Co. and Global Securities, Inc. (jointly referred to herein as "Sutro") by Life Partners Holdings, Inc. (the "Company") pursuant to a letter agreement dated September xx, 2001, among the Company and Sutro, as it may be amended from time to time (the "Engagement Letter"), the Company hereby agrees as follows:

1. In connection with or arising out of or relating to the engagement of Sutro under the Engagement Letter, or any actions taken or omitted, services performed or matters contemplated by or in connection with the Engagement Letter, the Company agrees to reimburse Sutro its affiliates and their respective directors, officers, employees, agents and controlling persons (each an "Indemnified Party") promptly demand for expenses (including fees and expenses of legal counsel) as they are incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim, or any litigation, proceeding or other action in respect thereof. The Company also agrees (in connection with the foregoing) to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages and liabilities, joint or several, to which any Indemnified Party may become subject, including any amount paid in settlement of any litigation or other action (commenced or threatened) to which the Company shall have consented in writing (such consent not to be unreasonably withheld), whether or not any Indemnified Party is a party and whether or not liability resulted; provided, however, that the Company shall not be liable pursuant to this sentence in respect of any loss, claim, damage or liability to the extent that a court of competent jurisdiction shall have determined by final judgment (not subject to further appeal) that such loss claim, damage or liability resulted primarily and directly from the willful misfeasance or gross negligence of such Indemnified Party.

2. Promptly after receipt by an Indemnified Party of notice of the commencement of any action, such Indemnified Party will, if a claim in respect thereof is to be made against the Company, notify the Company in writing of the commencement therefore; but the failure so to notify the Company will not relieve it from any liability hereunder unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the Company of substantial rights and defenses and will not, in any event, relieve the Company from any obligations to any Indemnified Party other than the indemnification obligation provided hereunder. The Company shall be entitled to appoint counsel of the Company's choice at the Company's expense to represent the Indemnified party in any action for which indemnification is sought (in which case the Company shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the Indemnified Party or parties except as set forth below); provided, however, that such counsel shall be satisfactory to the Indemnified Party (who shall not, except with the consent of the Indemnified Party, also be legal advisors to the Company, such consent not to be unreasonably withheld). Notwithstanding the Company's election to appoint counsel to represent the Indemnified Party in an action, the Indemnified Party shall have the right to employ separate counsel (including local counsel), and the Company shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the counsel chosen by the Company to represent the Indemnified Party would present such counsel with a conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the Indemnified Party and the Company and the Indemnified Party shall reasonably conclude that there may be legal defenses available to it and/or other indemnified parties which are different from, or additional to, those available to the Company, (iii) the Company shall not have employed counsel satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the institution of such action or (iv) the Company shall authorize the Indemnified Party to employ separate counsel at the expense of the Company. The Company will not, without the prior written consent of the Indemnified Parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action, suit or proceeding.

23

3. In the event that the indemnity provided for in paragraphs 1 and 2 hereof is unavailable or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to amounts paid or payable by an Indemnified Party in respect of such Indemnified Party's losses, claims, damages and liabilities as to which the indemnity provided for in paragraphs 1 and 2 hereof is unavailable or insufficient (i) in such proportion as appropriately reflects the relative benefits received by the Company, on the one hand, and the Indemnified Party, on the other hand, in connection with the matters as to which such losses, claims, damages or liabilities relate, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as appropriately reflects not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and the Indemnified Party, on the other hand, as well as any other equitable considerations. The amounts paid or payable by a party in respect of losses, claims, damages and liabilities referred to above shall be deemed to include any legal or other fees and expenses incurred in defending any litigation, proceeding or other action or claim. Notwithstanding the provisions hereof, the Indemnified Party's share of the liability hereunder shall not be in excess of the amount of fees actually received by the Indemnified Party under the Engagement Letter (excluding any amounts received as reimbursement of expenses incurred by the Indemnified Party).

4. These Indemnification and Contribution Provisions shall remain in full force and effect whether or not any of the transactions contemplated by the Engagement Letter are consummated and shall survive the expiration of the period of the Engagement Letter, and shall be in addition to any liability that the Company might otherwise have to any Indemnified Party under the Engagement Letter or otherwise.

**LIFE PARTNERS HOLDINGS, INC.**

By:/s/Brian  Pardo
------------------------------

**FIRST GLOBAL SECURITIES, INC.**

By:/s/Noble  B.  Trenham

**SUTRO & CO.**

By:/s/Neal  A.  Sebbard

24

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.