LeCLAIR RYAN, A Professional Corporation
Andrew J. Frisch
830 Third Avenue
New York, New York 10022
Telephone: (212) 430-8031
Facsimile: (212) 430-8061

Attorneys for Defendant
  Life Partners Holdings, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MAXIM GROUP LLC,

                Plaintiff,

  - against -

LIFE PARTNERS HOLDINGS, INC.,

                Defendant.
_____

Case No. 07 CV 8099 (LAP)

**LIFE PARTNERS HOLDINGS, INC.'S REPLY MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

LeCLAIR RYAN, A Professional Corporation
Andrew J. Frisch
830 Third Avenue
New York, New York 10022
Telephone: (212) 430-8031
Facsimile: (212) 430-8061

Attorneys for Defendant
  Life Partners Holdings, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MAXIM GROUP LLC,

                      Plaintiff,

      - against -                    Case No. 07 CV 8099 (LAP)

LIFE PARTNERS HOLDINGS, INC.,

                      Defendant.
_____

### LIFE PARTNERS HOLDINGS, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

        The papers submitted by Maxim Group LLC ("Maxim") in opposition to summary judgment against it demonstrate why any further litigation of this matter would be wasteful and unnecessary. While there is a difference of opinion about Maxim's performance under the contract (though Maxim's own documents undermine its stated position on that issue), the Court need not reach the question of whether Maxim performed because Maxim failed to deliver warrant certificates as required by the language it drafted, and no warrant agreement was ever consummated.

        Maxim claims that the contract's description of the warrant in paragraph 3(a) of the contract between Maxim and Life Partners Holdings, Inc. ("Life Partners")

does not represent a condition precedent, but a definite, fully-formed meeting of the minds on the warrant's purportedly "pro forma" terms, requiring no further negotiation, and rendering Maxim's delivery of warrant certificates an irrelevant ministerial trifle.

Maxim is wrong for at least four reasons.  <u>First</u>, Maxim's papers amount to a concession that it did not deliver the warrant certificates as it was required to.  None of the Maxim executives who have submitted declarations to the Court attest to the delivery of the certificates.  Rather, the most Maxim can say that is that it is "certain that they were available to LPHI well before it signed the Contract, either by delivery from Maxim support staff <u>or from LPHI's own prior warrants</u>."  Scott Declaration at ¶ 21 (emphasis added).  Life Partners has submitted declarations to the Court that it has no record or memory of receiving the certificates.  <u>See</u> Declarations of Peden at ¶ 5, Pardo at ¶ 21.  The only reasonable conclusion from these facts (together with facts discussed below) is that it is indisputable that the certificates were never delivered.

<u>Second</u>, Maxim's failure to deliver the certificates was not an insignificant trifle, as it claims, but a fatal failure to satisfy an express condition precedent of the contract which prevented the parties from negotiating and reaching agreement on the terms of the warrant.  As explained in the attached declaration of Joseph W. Bartlett, it appears that the warrant may have been initially intended as part of Maxim's "success fee" to be paid upon consummation of financing or a transaction under the contract, or that Maxim lifted the language describing the warrant from a contract in which it was s success fee.  When a warrant is earned as part of a success fee, its terms are hammered out later as a condition of closing of the underlying financing or transaction.  Here, it appears that the warrant morphed as a matter of the parties' intention (or as the result of

Maxim's drafting of the relevant language) from part of the success fee to part of the retainer, but Maxim did not adjust its approach to reflect that pivotal changed circumstance, and it did not deliver the certificates so that terms of the warrant could be negotiated and finalized. See Bartlett Declaration at ¶¶ 12-14. Under these circumstances, the contract's discussion of the warrant amounts to nothing more than a "term sheet." Bartlett Declaration at ¶ 11.

Third, the terms of a warrant are not at all "pro forma," as claimed by Mr. Teller's declaration in support of Maxim's position. It is precisely because of the range of possible terms that the hammering out of the details of a warrant intended as part of a success fee are left for the closing, when the parties know that an underlying financing or transaction is imminent, and they have reason to devote the time and expense to negotiation of the warrant. For example, as Mr. Bartlett explains, anti-dilution provisions can run on for several pages and address issues including whether anti-dilution is weighted average or full ratchet, broad based or narrow based, whether there's coverage of a carve-out or a "down round" of financing. Bartlett Declaration at ¶¶ 16-25. Registration rights are also not "pro forma" and raise a variety of questions to be negotiated and resolved. Bartlett Declaration at ¶¶ 29-39.

Another section of Maxim's contract underscores that point. Section 3(a) makes reference to a "Fee Schedule" attached as Exhibit B to the contract which describes additional compensation to which Maxim would be entitled if and as Maxim raised money pursuant to the contract. One such element of that compensation was "Agent Warrants." Section 3(a) acknowledges that the terms of "fees appearing in Exhibit B . . . will be mutually agreed upon under separate . . . placement agency . . .

3

agreements." As Mr. Bartlett points out, if that sentence were drafted in accordance with Maxim's current position, it would read "the terms of which [the fees] will be mutually agreed upon, except the Warrant which is 'pro forma' and is already agreed." Bartlett Declaration at ¶ 28.

Fourth, the parties at the time plainly did not believe that agreement on the warrant had been reached. The fact of the warrant has never appeared in any publicly-filed financial statement of Life Partners, presumably because Life Partners did not view the warrant as ever having closed. And yet Maxim, which characterizes itself as a substantial and sophisticated business employing 200 people in New York with institutional coverage around the world [See Scott Declaration at ¶¶ 3-4], was silent, never calling attention to the failure of its client to record what it now says was a fully-consummated component of its compensation. See Bartlett Declaration at ¶ 42. Maxim's silence for three years was not another ministerial gaffe along the lines of its possibly ministerial failure to deliver warrant certificates as it now suggests, but rather evidence of the indisputable fact making summary judgment here appropriate: there was no consummated warrant because Maxim fell asleep at the switch and failed to deliver the certificates that would have enabled the parties to negotiate the various terms of the warrant.

Further, the forfeiture and waiver doctrines on which Maxim relies have no applicability here, and not just because the terms of the warrants were never agreed to as discussed above. As demonstrated in the accompanying declaration of Brian D. Pardo, President and Chief Executive Officer of Life Partners, Life Partners engaged Maxim to create a "credit facility" or "warehouse facility" with which to buy and sell life

insurance policies. Pardo Declaration at ¶¶ 4-9. While Maxim now takes the position that Mr. Pardo only raised the notion of such a facility in 2005, months after execution of the contract in October 2004 [see Scott Declaration at ¶ 47], Maxim's own Commitment Committee Memo, Exhibit 4 to Maxim's submissions in opposition, confirms that creation of such a facility, described in the Memo as a "Strategic Settlement Fund," was the reason for the engagement of Maxim. Pardo Declaration at ¶¶ 7-9. It is not disputed that Maxim did nothing or virtually nothing to create such a fund. Scott Declaration at ¶ 47; Pardo Declaration at ¶ 10; Second Peden Declaration at ¶ 5.

Nor are Maxim's other claims of performance at all sustainable. Maxim claims that it performed under the contract by doing "due diligence work" to learn about the life settlement industry and Life Partners' business, spending "many hours familiarizing" itself with the industry and Life Partners' business model. Scott Declaration at ¶¶ 25-31. In fact, as Maxim's Andrew Scott fails to advise the Court, he prepared a thirteen-page "Equity Research Company Report," issued on September 27, 2004, providing an extensive discussion of the industry and Life Partners in support of Maxim's "buy" recommendation for Life Partners -- a month before the contract was signed. Pardo Declaration at ¶¶ 2-3.

As to Maxim's other purported performed services, Life Partners did not engage Maxim to sell stock, as Maxim claims [Scott Declaration at ¶¶ 38-39], and as Maxim's own Commitment Committee Memo serves to confirm. Indeed, Maxim has not claimed that any such sales qualified Maxim for any fees payable pursuant to Section 3(a) of the contract "in connection with any financings or transactions" undertaken by Life Partners pursuant to the contract. Rather, it appears that Maxim sold Life Partners stock

to Maxim's own clients principally for its own benefit, perhaps including commissions, and cites such sales to the Court on this motion to create the false impression that it performed pursuant to the contract.

As for Maxim's claim that spent time "reviewing and revising preparing and revising" the presentation, [Scott Declaration at ¶ 33], the equivocal drafting revealed in that sentence supports the fair inference that Maxim is doing its best in retrospect to marshal what facts it has to demonstrate that it performed. Mr. Pardo has no recollection of Maxim's assistance with such a presentation, nor does Maxim claim that it recreated it. Pardo Declaration at ¶ 15. As for meetings, there were necessarily meetings between Life Partners and Maxim, but Life Partners did not engage Maxim so that Maxim would meet with it. Id.

Nor is Maxim fair in inferring something nefarious from the lack of an immediate response from Life Partners after Maxim called Life Partners on or about September 6, 2007, demanding the warrant. As explained in the accompanying declarations of Mr. Pardo and Mr. Peden, Life Partners consulted outside counsel at Baker & McKenzie after receiving Maxim's call, but that firm was unable to provide counsel because of a conflict of interest. A second law firm subsequently consulted by Life Partners also had a conflict of interest. Maxim filed this lawsuit about a week after its initial call to Life Partners demanding the warrant, before Life Partners engaged LeClair Ryan, its current counsel in this matter. Second Peden Declaration at ¶¶ 3-6; Pardo Declaration at ¶¶ 19-20.

Further, after receiving Maxim's call in September 2007, Mr. Peden caused a search to be done of Life Partners' books, records and electronic

communications and spoke to others at Life Partners. Mr. Peden not only found no warrant, no warrant certificates nor any other documents evidencing the fact of a warrant agreement, but he found no evidence that Maxim had performed under the contract. Mr. Peden concluded that Mr. Rose's telephone call represented Maxim's opportunistic attempt to capitalize inappropriately on the rise in value of Life Partners' stock in 2007 and reap an undeserved windfall. Second Peden Declaration at ¶ 5. On the facts here presented, the same can fairly be said about this lawsuit.

For these reasons, and those stated in Life Partner's initial memorandum of law, its motion for summary judgment should be granted.

Respectfully submitted,

LeCLAIR RYAN,
A Professional Corporation
Attorneys for Defendant
  Life Partners Holdings, Inc.

By: /s/ Andrew J. Frisch
Andrew J. Frisch
830 Third Avenue, 5th Floor
New York, New York 10022
Telephone: (212) 430-8031
Facsimile: (212) 430-8061

Robert P. Howard, Jr.
1101 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 659-6707
    Of Counsel