UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAXIM GROUP LLC,

                    Plaintiff,

            - against -                               Case No. 07 CV 8099 (LAP)

LIFE PARTNERS HOLDINGS, INC.,

                    Defendant.

---

## DECLARATION OF BRIAN D. PARDO
## IN SUPPORT OF LIFE PARTNERS HOLDINGS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

1.      My name is Brian D. Pardo.  I am President and Chief Executive Officer
of Life Partners Holdings, Inc. ("Life Partners") and Chief Executive Officer of Life
Partners, Inc., the primary operating subsidiary of Life Partners.  I have served as Chief
Executive Officer of Life Partners, Inc. since its incorporation in 1991.  Through a trust,
I own a majority of the common stock of Life Partners.  Life Partners is publicly traded
on the NASDAQ market under the symbol LPHI.  Our business is assisting purchasers
who desire to buy interests in life insurance policies placed for sale on the national
market by sellers across the United States.  Before founding Life Partners, I was Chief
Executive Officer of American Solar King Corp., a provider of solar and alternative
energy products and related engineering designs.  I was honorably discharged from the
United States Army in 1968 after serving as a helicopter gunship pilot in Vietnam in
1965 and 1966.  I have personal knowledge of the facts stated in this Declaration.

A.    <u>Maxim Prepared an Equity Research Report on Life Partners in September 2004</u>

2.    I have reviewed a declaration of Andrew Scott, Managing Director of Investment Banking of Maxim Group LLC ("Maxim"), submitted to the Court in opposition to the pending motion of Life Partners for summary judgment.  Mr. Scott declares that he contacted Life Partners in 2004 and began negotiating a contractual relationship with Life Partners in September-October 2004.  Scott Declaration at ¶¶ 8-9. Mr. Scott further declares that, upon execution of the contract between Maxim and Life Partners on or about October 25, 2004, he and others at Maxim performed under the contract by doing "due diligence work" to learn about the life settlement industry and Life Partners' business, spending "many hours familiarizing" himself with the industry and Life Partners' business model.  Scott Declaration at ¶¶ 25-31.

3.    In fact, Mr. Scott had fully familiarized himself with the industry and Life Partners well before the contract was executed on or about October 25, 2004.  Attached as Exhibit A hereto is Maxim's thirteen-page "Equity Research Company Report" on Life Partners, issued September 27, 2004.  The Report, which indicates it was authored by Mr. Scott, provides an extensive discussion of the industry and Life Partners in support of Maxim's "buy" recommendation for Life Partners -- a month before the contract was executed.

B.    <u>Life Partners Engaged Maxim in October 2004 to Create a Credit Facility</u>

4.    I signed the contract with Maxim on behalf of Life Partners.  While I do not recall the specific date on which I signed the contract, I have seen the letter agreement on Maxim's letterhead addressed to me dated October 25, 2004, submitted to

the Court as Exhibit A to Maxim's Complaint in this action, and I have no reason to doubt that I signed the letter agreement on or about that date.

5.      Prior to signing the contract in October 2004, Life Partners had an interest in raising capital with which to buy and sell life insurance policies. We wished to create what we termed a "credit facility" or "warehouse facility" for that purpose. We discussed our interest in such a facility with numerous investment banking businesses. Maxim was one of the investment banking business with which we spoke. Maxim's professed ability to create the facility was the totality of our interest in Maxim.

6.      Prior to executing the contract in October 2004, Life Partners and Maxim discussed whether Life Partners would have "skin in the game," that is, whether Life Partners would itself contribute to the intended facility, as we had discussed with the investment banking businesses with whom we had discussed creating a facility. At the time, Life Partners had a cash reserve of only about $5 million, and we did not have the ability or inclination to contribute any of those funds to the facility. We so advised Maxim prior to entering into the contract.

B.     Maxim's "Commitment Committee Memo," Dated October 2004,
      Confirms that Life Partners Engaged Maxim to Create a Credit Facility

7.      I have reviewed a five-page document created by Maxim described as a "Commitment Committee Memo" for Life Partners. My understanding is that the document is attached as Exhibit 4 to Maxim's papers submitted to the Court in opposition to the pending motion of Life Partners for summary judgment. The document indicates that Maxim prepared it in October 2004. For example, the words "October 2004" appear at the top of the document's second through fifth pages. The first page of the document provides the stock price of Life Partners as of October 22, 2004, and further provides a

3

chart showing the stock price in 2004, noting in the upper left corner that the chart is "as

of" October 25, 2004. My further understanding is that Maxim has advised the Court that

it creates "Commitment Committee Memos" to provide synopses of its potential clients

to enable its executives to make decisions on whether to accept such clients and to

become familiar with the business models of such clients in order to better serve them.

See Scott Declaration at ¶ 31. That fact further establishes that Maxim prepared the

Memo on or about the date that I signed the contract in late October 2004.

       8.     Maxim's Commitment Committee Memo for Life Partners describes

Maxim's prospective role as "placement agent" for a "Settlement Strategic Fund" of

between $5 to $50 million to "be used for the acquisition and warehousing of a portfolio

of senior Life Settlements." Under the title "Transaction Overview," the Memo describes

the "Settlement Strategic Fund" as the "business model" for Life Partners, as follows:

> Current market conditions faced by institutional investors of life settlements
> dictate acquisition of policies in a portfolio format versus "one-off" assemblage.
> The Maxim Settlement Strategic (MSS) Fund 1 business model is aimed at filling
> this niche.

> By assembling life settlements in portfolio form through the advantages inherent
> in LPHI's unique position within the life settlement originator sphere, MSS will
> provide value to its institutional clients

While "Settlement Strategic Fund" is not a term I recall using to describe the facility for

which Life Partners engaged Maxim, the above-referenced sections of Maxim's

Commitment Committee Memo fairly describe the reason for Life Partners' engagement

of Maxim and fairly reflect the parties' mutual expectations of the engagement when I

signed the contract in October 2004.

       9.     Maxim's Commitment Committee Memo concludes with a

recommendation to Maxim's executives that it approve the proposed engagement:

We believe a strategic alliance with LPHI represents a superior opportunity on two fronts.

As the only publicly held life settlement originator in the world, LPHI is uniquely positioned for growth within the booming life settlements industry.

Furthermore, LPHI has withstood the regulatory tests through the courts by prevailing against both the SEC and state regulators which allows LPHI to source policies from anywhere within the country, giving LPHI a highly desired position of being a primary mover.

As noted above, the contract was executed on or about October 25, 2004. My understanding is that, on or about October 27, 2004, Life Partners paid $25,000 to Maxim as a non-refundable retainer.

C.    After Receiving the $25,000 Retainer,
       Maxim did Virtually Nothing for Life Partners

        10.    After the contract was signed and Life Partners paid the $25,000 retainer to Maxim, Maxim did virtually nothing for Life Partners and made virtually no effort toward creating the facility that was the reason for the engagement. I was and remain very disappointed at Maxim's lack of performance after I signed the contract compared with Maxim's promises before I signed the contract. It was almost as if Maxim received its $25,000 retainer and did nothing more thereafter than a token attempt to create the appearance of follow-through.

D.    Maxim's Position on this Motion is at Odds
       with its Own Commitment Committee Memo

        11.    According to Mr. Scott's declaration, I met with Mr. Scott and others at Maxim in New York in 2005 months after I signed the contract with Maxim. Mr. Scott declares that "[d]uring this meeting [in 2005], Mr. Pardo proposed setting up a 'Strategic Settlement Fund' whereby investors would deposit money into a fund to be used by LPHI to buy and sell life insurance polices." According to Mr. Scott, I also told him that

"LPHI did not have a lead investor for the proposed fund and, more importantly, was unwilling to put up its own capital to initiate the fund." Scott Declaration at ¶ 47. Mr. Scott declares that our unwillingness to contribute capital is one of the reasons why Maxim was unable in 2005 to create the fund.

12.    To the contrary, Maxim's Commitment Committee Memo of October 2004 establishes that the fund was not something I suggested for the first time in 2005, but was the reason for our engagement of Maxim in October 2004 -- months before Mr. Scott declares that he first learned of our interest in a fund. Indeed, Mr. Scott's declaration otherwise recounts a meeting on November 8, 2004, between Maxim and Michael Beste, President of Life Partners' Institutional Investor Division at the time, at which the parties discussed "LPHI's business model." Maxim's Commitment Committee Memo of October 2004 describes that "business model" as creating a "Settlement Strategic Fund," as discussed above.

13.    Further, contrary to Mr. Scott's declaration, we advised Maxim *prior* to signing the contract that Life Partners was not in a position to contribute to the facility. I discussed the creation of such a facility with numerous investment banking businesses and told them that Life Partners was not in a position to contribute to the facility. It makes no sense that any investment banking business would have prepared a Commitment Committee Memo like the one prepared by Maxim for Life Partners in October 2004 without first ascertaining whether its potential client was in a position to contribute to the intended facility.

14.    Mr. Scott's declaration recounts other purported services provided by Maxim to Life Partners pursuant to the contract. For example, Mr. Scott declares that

three of Maxim's institutional clients invested in Life Partners as part of the services for which Life Partners engaged Maxim.  Life Partners, however, did not engage Maxim to sell stock, as Maxim's Commitment Committee Memo serves to confirm.  It makes no sense that Life Partners would have engaged an investment banking business like Maxim to generate the sale of less than 200,000 shares.  Indeed, Maxim has not claimed that any such sales qualified Maxim for any fees payable pursuant to Section 3(a) of the contract "in connection with any financings or transactions" undertaken by Life Partners pursuant to the contract.  Rather, it appears that Maxim sold Life Partners stock to Maxim's own clients principally for its own benefit, perhaps including commissions, and cites such sales to the Court on this motion to create the false impression that it performed pursuant to the contract.

15.    Mr. Scott's declaration further recounts "due diligence work," meetings in New York and Waco, and Maxim's assistance with a power point presentation as elements of Maxim's performance under the contract.  None of these things, however, constitute performance.  As for the "due diligence work," Mr. Scott's thirteen-page "Equity Research Company Report" for Life Partners issued in September 2004 shows that Maxim was quite familiar with Life Partners and its industry a month before execution of the contract on or about October 25, 2004.  As for meetings, there were necessarily meetings between Life Partners and Maxim, but we did not engage Maxim so that Maxim would meet with us.  Further, while I have no recollection of Maxim's assistance with any power point presentation, Mr. Scott does not say that Maxim created the presentation, only that Maxim spent time "reviewing and revising preparing and revising" the presentation.  Scott Declaration at ¶ 33.  A fair inference from the

equivocal drafting revealed in that sentence is that Maxim is doing its best in retrospect to marshal what facts it has to demonstrate that it performed. Nonetheless, Maxim's own contemporaneous Commitment Committee Memo demonstrates that Maxim did not perform.

      16.     Mr. Scott also declares that Maxim was unable to create the facility for which it was engaged because of a disappointing earnings report released in mid-January 2005 and a fall in the price of the stock from "a high of $8.65 to $5.78." Scott Declaration at ¶ 45. That claim makes no sense. In recommending that its clients "buy" the stock in Life Partners in its Equity Research Company Report on September 27, 2004, Maxim noted risks of investment including that "Micro-cap stocks can face price fluctuations due to general lack of liquidity." Further, both that Report and Maxim's Commitment Committee Memo noted that the prior year's range of the stock had been between $3.56 and $7.80. The fall in stock price in January 2005 to which Maxim cites the Court -- two and one-half months *after* Maxim was engaged to create the fund -- was at the top end of the prior year's range of which Maxim was aware when it entered into the contract.

E.    The Warrant

      17.     Mr. Scott says in his declaration that he had "numerous conversations" with me and others in the months following execution of the contract "asking them to deliver the Warrant." I have no recollection of anyone making such a request of me. If anyone had made such a request of me, I would have directed them elsewhere. In my many years as Chief Executive Officer of Life Partners and Life Partners, Inc., I have never been the person responsible for ministerial implementation of contracts nor issues

8

such as whether the contract here required Maxim to deliver a warrant agreement. Nor do I have the legal training or expertise to make such a judgment.

18.     Moreover, as demonstrated in the accompanying declaration of R. Scott Peden, Corporate Secretary of Life Partners and President and General Counsel of Life Partners, Inc., he caused a search to be done of Life Partners' books, records and electronic communications, and he found no e-mail from Maxim or anything else in writing in which Maxim sought a warrant in the months following execution of the contract or at any time until mid-2007 when the stock was trading at $31.80, and Maxim made its contact with Life Partners which preceded its filing of this lawsuit.

19.     I have also reviewed a declaration submitted to the Court by Edward L. Rose, Maxim's Vice Chairman and General Counsel. Mr. Rose quotes two e-mails that I sent him on September 9 and 11, 2007, respectively. Prior to sending the first e-mail, I had not discussed the issue of the warrant with counsel and did not know whether or not Maxim was entitled to the warrant   My focus in responding to Mr. Rose was his claim that the strike price was $7 per share and the consequence of any untoward delay in our responding to Mr. Rose. Thus, I wrote as follows: "It appears to me that if the warrants were not delivered pursuant to a proper reading of the agreement the strike price is $7 per share." I do not have the legal training or expertise to opine on a proper reading of the contract.

20.     Mr. Rose also complains that I advised him that an attorney from Baker & McKenzie would contact him, but such an attorney never did. Unbeknownst to me at the time, Baker & McKenzie had a conflict of interest and was unable to represent Life Partners in this matter. Also unbeknownst to me at the time, a second law firm that Life

Partners subsequently sought to retain in this matter also had a conflict of interest.  By the time we contacted and retained the firm of LeClair Ryan to represent Life Partners in this matter, Maxim had already filed its lawsuit in this Court.

21.    Mr. Scott declares that, by signing the contract, Life Partners acknowledged that the warrant certificates had been delivered to Life Partners together with the contract.  Scott Declaration at ¶ 22.  I received no warrant certificates from Maxim and do not believe that anyone else at Life Partners received warrant certificates. To the best of my recollection, Maxim and I executed the contract in different places at different times.  I believe that I received and signed the contract in Texas and caused an executed copy to be returned to Maxim in New York.

Dated:  February 18, 2008

Signed under penalties of perjury by:

_____

Brian D. Pardo

# EXHIBIT A



## MAXIM GROUP

**EQUITY RESEARCH
COMPANY REPORT**

---

**Financial Services
September 27, 2004**

| | |
|---|---|
| Recent Price: | $6.25 |
| Target Price: | $8.00 |
| 52-Week Range: | $7.80-$3.56 |
| Market Cap (MM): | $59.4 |
| Shares O/S (MM): | 9.5 |
| Float (MM): | 4.5 |
| Avg. Vol. (000) | 15.0 |
| Book Value/Share: | $0.57 |
| Dividend/Yield: | 3.3% |
| Risk Profile: | High/Moderate |

| FYE: February | EPS | P/E |
|---|---|---|
| 2004A | $0.26 | 24.0 |
| 2005E | $0.51 | 12.3 |
| 2006E | $0.72 | 8.7 |
| LT Earnings Growth | 25%-30% | |



*Source: Bloomberg*

**Andrew Scott        (212) 895-3575**
  ascott@maximgrp.com
Albert Lee        (212) 895-3757
  alee@maximgrp.com

**Initiation**                                          **Buy**

# Life Partners Holdings, Inc.
(LPHI – NASDAQ – $6.25)

➢ **We are initiating coverage of Life Partners Holdings, Inc. with a Buy rating and $8 price target.** Widely considered the pioneer of the emerging life settlements business, the Company is the oldest, arguably the largest and the only publicly traded provider of viatical and senior life settlements with maturities ranging from less than 48 months to up to ten years. The Company has arranged the acquisition of nearly 5,000 life settlement transactions on behalf of a global client base of more than 12,000 accredited investors representing a total face value of approximately $1 billion. The average ROI to investors of life settlements has consistently exceeded 15% annually and has attracted the likes of reputable institutional investors such as AIG, Berkshire Hathaway, Merrill Lynch, among others. All have accumulated significant portions of these instruments as either an integral component of their investment portfolios or as attractive investment options for their institutional clientele.

➢ **The life settlements industry is still in its nascency but on the cusp of rapid expansion.** The life settlement market is expected to expand significantly as the core purchasers, while continuing to show a high degree of interest in shorter-term life expectancies, are actively beginning to favor senior life settlements policies, which represent a emerging asset class with broadening institutional support. Senior life settlements generate greater transactional revenue as compared to shorter term life settlements.

➢ **On the heels of a record FY2004, LPHI estimates that business volume will rise 90%-135% to between $80-$100MM for the current FY2005.** We currently estimate settlements transacted will exceed 500,000 with a total face value of roughly $100MM in the current FY2005, up from 333,000 last year. This should generate significant operating leverage and EPS expansion of at least 95% to $0.51 on revenue of $30.6MM for the current year. Bottom-line growth should continue to exceed top-line growth going forward as senior life settlements represent a growing percentage of total revenue.

**Maxim Group LLC
405 Lexington Avenue
New York, NY 10174**

---

**SEE PAGES 12 AND 13 FOR IMPORTANT DISCLOSURES AND DISCLAIMERS**

## CORPORATE PROFILE

**Life Partners Holdings, Inc. (LPHI)**
204 Woodhew Drive
Waco, TX  76712
(254) 751-7797
Web Site: www.lifepartnersinc.com

**Senior Management:**
Brian Pardo, Chairman & CEO
Michael Beste, President-Institutional Division

**Company Description:**

Life Partners Holdings, Inc. facilitates viatical and life settlement transfers including the purchase of the life insurance policies of terminally ill or elderly persons at a discount to their face value, matching viators or life settlers with purchasers, as well as identifying, examining, and purchasing the policies as agent for the purchasers. The purchasers of viatical settlements are high net worth individuals or smaller institutional buyers, and that of life policies are generally institutional purchasers. The Company was founded in 1991 and is based in Waco, Texas.

**Risks:**

- Potential competitors that are better capitalized could diminish LPHI's ability to attract new viatical/life settlements.

- Increased competition could further depress yields on investments, which may weigh down on our favorable outlook.

- Micro-cap stocks can face price fluctuations due to general lack of liquidity.

| | |
|---|---|
| Institutional Ownership: | 13.2% |
| Insider Ownership: | 58.8% |
| Shares Short: | 0 |

**Balance Sheet Summary:** $MM
*(As of May 31, 2004)*

| | |
|---|---|
| Equity: | $5.4 |
| Assets: | $9.6 |
| Long-term Debt: | $0.5 |
| ROE 2005E: | 87% |

### Quarterly EPS

| | F2004A | 2005E | 2006E |
|---|---|---|---|
| 1Q | $0.11 | $0.10A | $0.17 |
| 2Q | $0.03 | $0.12 | $0.17 |
| 3Q | $0.04 | $0.14 | $0.19 |
| 4Q | $0.08 | $0.15 | $0.20 |
| **FY** | **$0.26** | **$0.51** | **$0.72** |

### Quarterly Revenue (MM)

| | F2004A | 2005E | 2006E |
|---|---|---|---|
| 1Q | $4.7 | $5.1A | $9.6 |
| 2Q | $3.3 | $7.2 | $10.0 |
| 3Q | $3.1 | $8.9 | $11.0 |
| 4Q | $4.5 | $9.3 | $11.3 |
| **FY** | **$15.6** | **$30.6** | **$41.8** |

*Fiscal Year Ends December*

**Analysts Following the Co.:**    **0**
Consensus Estimate:

| | |
|---|---|
| Current Year: | NA |
| Next Year: | NA |

**Investor Relations Contact:**
Steve Kessler   516-539-0339

### INVESTMENT SUMMARY AND CONCLUSION

**Initiating coverage with a Buy rating and $8 price target.** Life Partners Holdings, Inc. (LPHI), founded in 1991, is a unique specialty finance company that arranges the acquisition of short and long-term life insurance policies characterized by maturities ranging from 48 months to over ten years. The policies are acquired from the insured, who have expressed the desire either to liquidate their insurance policy asset or have determined that life insurance coverage is no longer essential as part of their financial or estate plan. Regarded as the pioneer of this relatively unfamiliar asset class, LPHI has arranged the acquisitions of nearly 5,000 life settlement transactions on behalf of a global client base of more than 12,000 institutional and accredited individual investors representing a total face value of well over $1 billion. The average return to investors of these instruments has consistently exceeded 15% annually. Thus having only recently realized the attractive yields produced by life settlements, reputable institutional investors such as AIG, Berkshire Hathaway, Merrill Lynch have accumulated significant portfolios of these instruments as either an integral component of their investment portfolios, or as attractive investment options for their institutional clientele. In addition, an increasing number of international special purpose funds have begun acquiring a large number of these instruments thanks to the Company's network of more than 1,000 independent licensees and brokers who actively refer clients and policies for life settlement transactions. With the estimated face value of the viatical and life settlement market, according to public filings, conservatively at $1 billion, LPHI, based on last year's volume has roughly a 4% market share but could achieve between 8-10% should business volumes reach targeted levels this year.

**Following a record FY2004 in which revenue increased 28% to $15.6MM on $42MM in volume, LPHI recently delivered a more favorable outlook for FY2005 and now sees business volume jumping 90%-135% to $80-$100MM, up from its original forecast of $70-$80MM.** LPHI is attributing this expansion to the significantly larger and still growing average face values of life settlement policies in addition to a ramp up in demand for settlements that carry longer life expectancies or other wise known as senior life settlements. The Company derives revenue from fees earned on the acquisition, underwriting and placement of life settlement transactions. In our view, domestic as well as increasing international demand will begin to drive higher numbers of transactions that will increase margins and accelerate earnings to record levels. We currently forecast settlements transacted will exceed 500,000 with a total face value of roughly $100MM in the current FY2005, up from 333,000 last year, that will produce significant operating leverage and EPS expansion of 95% to $0.51 on revenue of $30.6MM for the current year, rising to roughly $42MM in revenue and EPS of $0.72 for fiscal 2006. This represents a three-year CAGR of about 64% and 66% for the top and bottom line, respectively. The top line will also be aided by the volume shift towards senior life settlement deals, which generate greater transactional revenue versus shorter term

life settlements. We anticipate this will increase average revenue per settlement to $60MM this year from $47MM in FY2004. The Company has been able to establish markets for its longer term viatical and life settlements with competitive discount rates and a boost in advertising expenditures to attract qualified policies from domestic and a greater number of foreign investors who are just now beginning to realize the value proposition of this asset class. With roughly 90% of business sourced domestically, the investor mix should begin to reflect a more even distribution between foreign and domestic throughout the remainder of the current fiscal year and well into FY2006 due in large part to heightened interest from Western European countries.

Furthermore, in August of 2004, LPHI announced an increase in its quarterly dividend to $0.05 from the prior $0.04 per share and will continue its tradition of declaring a special one-cent Christmas dividend bonus, payable on December 15, 2004. This translates into an annualized dividend of $0.21 per share or an attractive yield of close to 3.4%. The Company has paid out in excess of 80% of fully taxed net income over the past two years and while we anticipate a modest rate of decline from these levels, the Company could be in position to boost its quarterly dividend to $0.07 within the next 12-18 months.

**The life settlements space is still in its nascency but on the cusp of rapid expansion.** The life settlement market is expected to expand significantly as the core purchasers, while continuing to show a high degree of interest in shorter-term life expectancies, are actively beginning to favor senior life settlements policies, which represent a emerging asset class with broadening institutional support. Be it an individual purchaser or institution, we believe the demand for life settlements will continue to exist due to the premium yield characteristics. Management has clearly shown the capability to effectively educate individual and institutional purchasers with respect to these types of investments allowing for once uninformed investors to explore alternative investment strategies that diversify their portfolios while avoiding economically sensitive securities. Life settlements provide diversification and are largely immune from economic downturns. In addition, we believe the overall market for viatical and life settlements will continue to gain traction among investors while the aging population becomes increasingly aware of the option to liquidate an unwanted policy through a life settlement.

**Improved medical treatments and increasing government regulation have reduced the number of players in the life settlement space, among both purchasers and agents, positioning the Company to capture additional market share.** LPHI estimates the number of life settlement companies that either serve as purchasers for their own account or as agents for buyers, to be fewer than five while the number life settlement brokers is estimated at about twenty five. Despite the fact that the Company remains one of the largest life settlement companies (based on face value of policies settled), competition within the viatical is likely to be active amongst the several players in the market, which

may have effect prices LPHI pays viators and life settlors, the amount of brokerage and referral fees they pay as well as the prices they set for the acquisition of policies.  On the other hand, the life settlement market, in recent history, has been negatively affected by illegal or controversial business practices, eventually catching the eyes of state and federal regulators who been effective in identifying and shutting down a bulk of the companies that were engaged in such practices.  Naturally, the end result of these legal actions has been a reduction in competition for both policies and buyers alike.   In fact, LPHI's largest competitor was recently forced to close its doors by regulators, a move that should steer institutional clients the Company's way as the leading provider of life settlement services.  State legislatures and insurance regulators have passed laws and adopted regulations requiring the licensing of viatical brokers and settlement companies, mandating full disclosure, instituting frequent reporting requirements, and setting forth prohibited business practices. We believe these efforts will reestablish lost credibility, while opening up the door even wider for LPHI to compete more fiercely and win additional market share.

**Valuation.**  Comparative valuations for LPHI present a challenge due to the unique nature of the business and the fact that there are no publicly traded peers.  In our view, however, a fair valuation can be achieved from the Company's stand-alone merits and present an investment opportunity that combines growth, value and income characteristics.  As previously mentioned, LPHI is likely to remain the dominant force in the emerging life settlements industry and continue to capture market share, grow volume to record levels, deliver EPS growth of 95% and 40% for FY2005 and FY2006 and distribute an attractive dividend, all of which should not go unnoticed among potential investors.  Therefore, we have set our 12-month price target at $8, which suggests upside of 25% from current levels and implies the shares can trade at 16x and 11x our FY2005 and Fy2006 EPS estimates, which is reasonable when measured up against its y/y growth levels and consistent with the multiple being accorded the shares today.

### COMPANY OVERVIEW

Founded in 1991, LPHI is the oldest and one of the largest viatical and life settlement companies in the U.S.  As a pioneer in this emerging asset class, the Company has successfully closed nearly 5,000 life settlement transactions representing a total face value of $1 billion on behalf of more than 12,000 investors.  To date, purchasers of life settlements have generally been domestic accredited individuals and institutional investors but the Company is starting to serve a diverse investor base overseas, acquiring policies from a network of more than 1,000 independent insurance agents, as well as from referrals from other financial and legal professionals.  LPHI has its own in house underwriting, legal, marketing and customer service departments that readily responds to the needs of

industry participants. To protect its clients' monetary interests, LPHI employs the escrow services of Sterling Trust Company, which is regulated under the laws of Texas by the State Department of Banking. Sterling Trust, a subsidiary of Matrix Bancorp, Inc. provides administrative services for self directed IRAs, qualified business retirement plans, personal custodial accounts and a variety of other corporate trust and escrow arrangements in all 50 states, servicing over 35,000 accounts with total assets in excess of $2 billion. The life settlement transaction is completed once Sterling receives executed funding agreements from the purchaser as well as the acquisition price of the policy. Sterling than certifies that the policy is in full force and verifies receipt of the transfer of policy ownership from the insured and acknowledgment by the insurance company.

To purchase a life settlement, prospective buyers will submit a purchaser application as well as an agency agreement and special power of attorney, appointing LPHI as a limited agent of the purchaser. While in most of the policyholders in the past clinged on to life expectancies of 48 months or less, LPHI has widened its market to include individuals with life expectancies of up to seven years for viatical settlements and up to 15 years for senior life settlements, depending on the buying parameters of the client. A buyer can then select one or more policies and specify the portion of the policy or policies to be bought. In an effort to diversify their positions, individual purchasers will generally buy fractional interests in policies while institutional buyers will typically purchase entire policies.

As a result of newer medical treatments that have improved the longevity and quality of life of some terminally ill individuals, LPHI has responded by tightening its criteria in the selection process by reducing offer prices and including policies with longer life expectancies as previously noted. While the Company will accept policies from viators with any type of terminal illness, over 90% of the viatical settlements they transact are with viators living with AIDS.

**Life Settlements**

A life settlement transaction represents the sale or acquisition of a life insurance policy issued to an individual whose life expectancy can be reasonably estimated by empirical means, either through medical determination or by the application of actuarial science. The seller may be terminally ill with a life expectancy of less than 48 months otherwise known as short term life settlement, or a senior citizen, typically age 70 or higher with an actuarial life expectancy of around ten years, known as a senior life settlements. Life settlements are similar in nature to a zero coupon bond as policies are purchased at a discount to their face value. These discounts fall into general brackets according to the life expectancy of the insured, but may vary based on individual policy features and market conditions for the policy.

The acquisition cost incorporates LPHI's transaction fees as well as an escrowed amount stemming from the payment of premiums during the

maximum life expectancy of the insured. The Company derives revenue from and will typically only acquire policies that are issued by a number of America's more reputable life insurance companies. LPHI's investors enjoy the same regulatory protection available to all life insurance policyholders.

**Figure 1: LPHI: Life Settlements Experiencing Unprecedented Growth**

|  | FY 2001 | FY 2004 | Growth% | FY2005E |
|---|---|---|---|---|
| Number of Life Settlements | 125,000 | 333,000 | 166% | 506,000 |
| Face Value of Policies (000s) | $9,264 | $41,953 | 353% | $129,113 |
| Average Revenue Per Settlement | $27,246 | $46,837 | 72% | $60,383 |
| Net Revenues Derived (000s) | $1,807 | $8,218 | 355% | $14,770 |

Source: Company Reports

## Senior Life Settlements

According to Conning and Company, the current market size for senior life settlements ranges between $100 billion and $500 billion. Senior life settlements are essentially long-term investments and appeal to institutional investors because they are based on life expectancy as determined by actuarial science, thereby offering a high degree of precision and accuracy. They differ from short term life settlements in that the insured in a senior life settlement is not terminally ill, is typically 70 years of age or higher with a life expectancy of approximately 10 years. In the case of a short-term life settlement, life expectancy is determined by a medical evaluation, and generally entails a higher degree of investment risk. For instance, in the case of an individual suffering from AIDS, the patient may be able to benefit from therapeutics that may prolong his or her life and delay or even eliminate the likelihood of mortality. The investor who purchased the policy would be responsible for continuing payment of the insured's life insurance premiums beyond the point of expected mortality and may never realize the expected return on investment. In addition, senior life settlements are typically sold by individuals who purchased life insurance for a specific purpose (such as estate planning or as a form of income) but no longer need the insurance due to growth in their net worth or for other personal reasons. They also appeal to individuals that want to make immediate gifts to their beneficiaries without diminishing their current income, in which case the insured may feel the insurance coverage is no longer necessary.

LPHI has received numerous inquiries for originating, analyzing and purchasing senior life settlements on behalf of numerous institutional clients and international funds. The heightened level of interest is likely due to the inherent safety and attractive yield of senior life settlements as compared to corporate and government bonds. Furthermore, senior life

settlements issued by LPHI may be especially attractive to institutional or other accredited investors due to the Company's pattern of underwriting policies by insurers that are rated A or higher as determined by A.M. Best Company. The typical face value of life insurance policies acquired by LPHI for use as Senior Life Settlements is $500,000 or more.

LPHI's role in all types of life settlement transactions is the same, as they serve as the intermediary for the viators or life settlors with the buyers, facilitating transactions by identifying, examining, and purchasing the policies as agent for the purchasers. The Company will typically locate prospective clients through a network of brokers, insurance, financial and estate planning professionals as well as through personal referrals. Brokers are typically compensated based on a percentage of the face value of the policy and is paid upon the closing of a settlement. Estate planning professionals and financial planners often operate on a fee-for-service basis which is paid directly by their client. LPHI has long-term relationships with most of the viatical and life settlement brokers. In its recent fiscal year, broker referrals accounted for 75% of total business as policies presented by two brokers constituted 57% of all transactions closed.

## FINANCIAL DISCUSSION

### Recent Results – 1Q05

The Company reported a 7.5% decline in net income to $940,063 versus $1,016,419 attributable to a 21% increase in G&A and a 17% gain in brokerage and referral fees, partially offset by a 6% gain in average revenue per settlement to $59.1MM. Revenue increased 8% to $5.1MM owing to a 45% increase in the total face value of the viatical and life settlements transacted to $18.2MM versus $12.6MM, reflecting the growing number of life settlements as well as higher overall face values. Brokerage and referral fees rose 17% to $2.6MM owing primarily to the increase in face value of the policies from which the brokerage fees are based on. As life settlements will have higher face values than viatical settlements, brokerage fees ill also increase. Because broker fees are not paid out when a viator or life settlor is not represented by a broker, the planned increase advertising expenditures is likely to encourage direct presentation of policies and may limit broker fees going forward. Referral fees also vary depending on contractual obligations, market demand for a particular kind of policy or life expectancy category, and individual agreements between clients and their referring financial planners.

For FY2004, LPHI earnings increased to $2.5MM or $0.26/share on a 28% increase in revenues to $15.6MM. Average revenues realized per transaction increased to $46,837 versus $37,357 in the prior year.

## RISKS

An investment in shares of LPHI is subject to, but not limited to, the following risks and uncertainties:

**LPHI operates in a market that may change dramatically.** While the life settlements market has experienced robust growth, it has slowed measurably in recent years. While the senior life settlement market is only less than six years old, how and to what extent it will develop is uncertain though we are optimistic for continued expansion. While Conning & Co. estimates the entire life settlements market at approximately $2 billion per year in face value, the Company's ability to originate, underwrite and place senior life settlements has yet to be tested in large numbers and will rely on the entry of institutional buyers. While LPHI is among the most experienced players within the space, there are no assurances that they will be able to attract such buyers and the failure to do so may have a material effect on its operations and financial stability.

**In response to the development of viatical and life settlements, the insurance industry has responded with policy features offering accelerated death benefits.** While it remains possible, we do not expect accelerated death benefits to meaningfully affect market demand at this time as they are generally more restricted in nature than life settlements. Some policies often limit such benefits to persons who have a life expectancy of less than one year versus viatical life settlements that are available to individuals with remaining life expectancies of four years or more. In addition, life settlements generally offer viators greater amounts than they would receive under accelerated death benefit provisions.

**Success will largely depend on maintaining relationships within its referral networks.** LPHI relies heavily on brokers to refer potential viators and life settlors as well as financial planners to refer viatical and life settlement purchasers. The Company does not establish fixed contractual arrangements with the brokers or financial planners. The pool of viatical brokers and referring financial planners is relatively small, thereby increasing the Company's reliance on existing relationships. During the past fiscal year, two brokers presented 57% of total policies purchased through the Company, down from 68% in the prior year. Hence, the loss of either of these brokers could have a material effect on its future operations.

Life Partners Holdings, Inc. (LPHI)

## Life Partners Holdings, Inc.
## Quarterly Income Statement
*(In thousands, except per share data)*

| LPHI P&L (000s) - FY Ending March | F2003 | 1Q04 | 2004 | 3Q04 | 4Q04 | F2004 | 1Q05 | 2Q05E | 3Q05E | 4Q05E | F2005E | 1Q06E | 2Q06E | 3Q06E | 4Q06E | F2006E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 12,178 | 4,743 | 3,332 | 3,058 | 4,464 | 15,597 | 5,144 | 7,200 | 8,923 | 9,287 | 30,554 | 9,564 | 10,000 | 10,973 | 11,340 | 41,876 |
| Brokerage and referral fees | 6,113 | 2,189 | 1,588 | 1,344 | 2,259 | 7,379 | 2,571 | 3,744 | 4,640 | 4,829 | 15,784 | 4,944 | 5,160 | 5,651 | 5,840 | 21,595 |
| **Net revenue** | 6,066 | 2,554 | 1,745 | 1,714 | 2,205 | 8,218 | 2,573 | 3,456 | 4,283 | 4,458 | 14,770 | 4,619 | 4,840 | 5,322 | 5,500 | 20,281 |
| G&A | 3,378 | 985 | 1,086 | 1,141 | 1,209 | 4,421 | 1,193 | 1,915 | 2,365 | 2,452 | 7,924 | 2,391 | 2,620 | 2,853 | 2,892 | 10,755 |
| Accrued contingency costs | 233 | 1 | 0 | 0 | 98 | 99 | 5 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| Depreciation | 63 | 18 | 18 | 19 | 30 | 85 | 33 | 43 | 62 | 65 | 203 | 67 | 70 | 77 | 79 | 293 |
| **Operating income** | 2,392 | 1,550 | 641 | 554 | 868 | 3,612 | 1,343 | 1,498 | 1,856 | 1,941 | 6,638 | 2,161 | 2,150 | 2,392 | 2,529 | 9,232 |
| Interest and other income | 190 | 56 | 95 | 78 | (15) | 213 | (17) | 75 | 85 | 85 | 228 | 90 | 90 | 90 | 90 | 360 |
| Other expense | (53) | (75) | (545) | 33 | 359 | (405) | (11) | (25) | (25) | (25) | (87) | (25) | (25) | (25) | (25) | (100) |
| **Pretax income** | 2,530 | 1,531 | 191 | 665 | 1,212 | 3,420 | 1,315 | 1,548 | 1,916 | 2,001 | 6,779 | 2,226 | 2,215 | 2,457 | 2,594 | 9,492 |
| Provision for taxes | 651 | 515 | (138) | 279 | 287 | 942 | 375 | 441 | 546 | 570 | 1,931 | 634 | 631 | 700 | 739 | 2,704 |
| tax rate | 25.7% | 33.6% | (72.3%) | 42.0% | 23.7% | 27.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% | 28.5% |
| **Net income** | 1,879 | 1,016 | 329 | 386 | 925 | 2,478 | 940 | 1,107 | 1,370 | 1,431 | 4,848 | 1,592 | 1,584 | 1,757 | 1,855 | 6,788 |
| Shares outstanding | 9,485 | 9,450 | 9,447 | 9,455 | 9,484 | 9,457 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 | 9,484 |
| EPS | $0.20 | $0.11 | $0.03 | $0.04 | $0.10 | $0.26 | $0.10 | $0.12 | $0.14 | $0.15 | $0.51 | $0.17 | $0.17 | $0.19 | $0.20 | $0.72 |
| EBITDA | 2,455 | 1,568 | 659 | 573 | 898 | 3,697 | 1,376 | 1,541 | 1,918 | 2,006 | 6,841 | 2,228 | 2,220 | 2,469 | 2,608 | 9,525 |
| **Margin Analysis** | | | | | | | | | | | | | | | | |
| Operating margin | 39.4% | 60.7% | 36.7% | 32.3% | 39.4% | 44.0% | 52.2% | 43.3% | 43.3% | 43.5% | 44.9% | 46.8% | 44.4% | 44.9% | 46.0% | 45.5% |
| Pretax margin | 41.7% | 59.9% | 10.9% | 38.8% | 55.0% | 41.6% | 51.1% | 44.8% | 44.7% | 44.9% | 45.9% | 48.2% | 45.8% | 46.2% | 47.2% | 46.8% |
| Net margin | 31.0% | 39.8% | 18.8% | 22.5% | 42.0% | 30.2% | 36.5% | 32.0% | 32.0% | 32.1% | 32.8% | 34.5% | 32.7% | 33.0% | 33.7% | 33.5% |
| EBITDA margin | 40.5% | 61.4% | 37.8% | 33.4% | 40.7% | 45.0% | 53.5% | 44.6% | 44.8% | 45.0% | 46.3% | 48.2% | 45.9% | 46.4% | 47.4% | 47.0% |
| G&A | 55.7% | 38.6% | 62.2% | 66.6% | 54.8% | 53.8% | 46.3% | 55.4% | 55.2% | 55.0% | 53.7% | 51.8% | 54.1% | 53.6% | 52.6% | 53.0% |
| **YoY Change** | | | | | | | | | | | | | | | | |
| Revenue | | | | | | 28.1% | 8.5% | 116.1% | 191.8% | 108.1% | 95.9% | 85.9% | 38.9% | 23.0% | 22.1% | 37.1% |
| Net revenue | | | | | | 35.5% | 0.8% | 98.1% | 149.9% | 102.2% | 79.7% | 79.5% | 40.0% | 24.3% | 23.4% | 37.3% |
| G&A | | | | | | 30.9% | 21.0% | 76.4% | 107.2% | 102.9% | 79.2% | 100.5% | 36.8% | 20.6% | 17.9% | 35.7% |
| Operating income | | | | | | 51.0% | (13.3%) | 133.8% | 235.2% | 123.6% | 83.8% | 60.9% | 43.6% | 28.9% | 30.3% | 39.1% |
| Pretax income | | | | | | 35.2% | (14.1%) | 712.1% | 188.2% | 65.2% | 98.2% | 69.4% | 43.1% | 28.2% | 29.6% | 40.0% |
| Net income | | | | | | 31.9% | (7.5%) | 236.6% | 255.0% | 54.8% | 95.6% | 69.4% | 43.1% | 28.2% | 29.6% | 40.0% |
| EPS | | | | | | 31.0% | (9.9%) | 235.3% | 253.9% | 52.6% | 95.0% | 69.4% | 43.1% | 28.2% | 29.6% | 40.0% |

Source: Company Reports & Maxim Group LLC Estimates

**Maxim Group LLC**

## Life Partners Holdings, Inc.
### Historical Balance Sheet & Cash Flows
*(In thousands, except per share data)*

| Balance Sheet (000s) | F2003 | F2004 | 1Q05 |
|---|---|---|---|
| Cash | 5,243 | 3,174 | 2,343 |
| Investment in securities | | 1,906 | 2,311 |
| Accounts receivable | 180 | 2,068 | 2,784 |
| Prepaid expenses | 3 | 1 | 50 |
| **Total current assets** | **5,677** | **7,189** | **7,571** |
| PP&E, net | 996 | 1,115 | 1,195 |
| Deferred income tax | | 616 | 741 |
| Premium advances and other | 86 | 98 | 129 |
| **Total assets** | **6,759** | **9,018** | **9,636** |
| Accounts payable | 336 | 1,098 | 1,575 |
| Accrued liabilities | 1,378 | 1,634 | 1,533 |
| Current portion of LT debt | 29 | 47 | 47 |
| Deferred revenue | 158 | 168 | 171 |
| Income taxes payable | 501 | 595 | 432 |
| **Total current liabilities** | **2,401** | **3,542** | **3,758** |
| LT debt | 555 | 502 | 490 |
| **Total liabilities** | **2,956** | **4,044** | **4,248** |
| Common stock | 97 | 97 | 97 |
| Additional paid in capital | 10,287 | 10,328 | 10,365 |
| Accumulated deficit | (6,102) | (4,949) | (4,388) |
| Accumulated other comprehensive loss | | (23) | (207) |
| Less: notes receivable issued for common | (478) | (478) | (478) |
| **Total shareholders equity** | **3,803** | **4,974** | **5,388** |
| **Total liabilities & shareholders equity** | **6,759** | **9,018** | **9,636** |

| Cash flows (000s) | F2003 | F2004 | 1Q05 |
|---|---|---|---|
| Net income | 1,879 | 2,478 | 940 |
| Depreciation | 63 | 85 | 33 |
| Accounts receivable | (406) | (1,637) | (800) |
| Prepaid expenses | 128 | 2 | (49) |
| Deferred tax benefit | | (616) | (125) |
| Other assets | (77) | (12) | 10 |
| Accounts payable | 211 | 763 | 477 |
| Accrued liabilities | 377 | 256 | (100) |
| Income taxes payable | 501 | 95 | (163) |
| Unearned revenue | 14 | 10 | 3 |
| **Cash from operating activities** | **2,690** | **1,427** | **225** |
| Investment in income funds | | | (405) |
| Unrealized loss on marketable securities | | | (183) |
| Payments on notes receivable | 5 | (40) | |
| Loss on disposal of property & equipment | 1 | (1,929) | |
| Capex | (217) | (207) | (113) |
| **Cash from investing activities** | **(211)** | **(2,177)** | **(701)** |
| Payments on notes payable | (25) | (35) | (13) |
| Stock options exercised | | | 37 |
| Purchases of treasury stock | (633) | (12) | |
| Proceeds from issuance of common stock | 0 | 52 | |
| Dividends | (1,103) | (1,325) | (380) |
| **Cash from financing activities** | **(1,761)** | **(1,320)** | **(355)** |
| Change in cash | 718 | (2,069) | (831) |
| Beginning cash | 4,525 | 5,243 | 3,174 |
| **Ending cash** | **5,243** | **3,174** | **2,343** |

Source: Company Reports

**Life Partners Holdings, Inc. (LPHI)**

## DISCLOSURES

| Maxim Group LLC Stock Rating System | | As of 9/27/04 | |
|---|---|---|---|
| **Expected Performance***  | | % of Coverage Universe with Rating | % of Ratings that are Inv. Banking Clients |
| **Buy** | Expected total return of 15% or more over next 12 months | 53% | 21% |
| **Hold** | Expected total return of plus or minus 5% over next 12 months | 44% | 6% |
| **Sell** | Expected to provide negative return over next 12 months | 3% | 0% |
| Relative to S&P 500 or NASDAQ Composite. | | | |

*All prices in this report are as of market close 9/24/04*

I, **ANDREW SCOTT**, attest that the views expressed in this research report accurately reflect my personal views about the subject security and issuer. Furthermore, no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation or views expressed in this research report.

The research analyst(s) primarily responsible for the preparation of this research report have received compensation based upon various factors, including the firm's total revenues, a portion of which is generated by investment banking activities.

**Valuation Methods:**  One or more of the following valuation methods are used by Maxim Group analysts in making a ratings or price projection: Analysis of companies P/E ratio, price/book ratio, earnings expectations or sales growth as they relate within an industry group or to the broader market, enterprise value/sales, Individual sector analysis, sum of the parts analysis and discounted cash flow.

**Risks.**  Aside from general markets and economic other risks particular to this company include: 1) increased regulation, 2) lack of credibility among investors and 3) competition from better capitalized companies

Maxim Group expects to receive or intends to seek compensation for investment banking services from Life Partners Holdings in the next 3 months.

## DISCLAIMERS

Some companies that Maxim Group LLC follows are emerging growth companies whose securities typically involve a higher degree of risk and more volatility than the securities of more established companies. The securities discussed in Maxim Group LLC research reports may not be suitable for some investors. Investors must make their own determination as to the appropriateness of an investment in any securities referred to herein, based on their specific investment objectives, financial status and risk tolerance.

This communication is neither an offer to sell nor a solicitation of an offer to buy any securities mentioned herein. This publication is confidential for the information of the addressee only and may not be reproduced in whole or in part, copies circulated, or disclosed to another party, without the prior written consent of Maxim Group, LLC ("Maxim").

Information and opinions presented in this report have been obtained or derived from sources believed by Maxim to be reliable, but Maxim makes no representation as to their accuracy or completeness. Maxim accepts no liability for loss arising from the use of the material presented in this report, except that this exclusion of liability does not apply to the extent that such liability arises under specific statutes or regulations applicable to Maxim. This report is not to be relied upon in substitution for the exercise of independent judgment. Maxim may have issued, and may in the future issue, other reports that are inconsistent with, and reach different conclusions from, the information presented in this report. Those reports reflect the different assumptions, views and analytical methods of the analysts who prepared them and Maxim is under no obligation to ensure that such other reports are brought to the attention of any recipient of this report.

Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgment at its original date of publication by Maxim and are subject to change without notice. The price, value of and income from any of the securities mentioned in this report can fall as well as rise. The value of securities is subject to exchange rate fluctuation that may have a positive or adverse effect on the price or income of such securities. Investors in securities such as ADRs, the values of which are influenced by currency volatility, effectively assume this risk. Securities recommended, offered or sold by Maxim: (1) are not insured by the Federal Deposit Insurance Company; (2) are not deposits or other obligations of any insured depository institution; and (2) are subject to investment risks, including the possible loss of principal invested. Indeed, in the case of some investments, the potential losses may exceed the amount of initial investment and, in such circumstances; you may be required to pay more money to support these losses.



| EQUITY RESEARCH DEPARTMENT | | CAPITAL MARKETS | |
|---|---|---|---|
| **Specialty Retail/Consumer** | | Christopher Fiore, | 212-895-3743 |
| *Kathleen Heaney, Director of Research* | 212-895-3670 | *Head of Capital Markets* | |
| | | | |
| **Enterprise Software/Internet** | | Joseph Schefler | 212-895-3785 |
| *Michael B. Nemeroff* | 212-895-3827 | *Head US Institutional Sales* | |
| | | | |
| **Healthcare & Special Situations** | | **INSTITUTIONAL SALES** | 800-724-0761 |
| *Andrew Scott* | 212-895-3575 | Brant Bodden | 212-895-3654 |
| | | Carlo Corvaja | 212-895-3741 |
| **Medical Devices & Healthcare Services** | | Virginia Dadey | 212-895-3749 |
| *Anthony Vendetti* | 212-895-3802 | Christopher Fiore | 212-895-3743 |
| | | David Hayward | 312-896-2973 |
| | | Thomas Higgins | 212-895-3583 |
| **Equity Research Associates** | | Klaus Korzilius | 212-895-3673 |
| Albert Lee | 212-895-3757 | Takashi Mori | 212-895-3747 |
| Anthony Petrone | 212-895-3568 | Anthony Musto | 212-895-3824 |
| | | Joseph Schefler | 212-895-3785 |
| | | Joe Vianna | 212-895-3742 |
| **Market Strategy** | | Amanda Nozaki | 212-895-3570 |
| *Barry Ritholz* | 212-895-3614 | | |

| FIXED INCOME TRADING | | SALES TRADING | |
|---|---|---|---|
| Adam Ferencz | 212-895-3640 | James Dyer | 212-895-3837 |
| Deborah Frank | 212-895-3646 | Anthony Marciano | 212-895-3680 |
| Pierre Grant | 212-895-3582 | Danny Bellezze | 212-895-3680 |
| Michael Messinger | 212-894-3704 | John Conlin | 212-895-3680 |
| Michelle Agosta | 212-895-3631 | Edmond Farber | 212-895-3680 |
| | | Steve Farber | 212-895-3680 |
| **INSTITUTIONAL OPTIONS TRADING** | | Dan Kroski | 212-895-3680 |
| Leonard Greenbaum, Co-Head | 212-895-3791 | Gina Nelson | 212-895-3680 |
| Tim Moi, Co-Head | 212-895-3795 | Robert Sayegh | 212-895-3680 |
| | | William Zachoff | 212-895-3680 |

| RETAIL SALES | | SYNDICATE | |
|---|---|---|---|
| John Garrity, Director Sales & Marketing | 516-396-3302 | Joe Jaigobind | 212-895-6313 |
| Franco Zappone, Sales Manager | 212-895-3540 | Paul LaRosa | 516-396-3350 |