UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

MAXIM GROUP LLC,

                    Plaintiff,

        - against -

LIFE PARTNERS HOLDINGS, INC.,

                    Defendant.

_____

Case No. 07 CV 8099 (LAP)

## DECLARATION OF JOSEPH W. BARTLETT
## IN SUPPORT OF LIFE PARTNERS HOLDINGS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

      1.     My name is Joseph W. Bartlett. I have been engaged by the law firm of LeClair Ryan to assist in its representation of Defendant Life Partners Holdings, Inc. ("Life Partners') in this action. I have been requested to respond to a declaration of Clifford A. Teller, a Director of Investment Banking at Plaintiff Maxim Group LLC ("Maxim"), which he has submitted "to assist the Court in understanding the terms of the contract" between Life Partners and Maxim which is the subject of a pending motion of Life Partners for summary judgment.

A.     <u>My Background and Qualifications</u>

      2.     I have been active in the corporate finance sector, including mergers and acquisitions, since 1961 (with time out for public service) when I began as a law firm associate in Boston. I have remained active in this sector ever since, as a lawyer, advisor, board member and academic. As counsel, I have represented, variously, sell and buy side companies, placement agents, investment banks and private equity funds.

3.      In the course of my practice I have frequently been engaged in drafting, negotiating and reviewing agreements with financial advisers and placement agents acting on behalf of clients, which have included the agents themselves, principals, and counterparties to the transactions, i.e., the acquiring entity and/or the investors. I have acted both in my capacity as an attorney and as an adviser and/or board member.

4.      I have extensive experience as an academic, beginning in the 1960s, when I served as an instructor in corporate finance at Boston University Law School. During the winter/spring semester of 1978, while on sabbatical and with the title of Acting Professor, I served as a full time academic at Stanford Law School. On returning to practice and after moving to New York, I offered courses at NYU Law School for a period of 15 years, as an Adjunct Professor, as well as serving (as I do today) as a Senior Professional Fellow of the Center for Law and Business under the supervision of Professor (former Delaware Chancellor) William Allen. Since 2001, I have been teaching on the faculty of the Johnson School of Business at Cornell University, titled a Courtesy Professor. I have guest lectured at, among other places, the Wharton School, Columbia Business School, and the NYU Stern School of Business.

5.      I have written extensively. Since 1988, my list of publications includes the following (on occasion co-authored): *Venture Capital: Law, Business Strategies and Investment Planning*, (Wiley, 1988); *Corporate Restructurings, Reorganizations and Buyouts*, (Wiley, 1991); *Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations*, 2nd Ed., Vol. 3 (Aspen Publishers, 1995); *Raising Capital for Dummies* (Hungry Minds, 2002). I have frequently authored newsletters for the trade.

6.      In 1999, the three volume *Equity Finance* treatise was converted to an online portable library, offered by a company I founded for the purpose, VC Experts, Inc. *The Encyclopedia of Private Equity and Venture Capital* comprises over 4000 pages, founded initially on my content; 80 contributing editors drawn from the ranks of the leading professionals help to add, edit, enhance and update the content … to the point where *The Encyclopedia* is an acknowledged authority in this business.  I am its executive editor.

7.      I speak routinely at professional forums and symposia, both in this country and abroad.  A copy of my recent speaking schedule is attached as <u>Exhibit A</u>.  Within the last four years I have been engaged in several matters to render expert testimony.[1]

8.      My other qualifications are summarized as follows:

a.      <u>Law Firm Experience</u>

Of Counsel Sonnenschein Nath & Rosenthal, LLP; Of Counsel Fish & Richardson, P.C.; Law Office of Joseph W. Bartlett; Partner, Morrison & Foerster; Partner, Mayer, Brown (formerly Mayer, Brown & Platt); Partner, Gaston & Snow; Partner, Ely, Bartlett, Brown & Procter.

b.      <u>Academic and Civic</u>

Member, Council on Foreign Relations; Member, Board of Trustees and Executive Committee, Montefiore Medical Center; Co-Chair Children's Hospital at Montefiore; Life Fellow, American Bar Foundation; Member, American Law Institute.

c.      <u>Formerly</u>

President of Stanford Law Review; Order of the Coif; Board of Visitors of Stanford Law School; Board of Visitors, Harvard Graduate School of Education; Board of Visitors, The Fletcher School of Law and Diplomacy;  President, Boston Bar Association; U.S. Army, 1st Lt., 1956-1957.

d.      <u>Federal Government</u>

---

[1] As of this writing, my assistant has been unable to assemble an updated list of my engagements.  With the Court's permission, I will provide such a list at a later date.

Law Clerk, Chief Justice Earl Warren, United States Supreme Court (1960 term); Undersecretary (promoted from General Counsel), United States Department of Commerce, 1967-1968; Chairman, Health, Education & Welfare Task Force on Universal Social Security Coverage, 1979.

    e.      State and Local Government

Counsel to the Commissioner of Administration, Commonwealth of Massachusetts 1964-1965; Special (outside) Counsel to Boston Redevelopment Authority 1969-1970.

B.    Documents Reviewed

    9.    In connection with my work on this case, I have reviewed the documents identified below as Documents a through q

    a.    The Complaint in this case;

    b.    The Answer in this case;

    c.    Defendant's Memorandum of Law in Support of Motion for Summary Judgment;

    d.    Declaration of R. Scott Peden in support of Defendant's Motion for Summary Judgment;

    e.    Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment;

    f.    Declaration of Andrew Scott;

    g.    Declaration of Edward L. Rose;

    h.    Declaration of Clifford A. Teller;

        Exhibits to Plaintiff's papers in Opposition to Defendant's Motion for Summary Judgment, including

    i.    On Maxim letterhead, letter dated October 25, 2004 to Brian Pardo, with Exhibit and Exhibit B;

    j.    E-mail dated October 26, 2004 from Scott Peden to Andrew Scott;

    k.    Email dated October 27, 2004, from Scott Peden to Andrew Scott;

    l.    Maxim's Commitment Committee Memo, dated October 2004;

m.    E-mail exchange dated November 2, 2004, to and from Andrew Scott and Steven Kessler;

n.    Listing of "Historical Prices for Life Partners Holdings, Inc." dated 10/2704 through 1/31/05;

o.    Check dated October 27, 2007 from Life Partners payable to Maxim Group, LLC in the amount of $25000.00;

p.    Life Partners Holdings Inc., Form 10QSB/A (Amended Quarterly Report of Financial Condition), dated 2005, from EDGAR;

q.    E-mail exchange dated September 11, 2007 to and from Brian Pardo and Edward Rose.

C.    <u>My Response to the Declaration of Clifford A. Teller</u>

10.    Based on my experience, my response to Mr. Teller's declaration is best provided in the following Question and Answer format.  I do not intend these questions and answers to address every issue and nuance raised by Mr. Teller's declaration or this matter and may supplement this submission as appropriate if and as the matter continues.

11.    **Question**: What does the agreement between Maxim and Life Partners Holdings, Inc., dated October 24, 2004 (referred to herein as the "Term Sheet" or the "Agreement," as the context requires) represent vis-à-vis the warrant certificate (the "Warrant") mentioned therein?

**Answer**: It is, with respect to the provisions of Section 3(a) of the Agreement concerning the Warrant, a Term Sheet.  In fact, the provisions of the Agreement are generally specific and detailed; indeed the description of the "consideration paid in a Transaction" is as detailed as I recall ever seeing in a banker's draft; so also with the Indemnification language, expenses etc…all the points are covered, presumably from Maxim's form files; it is only when you get to Section 3(a) that the

drafting shifts to the style of a typically non binding term sheet . . . a guide to the parties and their lawyers as they undertake to draft what is usually called the definitive document(s).

12.    **Question**: Do you see a reason why such a shift occurred?

**Answer**:  From the record I have in front of me, which may be incomplete, it would appear there is an explanation. It may well be that the parties started out with a view that Maxim would be granted a warrant as part of its success fee when a contemplated transaction actually occurred. This would be consistent with standard industry practice ... a retainer in cash, expenses as they occur and then a success fee, cash and a warrant measured by the size of the transaction   What makes the facts here unusual is that the Warrant seems to have morphed in midstream to being a part of the retainer, meaning it would be issued at the beginning of the relationship rather than at the closing of a transaction.

13.    **Question**  Why would that fact make a difference in this context?

**Answer**. Success fee warrants, like the Agent Warrant (described in Exhibit B to the Maxim-Life Partners contract) and the Sutro Warrant (referred to in Mr. Teller's Declaration at ¶ 23), which I discuss *infra*, are described at the beginning of the banker's engagement  in language typical of a non binding term sheet; the drill is that, as a closing appears on the horizon, the parties then go to the time ... and the expense ... of drafting the definitive documents, including the warrant agreement, covering all the points, and then some, which I talk about *infra*.  The full dress warrant agreement is a condition of the closing, among the other documents necessary to flesh out the

understandings of all the parties involved.  If the definitive documents listed on the closing agenda are not executed, the trade will not close.  For a warrant to be part of the retainer, and this is the point which I think slipped by Maxim, you have to negotiate all the fine points, and they are very important points, up front.  There are way too many jump balls, as I refer to them in the text, for you to rely on term sheet language. The banker can commence the assignment at any time, but its deal with the client is not done until the composition of an integration, as a complete contract is sometimes referred to, is fully negotiated and the agreements memorialized, in accordance with professional standards, and then executed.  No more jump balls.

14    **Question**:  Does Section 3(a) of the agreement with Maxim, respecting the Warrant certificate, amount to a complete and integrated contract by incorporating by reference contract provisions which are "pro forma?"  (Teller Declaration at ¶ 13).

**Answer**:  No.  In fact, I am not sure I understand Mr. Teller's use of the words "pro forma."  If by "pro forma" Mr. Teller means that (a)  the Agreement is complete vis-à-vis the terms of the Warrant, (b) no material issue is left uncovered and (c) the Agreement evidences that the parties had reached a meeting of the minds on the critical points, the remark is way offside.  To repeat what I said earlier, Section 3(a) looks like a hybrid … term sheet language in the midst of what otherwise, on points like indemnification, measurement of the consideration if other than cash, etc, is thoughtful drafting up to professional standards.  Fleshing out a term sheet is not remotely a "pro forma" job in this business.

15.    **Question**:  Strong language.  What's left out?

**Answer**: To start with, the term sheet language in Section 3 (a) does not specify which security is to be registered … the Warrant itself or the underlying shares.

16.    **Question**: Next?

**Answer**: Typical anti-dilution provisions run on for several pages. The issues include (without limitation):

- Weighted average or full ratchet?

- Broad based or narrow based?

- Coverage of the carve out?

Anti-dilution provisions are amongst the most hotly negotiated provisions in deals generally, in my experience

17.    **Question**: We are quibbling about details?

**Answer**: Hardly. The first question is whether the term "anti-dilution protection" means, and only means, protection against stock splits and stock dividends … events which do not change the economics of the Warrant. However, the language may also include anti-dilution protection in the case of a subsequent financing or financings at a price which is "dilutive," meaning a price lower that $7.00 a share … a financing known as a "down round." It remains to be specified whether "down round" protection is the intent, or whether the phrase, standing alone denotes simply the routine adjustment for splits and dividends. Maxim's current view is, apparently, that the phrase signifies

the intent to opt for down round protection. (<u>See</u> Teller Declaration at ¶.20).[2]  Teller now

says anti-dilution protection in the case of down rounds is the correct meaning; a bit of a

surprise in view of his assertion that the language necessary to reduce that concept to a

formal contract is "pro forma."  (Teller Declaration at ¶.21; Scott Declaration at ¶.20).

    18    **Question.**  You are going to identify some jump balls, I take it?

    **Answer:**  Absolutely, starting off with a point which is often a deal

breaker:  Is the formula full ratchet or weighted average?  The economics are profoundly

different to the issuer.  That point simply must be specified before you can go any further.

Full ratchet is a big problem for issuers . . . the issuance of one share of cheap stock can

trigger huge penalties to the common shareholders.  In fact, if you do the math (and

under language I have seen in some deals), the increase in the number of shares which

Maxim could get under full ratchet could be close to infinite.  That, in turn, could raise

issues under NASDAQ's shareholder approval rules, which may be triggered if the

number of shares issuable upon exercise of the warrants exceeds certain percentages of

the issuer's outstanding common stock.  Triggering those rules would make issuance of

the warrant much more burdensome.  Careful, I underline <u>careful</u>, drafting of fully

negotiated provisions is a must.

    19.    **Question**:  You are saying the Devil is in the Details?

---

[2] Parenthetically, Teller's statement, based on his participation in "thousands of securities transactions," *Id.* at ¶ 6, is astonishing: he commits the error of conflating two quite different provisions … pre-emptive rights, pursuant to which a shareholder <u>buys</u> additional stock in a subsequent round, versus anti-dilution protection, which affords free stock.

**Answer**:  Much more than that.  The term sheet contemplates, <u>perhaps</u>, an unusual instrument ... anti-dilution for a warrant issued entirely in consideration for services, to a holder which did not pay, in cash or property, for the call.  Anti-dilution typically occurs in private equity with respect to investors contributing capital for convertible preferred.[3]  The formula is complex but, broad brush, understandable: the conversion price goes down upon a down round, meaning the holder gets more shares on conversion.  In fact, a typical documentation of the anti-dilution provisions runs several pages of densely negotiated and word-smithed provisions ... in addition to those discussed.

20.    **Question**:  And, with a warrant?

**Answer**:  Unclear.  As I say, anti-dilution is not typical in warrant agreements and for good reason.  Does the holder (i) pay less to call the same number of shares; or (ii) get more shares for the same amount of cash upon exercise? To illustrate, with a convertible preferred, the conversion price is adjusted (very different adjustment, full ratchet vs. weighted average) and the holder gets more stock as a result of a down

---

[3] Teller's reliance on a warrant reported by Life Partners resulting from an engagement of Sutro and First Global (Teller Declaration at ¶ 23) is off the mark.  The success fee for that engagement included a five year warrant, $8.00 exercise price, on 75,000 shares.  The terms of the Warrant were to mimic the terms of the warrants, if any issued, at the closing, the default option being warrants on terms to be specified, including "customary anti-dilution provisions, together with pre-emptive rights and tag along rights."  My guess is that Sutro meant the plain vanilla anti-dilution rights, as explained in the text, vs. down round protection; but the point is not important.  I am quite firm in the opinion that both Life Partners and Sutro expected, as a closing approached, that one of the parties (presumably Sutro as the party seeking to obtain the benefit) would draft the definitive agreement covering all the "jump balls" I have outlined, plus several more which are often, and mistakenly, referred to as "boilerplate;" such is the custom in the placement business.  The full dress contract would either be drafted once the terms of the financing were hammered out or, if no warrant were involved, in a stand alone contract covering the critical points and, in either event, would be a closing document, among the suite of documents necessary for the trade to close.

It is interesting, although not surprising, that Sutro understands the difference which eluded Mr. Teller ... between pre-emptive and anti-dilution rights.

round; with a warrant, Maxim, which was paying $7 a share for 100,000 shares ($700,000 total price), could either, in the event of a down round at $1 per share, get 100,000 shares for $1 per share or 700,000 shares (if the deal were full ratchet) for $700,000.

21.    **Question**:  What qualifies for a "down round," triggering some kind of reset?

**Answer**:  A complex issue.  Thus, with respect to what's typically called the "carve out," there need to be energetic negotiations on which issuances are covered and, more importantly, which are not.  For example:

- Are the issuance of in-the-money options to employees a "down round" which will trigger an adjustment?  How about exercise of the same?

- If employee options are carved out, is there a cap?

- How about warrants to consultants?

- Warrants to vendors, customers, creditors, and/or tech licensors to sweeten the deal?

- Issuance of stock or warrants in the course of corporate acquisitions, joint ventures and mergers?

All of these, and more, are 'jump balls.'

11

22.    **Question**: Are there other 'jump balls,' as you put it?

**Answer**: Certainly. Perhaps the most frequently discussed 'jump ball' is labeled "pay to play" (or "play or pay"). The idea of a holder enjoying a free ride (*i.e.*, more or cheaper stock) in the event of a down round is, intuitively, illogical from the issuer's prospective. Accordingly, the issuer typically will try to win a protective point: if the holder of the dilution-protected security does not participate (*i.e.*, "play") in the down round, the holder loses the anti-dilution protection with respect to that round any and future down rounds. This one can get emotional; I have had counterparties walk away from the entire deal over "pay to play."

23.    **Question**: Other issues … and let's confine ourselves at this point to provisions with real wallop, depending on which wins the point.

**Answer**: One very important point. Must the holder exercise the Warrant prior to the close of a corporate reorganization .. a stock for stock acquisition offer, say, from a strategic or financial partner?

24.    **Question**: Why is that important?

**Answer**: A warrant holder cannot be squeezed out in a merger under Delaware law. Absent the appropriate language, which I routinely insist on if representing the issuer, Maxim could have a potential blocking position meaning the ability to derail a multi-million dollar acquisition proposal to all the shareholders … unless, of course, Maxim is paid baksheesh.

25.    **Question**:  What cards would Maxim have, absent the language you insist on?

**Answer**:  The acquirer often conditions the trade on no warrants carrying over to its cap table.  Public companies rarely want to see warrants contaminating the balance sheet; the market prefers simple stories.  Warrants also can put a lid on stock prices … as Maxim well knows from its SPAC deals.

26.    **Question**:  Anything else?

**Answer**:  A lot, of course, but one detail stands out.  If the idea is that Warrant terms are all "pro forma," assuming that means you see the same provisions, a/k/a "boilerplate," routinely in warrant agreements, let's look at another warrant described in the very contract at issue here -- the "Agent Warrants" described in the contract's Exhibit B (the "Fee Schedule") to which Maxim would be entitled if and as Maxim raised money.  See Exhibit B to the Agreement, *viz*:

"Agent Warrants:

"The Company shall grant Maxim Agent Warrants in the form of, at Maxim's options, (a) Securities issued pursuant to a Financing or (b) Common Stock of the Company, as follows:

"(i)    For any Financing or Transaction, warrants to purchase 7% of the amount of capital raised, invested or committed; provided that The Company has sufficient treasury stock to issue that amount of such warrants at the time such compensation under this paragraph is due. Nothing herein shall require the Company to increase its number of authorized shares in order to comply with this provision and, in the event the Company does not have sufficient treasury shares to issue the amount of warrants called for in this provision at the time such compensation is due, the Company shall be required to issue only the amounts of warrants for which it has treasury shares to cover such warrants.

"The Agent Warrants shall have: (a) an exercise price equal to 110% of the 30-day VWAF of Common Stock preceding the closing of the Financing or Transaction, (b) a 5-year term, (c) cashless exercise provisions, (d) standard anti-dilution protections, (e) no limitation as to the right of registration at the expense of Maxim and (f) unlimited "piggy-back" registration rights." (Emphasis supplied.)

27.    **Question**:  I'll ask the question you are obviously leading up to:  Any difference you see in the "pro forma" provisions between the Warrant and the Agent Warrant?

**Answer**: See language underlined above.  The language, incidentally, appears to confuse authorized but unissued shares vs. treasury shares.  That said, if we are talking about "pro forma," why isn't this provision "pro forma" … *i.e.*, to be included as a matter of course in the Warrant?  And if it is not to be included, where does that leave Mr. Teller's assertion that warrants in Maxim's book are all alike?

And there is another relevant sentence on this score, appearing in Section 3(a) of the Agreement, *viz*:

"The fees appearing in Exhibit B (hereto, the "Fee Schedule") shall be earned by and paid to Maxim by the Company in connection with financings or transactions undertaken by the Company, the terms of which [fees] will be mutually agreed upon under separate advisory, placement agency and/or underwriting agreements."  (Emphasis supplied.)

28.    **Question**:  Relevant in what way?

**Answer**: The description of the Agent Warrants in Exhibit B is roughly as specific on deal terms as the description of the Warrant in Section 3(a).  And yet, the last sentence of Section 3(a) acknowledges that the terms of the "fees appearing in Exhibit B [*e.g.*, the Agent Warrants] … will be mutually agreed upon under separate … placement

agency … agreements." If that sentence were drafted in accordance with Maxim's current position, it would read "the terms of which [the fees] will be mutually agreed upon … except the Warrant, which is pro forma and is already agreed." The fact appears to be clear: The Agent Warrant is a conventional, success fee-type compensation for the banker, and is on the list of contracts to be drafted in detail and executed at the closing. Unfortunately, it appears no one at Maxim said: "Ah ha! We are now talking about a warrant as part of the **RETAINER** and we have to get that detailed **NOW** or that part of our fee agreement will not have closed."

And that's my point, of course. The "pro forma" notion is way off the mark. Once the parties have outlined some major terms, the real work begins … drafting a document, as per Exhibit B, which is fully negotiated and properly lawyered. It does a registered broker dealer/NASD member no credit to say, in effect, "Well, we hit the high points and that's it. The fill-in language is "pro forma," to be taken off the rack. You, our customer, are bound."

29.    **Question:** Leaving the anti-dilution provisions alone, are the registration rights and procedures "pro forma?"

**Answer**: Hardly. If the idea is that Maxim would be issued a Warrant certificate, or as the term sheet goes on to say "certificates," indicating the Warrant itself would trade on an exchange, a bunch of questions need to be addressed. In fact there are issues whichever way the language is to be read.

30.    **Question**: Such as?

**Answer**:  The issuance of the warrant, or any security, in a private

transaction requires an exemption from the `33 Act registration requirements.  In this

case, presumably, Reg. D.  Thus, Maxim has to fill out a subscription agreement which,

once negotiated, contains representations and warranties … that Maxim is an accredited

investor under Reg. D, that it understands the risks (herein protection for Life Partners

under the PSLRA), <u>and</u> that it has no present intent to distribute the security publicly.

Since a PIPE borders on a public offering … see the Section 3(a) language regarding

"immediate registration" … and the holder is in the business of distributing securities, the

language has to be carefully negotiated to avoid blowing the private offering exemption.

31.    **Question**:  Are the documents associated with a PIPE typically "pro

forma?"

**Answer**:  The answer is an emphatic "no."  With a PIPE, there are always

a number of issues to be negotiated and resolved.

32.    **Question**:  Such as?

**Answer**:  We start with the registration rights agreement, which the

certificate calls for.  It typically runs several pages and to many investors, registration

rights are one of the most important issues in a financing.

Moreover, a sample of the points to be negotiated include (and are not

limited to) the following:  Are the registration rights transferable?  Can the issuer limit

the times at which the rights may be exercised … *i.e.*, at a time which might compromise

a major acquisition by Life Partners?  Can the issuer pick the underwriter, if any?  Would

16

Maxim pay all expenses if other shareholders wanted to piggy back?  Can the issuer

block the demand if it is not S-3 eligible?  Will Life have to indemnify Maxim?  And, if

so, what is the extent of the indemnity?  Most  importantly, as mentioned above, which

security … the Warrant itself or the underlying shares … are to be registered?

33.    **Question**: Let's get back to that issue.  Which security is to be registered?

**Answer**:  Not clear.  The term sheet language may indicate the Warrant

itself.  That said, Mr. Teller's Declaration indicates that Maxim actually wanted

registration rights on the common shares (Teller Declaration at ¶.15), and I assume

therefore that, at least in 2007, that was Maxim's intent … another point against the

assertion that the term sheet contains plain language which needs only "ministerial"

fleshing out.

34.    **Question:**  Assuming the underlying common stock is to be registered,

how would the registration process work?

**Answer:**  Presumably Maxim would indicate its intent to exercise and ask

for cashless exercise, *i.e.*, the issuance of shares, the value of which represent the spread

between the exercise price and the current trading price.  Life Partners would then

register that trade by filing a registration statement with the SEC and respond on the basis

of SEC comments, should the SEC decide to review the registration statement.  Only

after the SEC has declared the registration statement effective would Maxim be free to

sell the underlying shares.

35.    **Question:**  Isn't this time consuming and expensive?

**Answer:** Expensive? Always. Time consuming? Usually ... but the time can vary dramatically depending on whether Life Partners is, for example, S-3 eligible, with respect to the particular transaction. Aside from that, the SEC staff can get picky when a broker exercises its rights to register stock it picked up by virtue of a PIPE. The probability of an SEC review and the resulting delay in effectiveness is quite high in PIPE cases.

36.     **Question:** This takes time, of course?

**Answer:** Of course. Accordingly, I am puzzled by the declaration of Maxim's general counsel, Mr. Rose, who says (Rose Declaration at ¶.7) that he told Life Partners' general counsel that, "I made it clear to Mr. Peden that Maxim intended to exercise its rights to purchase the LPH1 common stock fully and immediately. I also made it clear to Mr. Peden intended to sell the LPH1 stock immediately." It is not at all clear to me how Mr. Rose planned to accomplish that objective. I am interested in what exemption Rose planned to utilize to enable Maxim to sell "immediately." Maybe he had in mind that Maxim could demand that Life Partners file a Rule 415 registration statement, also called "evergreen" registration statement, to cover any and all issuances, at Maxim's discretion. If so, that is another can of worms, and Maxim should have negotiated for that procedure a lot earlier in the process. Maybe Mr. Rose had in mind Maxim selling in a private transaction. Mr. Teller indicates (Teller Declaration at ¶ 15) that Maxim planned to sell "on the public markets" so presumably Mr. Rose meant a public sale.)

37.     **Question**: There are more?

**Answer**: Yes. The points for the parties to wrestle with include:
Integration of the PIPE with a potential placement (see the plan set out in Exhibit B to the Term Sheet) and/or a public registration; and the impact of Reg. FD.

If the complexity of PIPE transactions is contested, I would be happy to expand the discussion, illustrating a more or less complete menu of issues which the parties and their advisers typically wrestle with, particularly if a broker/dealer is negotiating to obtain, then "immediately" register, list and trade a derivative security. Indeed, as I have stressed, a PIPE of any security sold to a broker/dealer attracts keen SEC scrutiny as to whether the PIPE is a disguised public offering ... a particular potential problem given Mr. Rose's statement regarding exercise followed by immediate sale.

38.    **Question**: Are there additional issues if Maxim demanded registration of the warrant itself?

**Answer**: All the above plus more. If the Warrant were registered, where would it trade? Mr. Teller states (Teller Declaration at ¶ 8) that warrants "can be traded on secondary markets." I am not sure what secondary markets he had in mind for this Warrant. The language in Section 3(a) uses both the term "a warrant" singular, and warrant "certificates," plural. Does this mean 100,000 certificates, each entitled to call one share for $7.00? It is unclear to me that a single warrant for 100,000 shares would be efficiently traded on, say, the Amex, or NASDAQ, assuming, of course, it would meet the initial listing requirements for the relevant exchange. If necessary, we can look at the listing requirements once Mr. Teller specifies what "secondary markets" he had in mind, if any, for this Warrant ... or if the suggestion that the right would cover the Warrant

19

itself meant that Maxim could choose between the two options, warrant certificates or common stock, at some future date.

39.    **Question:**  In circumstances like this, are demand rights typically exercised for a trade this small?

**Answer:**  No.  If Maxim demanded registration of the warrant … or the underlying shares … first "paying" $700,000 to call the shares, what sense would that make from Life's standpoint?  Even if S-3 eligible, and I don't know if Maxim inquired regarding S-3 eligibility at the time … an issue that influences the drafting … the expenses could consume the entire proceeds of the call.  If Maxim, upon cashless exercise, needn't cough up any cash, the burden on Life Partners, for a tiny trade of this size, would be uneconomical in the extreme.  It is no surprise that the terms of the Sutro Warrant did not include demand rights.

40.    **Question**:  But the document specifies at "the optionee's expense."

**Answer**:  Fat chance.  Any public registration will cost the registrant big bucks, if only in lost time of its management.  Will Maxim pay for that?  For an increase in the D&O premium?  For the time Maxim and its people, including outside counsel, spend in making sure the registration statement is complete and accurate?  For all the board and committee meetings required?  For time spent on road shows?  If so, let's see the negotiated provisions.  If not, how would the board justify such significant disruption and expense … just to please a shareholder which needs to wait only one year (now 6 months) before selling this small amount of stock under Rule 144?  And from Maxim's point of view, by the time the lawyers and accountants for both Maxim and Life Partners,

plus the SEC staff, got through with the registration statement, it is entirely possible the Rule 144 period would have run and Maxim chewed up its profit in registration related expenses of registration.

     41.    **Question**: But didn't Maxim spend a lot of time reviewing the Agreement, including these terms?

       **Answer**: I can't answer what Maxim did. The record is not clear to me as to who drafted what language. Mr. Scott's Declaration (Scott Declaration at ¶ 21) is interesting but cloudy. He states that Maxim's practice was to provide warrant "certificates" to its clients ... which is my understanding of the universal practice ... which will "provide the general substance of certain provisions to be included in our warrant." He qualifies that statement by saying that Maxim might use warrant certificates the client itself had previously executed. Scott is quite understandably, I assume, trying to navigate around the issue of the responsibility for delivering the first draft. I don't believe I have ever been involved in a deal with a broker like Maxim where the broker did not surface the first draft. That said, my issue has to do with the lack of evidence, on the paper trail before me, of many of the "general," let alone the specific, provisions necessary before the parties have a deal ... for example, the very basic issue of what security is to be registered. The problem is not that the terms couldn't have been hammered out. It is simply that they were not dealt with ... and the issues are not "pro forma" or ministerial ... not by a long shot.

     42.    **Question**: But didn't Maxim want the Warrant very badly?

**Answer**: If it did, they had a funny way of showing it. The obvious way to do it … and do it right … was to present proper documents for negotiation and execution in October of 2004. There is simply no excuse for professionals in this business, if they want something, to rely on incomplete, off hand remarks, all contained in just one paragraph. In this business, you do it right or you don't do it at all.

43.    **Question**: Who had the responsibility to get the job done?

**Answer**: That question answers itself. Maxim wanted the Warrant. Life Partners had no reason to want to compel Maxim to complete this end of the trade. In fact, by its actions, it appears from the record Life Partners didn't think the trade on the Warrant had closed. Life Partners didn't file a Form D, as far as I know; I don't believe Life Partners booked any expense for the Warrant or footnoted its issuance. Presumably Life Partners didn't think it proper to account for the issuance of the security, or to disclose its material terms, until it actually issued  It is also curious (if not quite revealing) that Maxim never raised an issue in 2004 or 2005 when its Warrant failed to be reflected in any Life Partners' publicly-filed financial statement.

The point about terms is critical, from a disclosure standpoint. For the market to understand the impact of the Warrant, the terms are critical; as I frequently point out when lecturing, the economics of every deal are a combination or price and terms.

44.    **Question**: Are you suggesting the Agreement is void or voidable?

**Answer**: My opinion is limited to the following propositions:

22

- The allegation that the terms of the Warrant were "pro forma" and could be supplied by "administrative staff" performing "a ministerial task" (Scott Declaration at ¶.21) is not, in light of the record before me, based on reality.

- Accordingly, before a Warrant which reflects a comprehensive meeting of the minds on material terms could or can issue, significant negotiation, expert counseling and drafting remain to be undertaken and completed . . . execution of the definitive document.

- It is inconsistent with responsible industry practice, as I understand it, for Maxim to place total reliance on the state of the documentation as it existed in 2004, when the Agreement was signed.  To claim at this date that the necessary steps to create an integration vis-à-vis the Warrant can be filled in "ministerially" is not supportable by practice in the securities industry.

Dated:  February 19, 2008

Signed under penalties of perjury by:

_____
Joseph W. Bartlett

# EXHIBIT A

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

## 2008

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| January 30, 2008 | 5:30 pm to 7:00 pm | Rooms 22304 & 22305 Pricewaterhouse Coopers Center 300 Madison Avenue at 42nd Street New York, NY | Pricewaterhouse/VC Experts | Hot Topics for Investees including: FAS 157 - Fair Value Measurements, FAS 141R - Revision to accounting for business combinations, and FIN 48 - Accounting for Uncertain tax positions | Belanne Ungarelli, Partner, NY Venture Capital Practice |
| February 12, 2008 | 10:30 AM | Webinar, dial in conference | VC Experts | VC Valuation Updates | Michael Ostendorff Michael@vcexperts.com |
| February 29, 2008 | 12:90-3:00 pm | The Cornell Club | Cornell University | Private Equity Society Lunch | James Profestas [mailto:jap234@cornell.edu] Francine Sommer |
| February 21, 2008 | 5:30 - 7:00 PM | Prairie Star at Santa Ana Golf Club The Pueblo of Santa Ana | Venture Capita Club | "VENTURE EQUITY RED ALERTS" Venture Capital Event, dinner | |
| April 30, 2008 | 1:15 to 3:00 pm | The Harmonie Club, NYC | Financial Research Associates | Introduction to Valuation Techniques for Complex Securities and Portfolios "Introduction to Valuation Techniques for Complex Securities and Portfolios" | Katie Matyus (kmatyus@frallc.com) |
| May 21, 2008 | 10:55 to 11:40 session | The Princeton Club | Financial Research Associates | "Solutions to Complex Pricing and Valuation Scenarios." | Thea Smith (tsmith@frallc.com) 831 464 2287 |
| June 23, 2008 | | | Financial Research Associates' 8th annual conference | Valuation of Hard-To-Value Securities and Portfolios | Martin Sens [MSens@Frallc.com] |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

### 2007

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| January 25-26, 2007 | PE and PIPEs session | Princeton Club, | Financial Research Associates | 6th Annual Industry Summit on PIPEs | Elizabeth Dunklee, Conference Producer Financial Research Associates, LLC 831.465.2296; edunklee@frallc.com |
| January 30, 2007 | 8 AM | Palo Alto, Stanford | Two Panels, details to follow, will be similar to NYSE November 30th event | TBA [Joe Grundfest] [Jeff Sonnenfeld] | Michael Whitehouse mwhitehouse@optonline.net |
| March 13-14, 2007 | 2:15-3:45 3/14/07 Exit Strategies & Solutions conference | New York City, Princeton Club | IIR USA | Exit Strategies & Solutions conference Tentative | Keith Kirkpatrick Executive Director Family Office Forum June 5-7, 2007 Marriott Downtown Magnificent Mile kirkpatrick@iirusa.com (212) 661-3500, x3089 |
| March 23, 2007 | 3/23/07 – 6 – 8 PM CLE Presentation | City Bar Association 42 West 44th Street, New York City | Negotiating Private Equity Limited Partnership Agreements March 22, 2006 Presented by the Private Funds Committee of the Bar of the City of New York | Moderator: George J. Mazin Panelists: Phyllis Schwartz Kevin Scanlan; John Hombostel; Joe Bartlett | |
| June 11th and 12th | 3:15 pm, Monday June 11th. | The Flatotel in mid-town Manhattan. | Financial Research Associates | 6th Annual Hard-to-Value Securities & Portfolios Conference | Donal Murphy Conference Producer Financial Research Associates, LLC 1840 41st Avenue, Suite 102-132 Capitola, CA 95010 Tel: (831) 465-2292 Fax: (831) 465-2290 |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| June 14 and 15, 2007 | 6/14/07 3:00 – 4:00 pm | The Princeton Club 15 West 43rd Street, (5/6) 212 596 1200 | Financial Research Associates | Private Equity Regulations and Compliance: How the New Accredited Investors Definition Affects Your Fund<br>This session will cover:<br>The new definition of accredited investors<br>New anti-fraud rules<br>Patriot Act/anti money-laundering developments<br>· The latest Justice Department antitrust activities on "Club Deals"<br>Deleted<br>· How not to be viewed as a PE bandit when you take a target company private | Thea Gentile Smith, Conference Director<br>Financial Research Associates, LLC<br>Direct: 831-465-2287<br>Fax: 831-465-2290 |
| July 16-17, 2007 | 7/17/07 2:00-3:15 | The Flatotel, New York 135 West 52nd Street (between 6th and 7th Ave) New York, NY 10019 212-887-9400 | Financial Research Associates, LLC | Valuation of Hard-To-Value Securities and Portfolios "Valuation and Pricing of Private Equity Investments<br>• Learn the latest trends in valuing private companies<br>• Get the latest updates on the Fair Value Project<br>• Procedures for arriving at a bullet-proof valuation<br>• Influence of deal terms on valuations<br>• Purpose for determining valuation – and how it affects pricing<br>• Case studies<br>   o Early\n stage technology company<br>   o Later stage company undergoing an exit (via IPO) | Fellow panelists:<br>Jesse Reyes, Managing Director Bear Stearns Asset Management<br>Balanne Ungarelli, Partner, Pricewaterhousecoopers LLP<br>Coordinator:<br>Marisa Banowski [mbanowski@frallc.com]<br>815 588 4528 |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| July 16-17, 2007 | 7/16/07- 12:45 PM | The Helmsley Hotel, New York City | Financial Research Associates LLC | Implications on Reg NMS on Best Execution for Broker/Dealers & Investment Advisors<br>• Order protection rule. Yes, it does impact both sides<br>• Access rule<br>• Sub-penny pricing: Win-win all the way around?<br>• Market data rule:<br>  ○ CTA plan (Consolidated Tape Association)<br>  ○ CQ plan (Consolidated Quote information)<br>  ○ UTP plan (Unlisted Trading Privileges) | Donal Murphy<br>www.frallc.com<br>dmurphy@frallc.com<br>Joseph W. Bartlett<br>Moderator<br>Panelists:<br>Gordon Charlop, President & CEO, WJ Dopwd Inc.<br>Thomas Jordan, President & CEO, Jordan & Jordan<br>John Barun, CEO, Capital Markets Consulting LLC<br>Richard Rosenblatt, President & CEO, Rosenblatt Securities Inc. |
| July 17-18, 2007 | 7/17/07 2:00 PM | The Flatotel 135 West 52nd Street (between 6th and 7th Ave) New York, NY 10019 212-887-9400 | Financial Research Associates | Valuation of Hard-to-Value Securities and Portfolios | Marisa M. Banowski<br>Conference Coordinator<br>Financial Research Associates, LLC<br>Pharmaceutical Education Associates<br>15022 West Albright Drive<br>Lockport, IL 60441<br>Tel: 815.588.4528<br>Fax: 815.588.4529<br>mbanowski@frallc.com<br>mbanowski@pharmedassociates.com<br>www.frallc.com |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| October 5, 2007 | tba | Venue TBD, New York City | Hedge Fund Financial Reporting Seminar Ace Your Next Audit! FAS 157 • Fair Valuation • Statement Format • Report Disclosures Presented by Financial Research Associates, LLC | From: Chrysi Krol [mailto:ckrol@frallc.com] Sent: Monday, July 23, 2007 4:45 PM To: Joseph Bartlett Subject: Hedge Fund Financial Reporting Seminar (October 5, 2007) We are delighted you are a confirmed faculty member at the: Hedge Fund Financial Reporting Seminar October 5, 2007 New York City | Chrysi Krol Conference & Continuing Education Coordinator Financial Research Associates LLC Tel: 630-585-8473 Fax: 630-585-8477 ckrol@frallc.com www.frallc.com |
| October 10, 2007 | 8:30 – 1:00 | Waldorf Astoria, Marco Polo Suite, 417 Park Avenue, 55th Street | Seed Forum event in New York City, Waldorf Astoria, Marco Polo Suite | 8.30 a.m. Registration 9.00 a.m. Welcome and key note speaker Mr. Joseph Bartlett, Of Counsel, Fish & Richardson P.C, "Global VC Trends in investments and partnership", Power-pitches, followed by company presentations and Q&A, 11.00 a.m. – 12.30 Light Buffet Lunch l | Jon Egilsson, Executive Vice President Seed Forum International Foundation Tel.: +1 214 556 6575 http://www.seedforum.org/jon@seedforum.org |
| November 1, 2007 | 8:30 – 12 noon | Presentation Room, 404 Wyman St., Waltham, MA, Forefront Center, www.forefrontcenter.com. | VC Experts | VC Experts Roundtable Presenters: Bryan Pearce of Ernst & Young, Gene Barton of Fish & Richardson Joe Bartlett of Fish & Richardson | J. Michael Ostendorff Director of Sales & Marketing VC Experts, Inc. 2031 Kings Hwy, Shreveport, LA 71103 Phone: 646-290-9254 Email: michael@vcexperts.com |
| November 14-15, 2007 | 11/15/07 3:00 – 4 PM | Flatotel in New York | FRA | Exploring Valuation and Pricing of Private Equity | Katie Matyus | Conference Producer Financial Research Associates, LLC 831.465.2293 | kmatyus@frallc.com |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| November 28-30, 2007 | 11/29/07 4:35-5:15 | Hyatt Regency, Boston, MA | IIR | Private Equity Fund Formation Management External Influence on Private Equity Deal Terms: The costs, benefits and implication of employee unions and other external influences on Private Equity fund formation | Ms. Daryl Betancourt Conference Coordinator Institute for International Research 708 Third Ave., 2nd Floor New York, NY 10017 212.661.3500 x3040 DBetancourt@IIRUSA.com |
| | | | **2006** | | |
| January 23, 2006 | 1/23/06 – 8 AM to noon | British Consulate, 845 3rd Avenue, New York City | The Alternative Investment Market (AIM), London The World's Most Successful Market for Growth Companies | Panel discussion Moderator: Joseph W. Bartlett, Of Counsel, Fish & Richardson P.C., New York | Aurelia Pretorius Business Development Executive SJ Berwin LLP Direct Line: +44 (0)20 7533 2060 Email:aurelia.pretorius@sjberwin.c o.uk |
| January 26, 2006 | 1/26/06-8 AM to 12 noon | Westin Hotel, Boston | The Alternative Investment Market (AIM), London The World's Most Successful Market for Growth Companies  Westin Hotel, Waltham: 70 3rd Avenue, Waltham, MA. Tel: (781)-290-5601 | Panel discussion Moderator: Joseph W. Bartlett, Of Counsel, Fish & Richardson P.C., New York | Oscar Jazdowski Silicon Valley Bank  Tel #  617-630-4126 Fax # 617-969-4395 ojazdows@svbank.com  One Newton Executive Park Newton, MA. 02462  www.svb.com |
| March 17, 2006 | March 17, 2006 | Ohio State University | Michael E. Moritz College of Law The Ohio State University 55 West 12th Avenue Columbus, OH 43210-1391 | Participate in legal panel on "Why some VC communities work and others don't" Dale | Dale Oesterle [Oesterle.4@osu.edu |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| March 30, 2006 | March 30, 2006 11:00 A< | Mike Segal Associates, The Yale Club, New York City | PRIVATE EQUITY 2006 Emerging Growth & Venture Forum | The Liquidity Dilemma "Alternative Strategies to Traditional IPO Exits" Find out what issues are preventing IPO exits for venture-backed companies and the liquidity alternatives that may be available through the AIM (Alternative Investment Market - A subsidiary of the London stock Exchange) or the | |
| May 22, 23, 2006 | May 22, 2006 2:45-3:30 | Financial Research Associates, LLC | 3rd Annual Effectively Administering Private Equity Funds. May 22-23, 2006. New York | Complimentary "White Paper" on SPACS The Impact of New Accounting and Deferred Compensation Rules on Compensation Strategies Changing Landscape of Executive compensation Compensation Data/Report Speakers: Howard Bertraum, Partner O'MELVENEY & MYERS LLP Scott A. Webster, Partner GOODWIN PROCTER Joseph W. Bartlett, Of Counsel FISH & RICHARDSON Executive search firm perspective: | Karin van Rooyen Conference Director Financial Research Associates kvrooyen@frallc.com 831-465-2282 |
| October 23-25, 2006 | | Marriott Fisherman's Wharf, San Francisco. | Institute for International Research | Venture Capital & Private Equity Tax Practices | Becky Swenson Conference Coordinator Institute for International Research 708 Third Avenue, 2nd Floor, New York, NY 10017 Tel: (212) 661-3500 x 3189 Fax: (212) 661-5952 Becky Swenson BSwenson@IIRUSA.com |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| Nov. 14 | 8:00 A.M. - 12:00 P.M. Continental breakfast will be provided. | Bloomberg Offices, located at 731 Lexington Avenue. | 2006 4th Quarter Roundtable (New York) | Date/Time: Tuesday, November 14th, 2006 from Location: New York, NY. Attendance: In addition to our speakers, 50 general partners at leading venture capital firms and other members of the venture community will participate. Registration: Please note that this event is for GPs, LPs, principal investors, investment bankers, and placement agents only. | Jill Ozovek Conference Director IIR 212.661.3500 X3023 |
| Nov. 14-15, 2006 | **11/14/06** 9:00 AM | Beekman Tower, New York City. | IIR | Private Equity Fund of Funds Summit - Effectively Identifying and Engaging Emerging Global Markets<br><br>9:00    Develop Effective Communication Between your Fund of Funds and Investors<br>·    Identify, screen and manage potential investors<br>·    Facilitate new investor relationships and maintain appropriate levels of disclosure<br>·    Create a clear analysis and explanation of the fee structure for investors<br>·    Pinpoint methods to convey interim performance to your investors<br>·    Establishing relevant metrics for communicating portfolio status | Cara Friedman Conference Coordinator Institute for International Research 708 Third Avenue New York, NY 10017 tel: (212) 661-3500 ext. 3219 fax: (212) 661-5952 cfriedman@iirusa.com |
| November 16, 2006 | 2:00 PM | The Yale Club, New York City | Private Equity XVIII 2006 Year-End Venture Forum | New York's Premier Investment Conference for Private Equity and Venture Capital Firms Introducing America's Next Generation of Entrepreneurship and Technology THE YALE CLUB NEW YORK Grand Ballroom - Thursday, 12 Noon, November 16th, 2006 Where Capital and Opportunity Connect | 800 847 6124 MIKE.SEGAL@VERIZON.NET |

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
jbartlett@sonnenschein.com

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| November 30, 2006 | NYSE building or Bloomberg Headquarters | New York Stock Exchange NYSE Arca | **Tentative/Draft Agenda** NYSE Arca THE NYSE FALL CONFERENCE ON THE CAPITAL MARKETS A half-day seminar addressing liquidity in the public capital markets and the NYSE-Arca platform. 8:00 -- 9:00 a.m. - Continental Breakfast Welcome Speaker: Jerry Putnam or John Thain or Cathy Kinney, (This is either a welcome/ brief comments or keynote); followed by 2 or 3 panels on the public markets. **9:00 -- 10:00 a.m. Panel 1: Markets "The Evolving Capital Markets: New Opportunities for Liquidity in the U.S. and Abroad"** Discussion among VCs, investment bankers and private equity funds - Joe Bartlett, VC Experts, (Chair) - VCs, (Dennis Purcell, Senior Managing Director, Aisling Capital; Blair Flicker, General Counsel, Insight Ventures) - Investment Bankers, (i.e., Clint Gartin, Vice Chair, Morgan Stanley) - Private Equity firms (i.e., Bob Calhoun, Managing Director, Monitor Clipper, Boston). Others to consider: Cowen, Bain, and Weisel Partners 10:00-10:15 Break | Michael Whitehouse, mwhitehouse@optonline.net |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| | | | | 11:00 – 12:15 p.m. Panel 3: Regulatory Issues<br>Do Rules of Fair Play Get in the Way of Doing Business?<br>A Look at Sarbanes-Oxley and Other Regulatory Statutes<br>- Is more transparency truly driving companies away from US Markets or are these rules merely a foil allowing foreign markets to capitalize?<br>- Do US capital market rules and regulations actually provide more liquidity and fluidity to the international marketplace?<br>- Noted academic: Jeff Sonnenfeld (Chair), Yale School of Management<br>- Ira Millstein, Attorney & noted governance authority, Member, Treasury's Commission on Competitive Capital Markets<br>- SEC Commissioner (i.e., Paul Atkins or Cynthia Glassman)<br>- CEO of a major accounting firm<br>- Member of the US Congress or the Senate, such as Christopher Shays,<br>* If re-elected (R-CT) Member, House Committee for Financial Services.<br>12:30 – 1:30 p.m. Lunch & Keynote<br>An NYSE luncheon speaker: Jerry, John or Cathy keynoting. If we opt not to have the SEC on a panel, we could invite Christopher Cox to lunch, especially if one of the senior NYSE officers has already keynote at addressed the group during breakfast. | |
| November 30,<br>December 1, 1006 | 11/30/06<br>3:15-4:00 PM | Princeton Club,<br>New York City | Financial Research<br>Associates, LLC | 5th Annual, Valuation of Hard-to-Value Securities<br>and Portfolios<br>Mitigating Operational Risk Associated with the<br>Valuation Process | Donal Murphy<br>Conference Producer<br>Financial Research Associates, LLC<br>343 Soquel Avenue, Suite 334<br>Santa Cruz, CA 95062<br>Tel: (831) 465-2292<br>Fax: (831) 465-2290<br>www.frallc.com<br>dmurphy@frrallc.com<br>Joseph W. Bartlett<br>Jesse Reyes |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| December 5-6, 2006 | 12/6/06 3:50 pm | Hilton Boston Back Bay, MA. | IIRUSA | Private Equity Fund Formation conference | Kristy Perkins Conference Director, IIR USA 708 Third Avenue, NY, NY 10017 212-661-3500 ext. 3186 kperkins@iirusa.com |
| | | | | **2005** | |
| January 27-28, 2005 | January 28, 2005 | Madison Square Garden | Silicon Alley Entrepreneurs Club | 03:00 PM - 04:00 PM<br><br>PANEL VIII  The Exit: M&A, IPO & other options<br><br>TECHNOLOGY Global Venture Congress™ 2005 Madison Square Garden How is Panel VIII: The Exit: M&A, IPO & other Options on Jan 28th | Dr. Gyan Parida [mailto:gparida@saedub.com] |
| March 10, 2005 | JOE NOT participating | | Bloomberg/ VC Experts/ Fish & Richardson | The topic of the first VC Roundtable is current trends and issues in venture capital.  PWC and F&R will both present.  From F&R, Roger Feldman, Chip Korn and John Gagel will present a panel on the intellectual property due diligence process in 'green goods' ... M&A; IPO; and Private Equity | This is a great opportunity to highlight Fish & Richardson's unique and unmatched expertise at the intersection of corporate and intellectual property law to an ideal audience: the venture capital community. |
| Mach 29, 2005 | Joe NOT participating | Grand Hyatt New York, Park Avenue at Grand Central Station | | | F&R sponsored New York Biotechnology Annual Meeting |
| May 19-20, 2005 | May 19, 2005-1:15 PM | The Harvard Club | Financial Research Associates, LLC | Joe Bartlett moderates a panel on Thursday, May 19th, at 1:15 "Attracting the Right Talent by Understanding Executive Compensation" | www.frallc.com Donal Murphy dmurphy@frallc.com |

17589128

**Joseph W. Bartlett**
**Sonnenschein Nath & Rosenthal LLP**
**212 768 5353**
**jbartlett@sonnenschein.com**

| Dates | Date/Time for participation | Location | Sponsor | Topics/Position | Contact/Remarks |
|---|---|---|---|---|---|
| October 17-18, 2005 | October 17th all day | New York City at the Princeton Club | Financial Research Associates, LLC | The Private Equity Business Operations Forum legal strategies, deal innovations, & fundraising success" | Joni White [mailto:jwhite@frallc.com] Conference Producer Pharmaceutical Education Associates 831.465.7412 jwhite@pharmedassociates.com sent Private Equity Bulletin [30213949.2] |
| November 1, 2005 8 AM to 1 PM | 11/1/05-11:40- | 845 Third Avenue, New York City (British Consulate) | The Alternative Investment Market (AIM), London The World's Most Successful Market for Growth Companies | Panel discussion Moderator: Joseph W. Bartlett, Of Counsel, Fish & Richardson P.C., New York | Aurelia Pretorius Business Development Executive SJ Berwin LLP Direct Line: +44 (0)20 7533 2060 Email:aurelia.pretorius@sjberwin.co.uk |

17589128